B1040 (FORM 1040) (12/15)

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

| PLAINTIFFS | DEFENDANTS |
|---|---|

| **ATTORNEYS** (Firm Name, Address, and Telephone No.) | **ATTORNEYS** (If Known) |
|---|---|

| **PARTY** (Check One Box Only)<br>□ Debtor    □ U.S. Trustee/Bankruptcy Admin<br>□ Creditor    □ Other<br>□ Trustee | **PARTY** (Check One Box Only)<br>□ Debtor    □ U.S. Trustee/Bankruptcy Admin<br>□ Creditor    □ Other<br>□ Trustee |
|---|---|

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
□ 11-Recovery of money/property - §542 turnover of property
□ 12-Recovery of money/property - §547 preference
□ 13-Recovery of money/property - §548 fraudulent transfer
□ 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
□ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
□ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
□ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
□ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
□ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
□ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
□ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(6) – Dischargeability (continued)**
□ 61-Dischargeability - §523(a)(5), domestic support
□ 68-Dischargeability - §523(a)(6), willful and malicious injury
□ 63-Dischargeability - §523(a)(8), student loan
□ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
□ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
□ 71-Injunctive relief – imposition of stay
□ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
□ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
□ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
□ 01-Determination of removed claim or cause

**Other**
□ SS-SIPA Case – 15 U.S.C. §§78aaa *et.seq.*
□ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| □ Check if this case involves a substantive issue of state law | □ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| □ Check if a jury trial is demanded in complaint | Demand  $ |

Other Relief Sought

B1040 (FORM 1040) (12/15)

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR | BANKRUPTCY CASE NO. | |
| DISTRICT IN WHICH CASE IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| **RELATED ADVERSARY PROCEEDING (IF ANY)** | | |
| PLAINTIFF | DEFENDANT | ADVERSARY PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF) | | |
| DATE | PRINT NAME OF ATTORNEY (OR PLAINTIFF) | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Northwest Capital Holdings LCC, | ) | Bankruptcy No. 20-05334 |
| | ) | |
| Debtor. | ) | Honorable Jack B. Schmetterer |
| | ) | |
| | ) | |
| Northwest Capital Holdings LCC, | ) | |
| | ) | Adv. Pro No. _____ |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| Midland States Bank, | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |

### CLAIM OBJECTION AND COMPLAINT TO DETERMINE
### EXTENT AND AMOUNT OF BANK'S CLAIM AND LIEN AND TO
### EQUITABLY SUBORDINATE BANK'S CLAIM

Northwest Capital Holdings LLC (the "Debtor"), as debtor and debtor in possession in the captioned proceeding under Chapter 11 of title 11, United States Code (11 U.S.C. §§101, et. seq., the "Bankruptcy Code"), states as follows for its Complaint to determine the extent and amount of Midland State Bank's (the "Bank") claim and mortgage lien upon the Debtor's property, to equitably subordinate any allowed claim of the Bank and for its Objection to Claim Number 3 filed by the Bank.

1. The Debtor brings this claim objection proceeding to obtain a determination as to the value of the collateral that secures the Bank's claim and to obtain a determination as to the amount owed to the Bank. There is a dispute as to the value of the collateral securing the Bank's claim in light of the conflicting

1

opinions and reports on such matters.  There also is a lack of clarity and at this time there is a dispute as to the amount the Bank is owed.  This is particularly true because the Bank has not provided sufficient information as to the specific elements of its claim and its application of payments.  The Debtor further seeks an order equitably subordinating the Bank's claim based upon its misconduct vis-à-vis the Debtor, as detailed below.

## II.   <u>Background</u>

2. The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334 and 157.  This is a core proceeding pursuant to one or more of the provisions of 28 U.S.C. § 157(b), including  §§ 157(b)(2)(A), (B), (C), (K) and (O).

3. The statutory predicates for this action consist of, among other provisions,11 U.S.C. §§ 502,  506 and 510(c) and 28 U.S.C. 2201(a).

4. The matter is brought as an adversary proceeding in accordance with Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") 3007(b) and 7001(2) and (8).

## III.   <u>Parties</u>

5. The Bank is an Illinois state  chartered bank regulated by the Federal Deposit Insurance Corporation with offices and branches in Illinois.

6. The Debtor is an Illinois limited liability company that owns and operates a 220-unit apartment complex in Springfield, Illinois (the "Property").

7. The Bank has alleged in a state court foreclosure complaint that it filed against the Debtor in late January 2020, that on or about February 24, 2016, the Debtor borrowed the principal sum of $8,600,000.00 from the Bank and granted the Bank a mortgage on the Property to secure the payment of those funds.

8. Since 2016, the Debtor has transferred certain funds to the Bank as additional collateral to secure the amounts the Bank claims it is owed, and did so

with the expectation and belief that some of those funds would be available to make improvements to the Property and to enhance the value of the Property.

9. The Bank has asserted in the foreclosure action that as of January 24, 2020, the Debtor owed it $8,068,343.98, together with interest late fees, and attorneys' fees.

10. On February 27, 2020, the Debtor filed the captioned case under Chapter 11 of the Bankruptcy Code.  The Debtor is operating as a debtor in possession.

11. On May 8, 2020, the Bank filed proof of claim number 3 (the "POC") against the Debtor's bankruptcy estate in the amount of $8,115,226.13.  A copy of the POC is attached as Exhibit 1.

12. The Bank asserts in its POC that it is owed principal of $7,954,472.83; and that an additional $127,397.99 is owed as interest; an additional $16,206.20 in late charges is owed; $30,170.70 is owed for a renewal fee; $800 is owed for a lien search; and $23,230.38 is owed in attorneys' fees and each of those sums, less a $37,052.37 escrow credit, accounts for the total amount owed.

13. The Bank has not itemized the attorneys' fees it claims it is owed, the basis for its renewal  fees nor the late charges.  The Bank also has not included with the POC a loan history ledger showing the inflows of payments and the accruals of interest, fees and other items.

14. The Bank further asserts the value of the property securing its claim is $7,912,553.08 and that it is the holder of an unsecured claim in the amount of $202,637.05.

15. The Bank asserts that the Property itself is worth $7,550,000 million.  The Bank also asserts it is holding additional collateral of approximately $362,553.08, which is the difference between the amount of its asserted secured claim and the asserted value of the Property.

## COUNT 1: Declaratory Judgment
## as to the Extent of Bank's Lien

16. The Debtor incorporates into Count 1 of this complaint all of the allegations set forth above as if set forth below.

17. Section 506(a) of the Bankruptcy Code provides that a claim is a secured claim to the extent of the creditors interest in property of the estate.

18. The Bank asserts that it is an under-secured creditor because the value of the Property is approximately $7,550,000 million.

19. The Debtor believes the Property is worth in excess of $10 million and that the Bank's statement of value is based upon a defective capitalization rate of 8.75%. The Debtor further believes, based upon the opinion of its expert, that an appropriate capitalization rate is around 7% to 7.25% and that an appropriate capitalization rate yields a value of more than $10 million for the Property.

20. An actual controversy has arisen regarding the extent of the Bank's secured claim.

21. Pursuant to 28 U.S.C. §§ 2201 and 2202 and Fed. R. Bankr. P. 7001(2), the Debtor is entitled to a binding declaration that the Bank's claim is fully secured and that the Property is worth in excess of $10 million.

WHEREFORE, for Count 1 of its Complaint, the Debtor requests that the Court enter an Order (a) determining the value of the Property, (b) determining the extent of the Bank's secured claim in light of the value of the Property and the other collateral securing the Bank's claim, and (c) providing such other and further relief as is just and proper.

## COUNT 2: Declaratory Judgment
## and Accounting as to Extent of the Bank's Claim

22. The Debtor incorporates into Count II of this complaint all of the allegations set forth above as if set forth below.

23. The Debtor has transferred funds to the Bank at various times, including in 2019. Such amounts are greater than $500,000.

24. The loan documents attached to the POC indicate that at least $50,000 was to be maintained in a Cash Reserve Account and $750,000 was to be maintained in a Money Market Account, although a lesser sum was advanced into the Money Market Account.

25. The Bank has not fully indicated how it used, applied or maintained the funds that the Debtor posted as additional collateral, including any funds in the Money Market Account and the Cash Reserve Account.

26. The POC only reflects a partial application of the funds that have been advanced. On information and belief, the Bank presently asserts that the funds it is holding as additional collateral are equal to the difference between its secured claim and the $7,550,000 value that it has ascribed to the Property. Other than that, the Bank has not indicated how it applied the payments made to it or how it accounted for the additional collateral provided.

27. The Debtor believes there is a lack of clarity as to the amount of funds the Bank is holding that should be considered additional collateral, and there is a lack of clarity as to the Bank's calculation of the total amount it is owed either in principal, interest, fees or expenses.

28. The Debtor believes that an actual controversy exists as to the extent of the collateral the Bank is holding and as to the calculation of the Bank's claim.

29. The Debtor also is entitled to an accounting of the funds the Bank has received since the inception of the loan in 2016. That accounting should include all payments and transfers of property.

WHEREFORE, for Count 2 of its Complaint, the Debtor requests that the Court enter an Order (a) directing the Bank to account for all payments and transfers received from the Debtor or in connection with its loan to the Debtor, (b) disallowing the Bank's claim to the extent the amount asserted is not due and

owing considering the rights and obligations of the parties and applicable law, and
(c) providing such other and further relief as is just and proper.

## COUNT 3: Disallowance of Claim based upon Inadequacy of Documentations

30. The Debtor repeats and realleges in this Count of this Complaint
all of the other allegations set forth herein, as if fully set forth below, except to the
extent such allegations are inconsistent with the allegations in this Count.

31. The POC fails to satisfy the Bank's prima facie burden regarding
the extent of the secured portion because the Bank does not include with the POC
any indication of property value.

32. The POC fails to satisfy the Bank's prima facie burden regarding
the amount of the claim because the Bank does not include with the POC any
information regarding the method for calculating the claim, the basis for the
amounts asserted, and the manner in which payments were applied.

WHEREFORE, for Count 3 of its Complaint, the Debtor requests the entry of
an order disallowing the Bank's claim as filed and providing such further relief as is
just and proper.

## COUNT 4:Equitable Subordination

33. The Debtor repeats and realleges in this Count of this Complaint
all of the other allegations set forth herein, as if fully set forth below, except to the
extent such allegations are inconsistent with the allegations in this Count.

34. This Count is plead in the alternative to any other counts that are
inconsistent with the allegations herein.

35. At all times relevant to the allegations set forth herein, § 510(c) of
the Bankruptcy Code provides that:

> (c) Notwithstanding subsections (a) and (b) of this section,
> after notice and a hearing, the court may--(1) under
> principles of equitable subordination, subordinate for

> purposes of distribution all or part of an allowed claim to
> all or part of another allowed claim or all or part of an
> allowed interest to all or part of another allowed interest;
> or (2) order that any lien securing such a subordinated
> claim be transferred to the estate.

11 USCS § 510(c).

36. Equitable subordination is proper under § 510(c) if (a) a creditor engaged in some type of inequitable conduct, (b) the misconduct resulted in injury to other creditors or gave the creditor some unfair advantage, and (c) subordination is not inconsistent with other provisions of the Bankruptcy Code.

37. When a creditor is not an insider or fiduciary, equitable subordination requires a showing of gross and egregious conduct such as fraud, spoliation or overreaching.

38. The Bank's conduct with respect to the Debtor is sufficient to equitably subordinate the Bank's claim.

39. For example, the Bank commissioned and/or demanded Property appraisals that they knew, or should have known, were not accurate or in accordance with appraisal standards and they did so in order to deceive the Debtor and others.

40. In April of 2019, the Bank sent an email to the Debtor stating: "Just an FYI. I heard from our Appraisal Department. The appraisal from W. H. Heyden & Associates came in at $10,100,000.00. It still has to go through our review process where there could be some adjustments. That should only take a couple of days."

41. Although the appraiser determined the Property was worth $10.1 million in March of 2019, after the Bank's "review process" the value was reduced to $8,900,000. The Bank also submitted the same $8,900,000 appraisal to the Court in connection with its motion for stay relief.

42. The Bank also demanded additional collateral from the Debtor based, in part, upon the Bank's false assertion that there was a sharp drop in the value of the Property.

43. The Bank also used the false narrative as to the Property's value to prevent the Debtor from using funds to make capital improvements that were necessary to increase occupancy and thus the value of the Property.

44. Since the later part of 2019 and into the early part of 2020, the Bank forced the Debtor into a Hobson's' Choice:  pay the full amount of the mortgage to the Bank and let the Property and its value deteriorate, or abate mortgage payments and plow the revenue into the Property so that units could be upgraded, new tenants attracted and value enhanced.

45. The Bank also acted inequitably in connection with the foreclosure action by seeking an ex parte order authorizing a receiver to take possession of the Property.  As a result of that ex parte order the Bank's agent trespassed on the Debtor's Property and used that access to manufacture an inaccurate and misleading report regarding the condition of the Property.  The State Court vacated the receiver order after it learned it had been entered without proper notice to the Debtor.

46. The foregoing actions of the Bank constitute the type of fraud and over-reaching that warrant equitable subordination of its claim.

47. In light of the Bank's conduct, the Bank's claim should be equitably subordinated to the claims of all other creditors.

48. Subordinating the Bank's claim is consistent with the Bankruptcy Code.

WHEREFORE, for Count 4 of its Complaint, the Debtor requests that the Court enter an Order equitably subordinating the Bank's claim to the claims of all other creditors, and that the Court grant such other and further relief as is just and proper.

Respectfully submitted.

Dated: July 1, 2020

**Northwest Capital Holdings LLC**
By: /s/ William J. Factor
One of Their Attorneys

William J. Factor (6205675)
Jeffrey K. Paulsen (6300528)
**FACTORLAW**
105 W. Madison Street, Suite 1500
Chicago, IL 60602
Tel:      (312) 878-6976
Fax:      (847) 574-8233
Email: wfactor@wfactorlaw.com
        jpaulsen@wfactorlaw.com

Exhibit 1

**Fill in this information to identify the case:**

Debtor 1    Northwest Capital Holdings, LLC

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court for the:  Northern District of Illinois

Case number    20-05334

## Official Form 410

# Proof of Claim
04/19

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.**

| Part 1: | Identify the Claim |
|---|---|

| | | |
|---|---|---|
| 1. | Who is the current creditor? | Midland States Bank |
| | | Name of the current creditor (the person or entity to be paid for this claim) |
| | | Other names the creditor used with the debtor _____ |
| 2. | Has this claim been acquired from someone else? | ☑ No<br>☐ Yes.  From whom? _____ |

| | | Where should notices to the creditor be sent? | Where should payments to the creditor be sent? (if different) |
|---|---|---|---|
| 3. | Where should notices and payments to the creditor be sent?<br><br>Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | Brandon R. Freud/Chuhak & Tecson, P.C.<br>Name<br>30 S. Wacker Dr., Suite 2600<br>Number      Street<br>Chicago            IL        60062<br>City                State        ZIP Code<br><br>Contact phone 312-201-4201<br><br>Contact email bfreud@chuhak.com | Name<br><br>Number        Street<br><br>City              State      ZIP Code<br><br>Contact phone<br><br>Contact email |
| | | Uniform claim identifier for electronic payments in chapter 13 (if you use one):<br><br>_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | |

| | | |
|---|---|---|
| 4. | Does this claim amend one already filed? | ☑ No<br>☐ Yes.  Claim number on court claims registry (if known) _____    Filed on _____<br>                                                                                                  MM / DD  / YYYY |
| 5. | Do you know if anyone else has filed a proof of claim for this claim? | ☑ No<br>☐ Yes.  Who made the earlier filing? _____ |

| **Part 2:** | **Give Information About the Claim as of the Date the Case Was Filed** |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☐ No

☑ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor:  0   8   5   3

**7. How much is the claim?**   $ _____8,115,226.13_____ . **Does this amount include interest or other charges?**

☐ No

☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

money loaned

**9. Is all or part of the claim secured?**

☐ No

☑ Yes. The claim is secured by a lien on property.

**Nature of property:**

☑ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.

☐ Motor vehicle

☑ Other. Describe:   and pledged deposit accounts held at Midland States Bank

**Basis for perfection:**   recorded mortgage

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

| | |
|---|---|
| **Value of property:** | $   7,912,553.08 |
| **Amount of the claim that is secured:** | $   7,912,553.08 |
| **Amount of the claim that is unsecured:** | $   202,637.05  (The sum of the secured and unsecured amounts should match the amount in line 7.) |

**Amount necessary to cure any default as of the date of the petition:**   $   8,115,226.13

**Annual Interest Rate** (when case was filed)  5.68 %

☑ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.**   $ _____

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

| 12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)? | ☑ No | |
|---|---|---|
| A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☐ Yes. *Check one:* | **Amount entitled to priority** |
| | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| | ☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| | ☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | $_____ |
| | * Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment. | |

---

**Part 3:  Sign Below**

| **The person completing this proof of claim must sign and date it. FRBP 9011(b).** | Check the appropriate box: |
|---|---|
| If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is. | ☐ I am the creditor.<br>☑ I am the creditor's attorney or authorized agent.<br>☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.<br>☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005. |
| **A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.** | I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.<br><br>I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.<br><br>I declare under penalty of perjury that the foregoing is true and correct. |

Executed on date  05/07/2020
  MM / DD / YYYY

/s/ Brandon R. Freud
  Signature

**Print the name of the person who is completing and signing this claim:**

| Name | Brandon R. Freud | | |
|---|---|---|---|
| | First name | Middle name | Last name |
| Title | Attorney | | |
| Company | Chuhak & Tecson, P.C. | | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. | | |
| Address | 30 S. Wacker Dr., Suite 2600 | | |
| | Number  Street | | |
| | Chicago | IL | 60606 |
| | City | State | ZIP Code |
| Contact phone | 312-201-4201 | Email | bfreud@chuhak.com |

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| NORTHWEST CAPITAL HOLDINGS, LLC, | ) | 20-05334 |
| | ) | |
| | ) | Honorable Jack B. Schmetterer |
| Debtor. | ) | |

## STATEMENT UNDER RULE 3001(c)(2)(A)

As of the petition of February 27, 2020, the following are the amounts due and owing on the promissory note dated February 24, 2016 in the principal amount of $8,600,000, as modified, made by Debtor payable to the order of Midland States Bank:

| | |
|---|---|
| Principal: | $7,954,472.83 |
| Interest: | $127,397.99 |
| Late charges: | $16,206.60 |
| Renewal fee: | $30,170.70 |
| Lien search: | $800.00 |
| Attorneys' fees: | $23,230.38 |
| Escrow balance: | ($37,052.37) |
| Total: | $8,115,226.13 |

4811-6636-7420.v1.31759.73172

# PROMISSORY NOTE

$8,600,000.00                                                           February 24, 2016

     1.     <u>PROMISE TO PAY; TERM; MATURITY</u>. FOR VALUE RECEIVED, the undersigned, NORTHWEST CAPITAL HOLDINGS, LLC, an Illinois limited liability company (herein, "***Maker***"), with an address of 2000 Galena Boulevard, Suite 200, Aurora, Illinois 60506, hereby promises to pay to the order of MIDLAND STATES BANK, an Illinois banking corporation (together with its successors or assigns or any subsequent legal holder of this Note, "***Lender***"), in immediately available funds in lawful money of the United States of America, at 100 N. Chicago Street, Joliet, Illinois 60432 (or such other address as designated by Lender in writing from time to time), the principal sum of EIGHT MILLION SIX HUNDRED THOUSAND AND NO/100 DOLLARS ($8,600,000.00) (or so much thereof as may be advanced against this Note as hereinafter provided) together with interest on the unpaid principal balance of this Note from day to day outstanding at the Base Rate as set forth in the Loan Agreement (defined below), or, where applicable at the Default Rate (defined in the Loan Agreement), with any change in such rate to be automatically and immediately effective on the date of any change in such rate, it being understood that such rate may not be Lender's best or lowest rate. Interest shall accrue on the principal amount actually advanced hereunder, from and after the date of such advance.

     Monthly payments of principal and accrued interest shall be due and payable to Lender beginning on the first (1st) day of the month following the date of this Note and continuing on the first (1st) day of each month thereafter, through and including the maturity of this Note, whether by acceleration or otherwise, with a balloon payment due after twenty four (24) months of the date of this Note of all unpaid principal, interest, fees, charges, expenses, and other amounts and sums payable by Maker to Lender under this Note and the Loan Agreement (including, without limitation, all Liabilities (defined in the Loan Agreement)), which monthly installments and balloon payment the undersigned promises to pay as the same fall due. The monthly principal and interest payments shall be based on a three hundred (300) month amortization period.

     Unless earlier accelerated, in all events and under all circumstances the Note matures upon the earlier of the following to occur, at which time all unpaid principal, interest, fees, charges, expenses, and other amounts and sums payable by Maker to Lender under the Note and the Loan Agreement (including, without limitation, all Liabilities) shall become immediately due and payable in full to Lender without notice or demand:

          (i)     twenty four (24) consecutive months from the date of this Note; or

          (ii)     any sale, assignment, liquidation, bankruptcy, receivership, transfer or conveyance of all or any portion of Borrower or Guarantor (defined in the Loan Agreement) or any Collateral (defined in the Loan Agreement); or

          (iii)     any foreclosure of (including any sale thereunder of), or any deed in lieu of foreclosure or, or any other sale, assignment, transfer, or conveyance of any Collateral.

     Maker acknowledges that these calculation methods may result in a higher effective interest rate than the numeric rate stated in this Note, and Maker agrees to these calculation methods, notwithstanding any other provisions of this Note. For purposes of making payments hereunder, but not for purposes of calculating accrued interest, if a payment date in a given month shall not be a business day (defined in the Loan Agreement), then the payment date for such month shall be the following business day.

1

This Note is given to Lender as in connection with the Loan Agreement dated as of even date herewith between Maker and Lender (as the same may be amended, modified or restated from time to time, the "***Loan Agreement***"). The funds drawn under this Note shall be exclusively used for the refinance of the Assignment Transaction (defined in the Loan Agreement) pursuant to the terms and conditions of the Loan Agreement and in no other amounts, and for no other uses or purposes, whatsoever without the express prior written consent of Lender in its sole and absolute discretion.

The terms for reimbursement of amounts drawn on this Note are set forth in the Loan Agreement. Reference is hereby made to the Loan Agreement for additional terms and conditions to which this Note is subject. This Note evidences a loan under which Maker may borrow up to the maximum principal amount of this Note.

The annual interest rate for this Note is calculated on the basis of a year of 360 days and the actual number of days elapsed; that is, by applying the ratio of the annual interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding. Maker will pay Lender at Lender's address shown above or at such other place as Lender may designate in writing. Unless otherwise agreed in the Loan Agreement or required by applicable law, payments will be applied first, to fees, charges and expenses of or due Lender then due and payable, second, to accrued unpaid interest, then, to principal.

In the event that any installment or installments under this Note are not paid within five (5) days of when due, Maker shall pay to the holder of this Note, in addition to any interest at the Default Rate, if applicable, a late charge equal to the sum of One Hundred and 00/100 Dollars ($100.00) per day delinquent. Maker acknowledges that the holder will incur costs in such event, the exact amount of which will be extremely difficult to ascertain and that such late charge represents a fair and reasonable estimate of the costs the holder will incur by reason of late payment by Maker. Acceptance of such late charge by the holder of this Note shall in no event constitute a waiver of Maker's default with respect to such overdue amount, nor prevent the holder of this Note from declaring a default and exercising any of the other rights and remedies granted to the holder hereunder.

2.    PREPAYMENT. Maker may prepay the outstanding principal balance of this Note in accordance with the terms and conditions of the Loan Agreement.

3.    DEFAULT. The covenants, terms and conditions concerning default and Events of Default are defined and set forth in the Loan Agreement and are incorporated herein by reference.

4.    SECURITY. This Note is secured by the Loan Agreement, the Mortgage (defined in the Loan Agreement), the Guaranty (defined in the Loan Agreement), the Security Agreement (defined in the Loan Agreement), the Collateral Assignment (defined in the Loan Agreement), the Financing Statement (defined in the Loan Agreement), and all other accounts, documents, instruments and agreements securing, guaranteeing, and/or evidencing the indebtedness of Borrower and Guarantor (defined in the Loan Agreement) (and any other guarantors, obligors and/or assignors) of the Loan (defined in the Loan Agreement), the Reimbursement Obligations (defined in the Loan Agreement) and the Liabilities to or for the benefit of Lender and/or which are made, granted and/or executed in connection herewith or therewith (collectively, the "***Security Instruments***"). Reference to the Security Instruments is hereby made for rights of Lender to accelerate the maturity of the indebtedness evidenced by this Note and/or the Loan Agreement and for Maker and/or Guarantor and/or any other guarantors or obligors to perform certain other obligations under this Note and/or any of the Security Instruments, at law or in equity, in addition to the rights stated below in Paragraph 5 all of which are incorporated into this Note by reference.

2

5. <u>LENDER'S RIGHTS</u>. Upon the occurrence of an Event of Default as defined in and pursuant to the Loan Agreement, Lender may, among other rights and remedies set forth in the Loan Agreement, declare the entire unpaid principal balance of this Note and all accrued unpaid interest and other fees and charges due Lender immediately due, without notice, and then Maker will pay that amount. Upon the occurrence of an Event of Default, including failure to pay this Note in full upon final maturity, if permitted under applicable law, the interest rate on this Note will increase to the Default Rate. The interest rate will not exceed the maximum rate permitted by applicable law. Lender may hire or pay someone else to help collect this Note if Maker does not pay. Maker also will pay Lender that amount. This includes, subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. If not prohibited by applicable law, Maker also will pay any court costs, in addition to all other sums provided by law. If there is a lawsuit, Maker agrees to the terms and conditions provided in the Loan Agreement including, without limitation, those provisions concerning jurisdiction and venue of any suit. Lender and Maker have waived the right to any jury trial in any action, proceeding, or counterclaim brought by either Lender or Maker against the other as provided in the Loan Agreement. All provisions of this Note are binding upon and are enforceable by or against Maker and Maker's legal representatives, successors and assigns, and all guarantors and obligors of this Note.

6. <u>REPRESENTATIONS AND WARRANTIES</u>. Maker has made certain representations and warranties in the Loan Agreement, which are incorporated herein by reference.

7. <u>COVENANTS</u>. Maker has made certain covenants with Lender in the Loan Agreement, which are incorporated herein by reference.

8. <u>GOVERNING LAW; CHOICE OF FORUM; SERVICE OF PROCESS; JURY TRIAL WAIVER</u>. The provisions governing this Note pertaining to governing law, choice of forum, service of process, and jury trial waiver are set forth in the Loan Agreement, which are incorporated herein by reference.

9. <u>HEADINGS</u>. The headings of this Note are inserted for convenience of reference only and shall not be applied in construing the provisions of this Note.

10. <u>INVALIDITY</u>. In case any one or more of the provisions contained in this Note shall for any reason be held to be invalid, illegal, or unenforceable in any respect, such invalidity or unenforceability shall not affect any other provisions hereof, and this Note shall be construed as if such invalid, illegal, or unenforceable provision(s) had never been included.

11. <u>GENERAL PROVISIONS</u>. Lender may delay or forgo enforcing any of its rights or remedies under this Note without losing them. Maker and any other person who signs, guarantees or endorses this Note, to the extent allowed by law, waive presentment, demand for payment, protest and notice of dishonor. Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this Note, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability. All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan, or release any party or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral; and take any other action deemed necessary by Lender without the consent of or notice to anyone. All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made.

3

12.     TIME OF THE ESSENCE. Time is of the essence under this Note.

13.     NO ORAL WAIVER, MODIFICATION OR CANCELLATION. No provision of this Note may be waived, modified, discharged, or cancelled orally, but only in writing and signed by the party against whom enforcement of any waiver, modification, discharge or cancellation is sought.

14.     As used herein, "creditor" means Lender, "borrower" means Maker, and "this writing" means this Note and the Loan Agreement and all the other instruments evidencing or securing the indebtedness evidenced by this Note.

**ORAL AGREEMENTS OR COMMITMENTS TO LOAN MONEY, EXTEND CREDIT, OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT INCLUDING PROMISES TO EXTEND OR RENEW SUCH DEBT ARE NOT ENFORCEABLE, REGARDLESS OF THE LEGAL THEORY UPON WHICH IT IS BASED THAT IS IN ANY WAY RELATED TO THE CREDIT AGREEMENT. TO PROTECT YOU (BORROWER) AND US (CREDITOR) FROM MISUNDERSTANDING OR DISAPPOINTMENT, ANY AGREEMENTS WE REACH COVERING SUCH MATTERS ARE CONTAINED IN THIS WRITING, WHICH IS THE COMPLETE AND EXCLUSIVE STATEMENT OF THE AGREEMENT BETWEEN US, EXCEPT AS WE MAY LATER AGREE IN WRITING TO MODIFY IT.**

**[Signature Page Follows]**

**MAKER:**

NORTHWEST CAPITAL HOLDINGS, LLC,
an Illinois limited liability company

By: _Edward J. Streit_ _____
        Edward J. Streit, Manager

5

*2016R04440*

2016R04440

02/26/2016          01:36PM
REC FEE:         49.00
RHSP FEE:         9.00
TOTAL:          $58.00
PAGES:             23
DELLA
JOSHUA A. LANGFELDER
SANGAMON COUNTY RECORDER

## MORTGAGE, ASSIGNMENT OF LEASES AND RENTS, SECURITY AGREEMENT AND FIXTURE FILING

[Recorder's Cover Sheet]

**Preparer Information:**

Kodner Watkins, LC
7800 Forsyth Blvd., Suite 700
St. Louis, MO 63105
314.727.9111

**Taxpayer Information:**

Northwest Capital Holdings, LLC
2000 Galena Boulevard, Suite 200
Aurora, Illinois 60506

**Return Document To:**

Kodner Watkins, LC
7800 Forsyth Blvd., Suite 700
St. Louis, MO 63105
314.727.9111

**Grantor(s):**

Northwest Capital Holdings, LLC
2000 Galena Boulevard, Suite 200
Aurora, Illinois 60506

**Grantee(s):**

Midland States Bank
100 N. Chicago Street
Joliet, Illinois 60432

**Legal Description:**

See Exhibit A attached.

**Document or instrument number of previously recorded documents: n/a**

Mortgage – IL

*(Space above this line for recording purposes only.)*

NORTHWEST CAPITAL HOLDINGS, LLC,
an Illinois limited liability company,
as Mortgagor

for the benefit of

MIDLAND STATES BANK,
an Illinois banking corporation,
as Mortgagee

## MORTGAGE, ASSIGNMENT OF LEASES AND RENTS, SECURITY AGREEMENT AND FIXTURE FILING

| | |
|---|---|
| Dated: | As of February 24, 2016 |
| Location: | See Exhibit A |
| County: | Sangamon County, Illinois |

PREPARED BY AND
UPON RECORDATION RETURN TO:

Kodner Watkins, LC
7800 Forsyth Blvd., Suite 700
St. Louis, MO 63105
314.727.9111
Attn: Loren I. Ettinger, Esq.

Mortgage – IL

**NOTICE: This Mortgage secures credit in the amount of $8,600,000.00. Loans and advances up to this amount, together with interest are senior to indebtedness to other creditors under subsequently recorded or filed mortgages and liens.**

**THIS MORTGAGE, ASSIGNMENT OF LEASES AND RENTS, SECURITY AGREEMENT, AND FIXTURE FILING** (together with all modifications, amendments, renewals, extensions, replacements, restatements, supplements and substitutions thereto or therefor, and any and all exhibits, schedules, and addenda thereto, this "*Security Instrument*") is made as of this 24th day of February, 2016 ("*Effective Date*"), by **NORTHWEST CAPITAL HOLDINGS, LLC**, an Illinois limited liability company, having an address at 2000 Galena Boulevard, Suite 200, Aurora, Illinois 60506 (together with its permitted successors and assigns, individually or collectively (as the context requires) referred to herein as "*Mortgagor*"), as Mortgagor, to **MIDLAND STATES BANK**, an Illinois banking corporation, having an address to which notices may be mailed or delivered of 100 N. Chicago Street, Joliet, Illinois 60432 (together with its permitted successors and assigns, individually or collectively (as the context requires) referred to herein as the "*Mortgagee*"), as Mortgagee.

## RECITALS:

A.     Mortgagee has agreed to make a loan to Mortgagor in the aggregate original principal amount of up to $8,600,000.00 (the "*Loan*"), evidenced by a certain Promissory Note in said principal amount, made and executed by Mortgagor and payable to the order of Mortgagee (together with all modifications, amendments, renewals, extensions, replacements, restatements, restructures, supplements and substitutions thereto or therefor, the "*Note*").

B.     The Loan will be secured by, among other things, a certain Loan Agreement entered into and executed by and between Mortgagor and Mortgagee dated as of even date herewith (together with all modifications, amendments, renewals, extensions, replacements, restatements, restructures, supplements and substitutions thereto or therefor, and any and all exhibits, schedules, and addenda thereto, the "*Loan Agreement*") and this Security Instrument encumbering certain real property located in the City of Springfield, Illinois, which property is more particularly described and defined herein as the Mortgaged Property. The Note, the Loan Agreement, the Security Instrument, and all other documents, instruments, affidavits, supplements, certificates, and agreements now or hereafter evidencing, securing, guaranteeing, executed and/or entered into in connection herewith, the Note and/or with the Loan are collectively referred to herein as the "*Loan Documents*".

C.     Mortgagor is the owner of the property commonly known as Westbrook Apartments and located at 1833 Seven Pines Road in Springfield, Illinois 62704. The proceeds of the Loan and from the making of the Note are to provide funds to Mortgagor to refinance in full current acquisition indebtedness (and, if applicable, construction and/or redevelopment indebtedness) made and incurred by Mortgagor and encumbering the Mortgaged Property and to pay off existing investors of Mortgagor in connection with the Mortgaged Property (collectively, the "*Current Indebtedness*") by utilizing the proceeds of the Loan to pay off the Current Indebtedness in full and encumber the Mortgaged Property solely with the indebtedness of the Loan.

D.     Mortgagor and certain other parties (each, a "*Guarantor*", and collectively, "*Guarantors*", as defined in the Loan Agreement) have guaranteed, pursuant to an Unconditional Continuing Guaranty of Unlimited Obligations and Security Agreement made, executed and delivered by each Guarantor of even date with the Loan Agreement (each, a "*Guaranty*", and collectively, "*Guaranties*", as defined in the Loan Agreement), the Secured Obligations (defined below), including, without limitation, the Loan and any and all existing and future indebtedness and liabilities of every kind, nature and character, direct or indirect, absolute or contingent, liquidated or unliquidated, voluntary or

Mortgage – IL

1

involuntary, of Mortgagor to Mortgagee under the Note, the Loan Agreement and the other Loan Documents (collectively, the "***Guarantor Obligations***").

     E.     Pursuant to the terms of the Loan Agreement, Mortgagor, is required to grant to Mortgagee as security for the full payment and performance of all Secured Obligations under the Note, the Loan Agreement, and the other Loan Documents, a valid, enforceable, first priority lien on the Mortgaged Property owned by Mortgagor.

     F.     Mortgagee's commitment under the Loan Agreement and the Note to make an advance of the Loan shall be in the aggregate maximum amount of $8,600,000.00, and it is the intention of Mortgagor and Mortgagee that this Security Instrument shall secure the payment of such amount.

     G.     It is the intention of Mortgagor and Mortgagee that the Guarantor Obligations include and apply to all amounts due and outstanding under the Note, the Loan Agreement and the other Loan Documents and that this Security Instrument secure the payment and performance of all such Guarantor Obligations.

     H.     This Security Instrument is given pursuant to the Loan Agreement, and payment, fulfillment, and performance of the Guarantor Obligations are secured hereby in accordance with the terms hereof.

     I.     It is in the best interest of Mortgagor to execute this Security Instrument inasmuch as Mortgagor will derive substantial direct and indirect benefits from the Loan made to Mortgagor pursuant to the Note and the Loan Agreement.

     J.     All capitalized terms used herein and not otherwise defined shall have the respective meanings given such terms in the Loan Agreement or the other applicable Loan Documents.

### Article 1 — GRANTS OF SECURITY

     **Section 1.1.**    PROPERTY MORTGAGED. Mortgagor, for good and valuable consideration, does hereby irrevocably mortgage, pledge, assign, warranty, transfer, convey and grant a security interest to Mortgagee and its successors and assigns in and to the following property, rights, interests and estates, each to the extent now owned, or hereafter acquired by Mortgagor (collectively, "***Mortgaged Property***"):

     (a)    Land.  The real property described in ***Exhibit A*** attached hereto and made a part hereof (collectively, the "Land");

     (b)    Additional Land.  All additional lands, estates and development rights hereafter acquired by Mortgagor for use in connection with the Land and the development of the Land and all additional lands and estates therein which may, from time to time, by supplemental mortgage or otherwise be expressly made subject to the lien of this Security Instrument;

     (c)    Improvements.  The buildings, structures, fixtures, additions, alterations, appurtenances, enlargements, extensions, modifications, repairs, replacements and improvements now or hereafter erected or located on the Land (collectively, the "***Improvements***");

     (d)    Easements.  All easements, rights-of-way or use, rights, strips and gores of land, streets, ways, alleys, passages, sewer rights, water, water courses, water rights and powers, air rights and development rights, and all estates, rights, titles, interests, privileges, liberties, servitudes, tenements, hereditaments and appurtenances of any nature whatsoever, in any way

Mortgage – IL

2

now or hereafter belonging, relating or pertaining to the Land and the Improvements (collectively, the "***Real Property***"), and the reversions and remainders, and all land lying in the bed of any street, road or avenue, opened or proposed, in front of or adjoining the Land, to the center line thereof and all the estates, rights, titles, interests, rights of dower, rights of curtesy, property, possession, claim and demand whatsoever, both at law and in equity, of Mortgagor of, in and to the Real Property, and every part and parcel thereof, with the appurtenances thereto;

(e) <u>Fixtures and Personal Property</u>. All machinery, equipment, furniture, furnishings, appliances, goods, fixtures (including, but not limited to, all heating, air-conditioning, plumbing, lighting, communications and elevator fixtures, inventory, wares and goods), inventory, articles of personal property and accessions thereof and renewals, replacements thereof and substitutions therefor (including, but not limited to, electric and electronic equipment, computer equipment, lighting and plumbing fixtures, fire prevention and extinguishing apparatus, cooling and air-conditioning systems, elevators, escalators, fittings, plants, apparatus, machinery, engines, motors, boilers, incinerators, conduits, compressors and any and all software embedded in or used in connection with any of the foregoing), other customary equipment and other tangible property of every kind and nature whatsoever owned by Mortgagor, or in which Mortgagor has or shall have an interest (to the extent Mortgagor is not prohibited from granting a security interest therein), now or hereafter located upon the Real Property, or appurtenant thereto, or used in connection with the present or future planning, development, use, operation and occupancy of the Real Property, and all building equipment, materials and supplies of any nature whatsoever owned by Mortgagor, or in which Mortgagor has or shall have an interest (to the extent Mortgagor is not prohibited from granting a security interest therein), now or hereafter located upon the Real Property for use or installation in or on the Real Property, or appurtenant thereto, or used in connection with the present or future planning, development, use, operation and occupancy of the Real Property (hereinafter collectively called the "***Personal Property***"), including the right, title and interest of Mortgagor in and to any of the Personal Property which may be subject to any security interests, as defined in the Uniform Commercial Code, as adopted and enacted by the state or states where any of the Property is located (the "***Uniform Commercial Code***"), or equipment leases superior in lien to the Lien of this Security Instrument and all proceeds and products of all of the above;

(f) <u>Leases and Rents</u>. All existing or future leases, subleases, rental agreements and other agreements whether or not in writing for the use or occupancy of the Real Property, or any part thereof, heretofore or hereafter entered into and all extensions, renewals, amendments, replacements, and modifications thereto or thereof, and each existing or future guaranty of payment or performance thereunder, whether before or after the filing by or against Mortgagor of any petition for relief under Debtor Relief Laws (defined below) (each, a "***Lease***, or collectively, the "***Leases***") and all right, title and interest of Mortgagor, its successors and assigns therein and thereunder, including, without limitation, any guaranties of the lessees' obligations thereunder, cash or securities deposited or letters of credit delivered thereunder to secure the performance by the lessees of their obligations thereunder and all rents, additional rents, bonuses, revenues, issues, proceeds, and profits (including all rents, revenues, bonus money, royalties, rights, and benefits accruing to Mortgagor under all present and future oil, gas and mineral leases on any parts of the Real Property) from the Real Property, all income, rents, issues, profits, revenues, deposits, accounts and other benefits from operation of the Improvements on the Land and/or the Improvements, including, without limitation, all receivables, customer obligations, installment payment obligations and other obligations now existing or hereafter arising or created out of sale, lease, sublease, license, concession or other grant of the right of the possession, use or occupancy of all or any portion of the Real Property, or personalty located thereon, or rendering of services by Mortgagor or any operator or manager of the Improvements or the commercial space located

in the Improvements or acquired from others including, without limitation, from business interruption or other loss of income insurance relating to the use, enjoyment or occupancy of the Real Property whether paid or accruing before or after the filing by or against Mortgagor of any petition for relief under Debtor Relief Laws and all proceeds and other amounts paid or owing to Mortgagor under or pursuant to any and all contracts and bonds relating to the construction or renovation of the Real Property (collectively, the "*Rents*") and all proceeds from the sale or other disposition of the Leases and the right to receive and apply the Rents to the payment of the Secured Obligations (as such term is defined in *Section 2.3* herein below);

(g)     Insurance Proceeds.  Subject to Mortgagor's rights with respect to restoration, all insurance proceeds in respect of the Mortgaged Property under any insurance policies covering the Mortgaged Property, including, without limitation, the right to receive and apply the proceeds of any insurance, judgments, or settlements made in lieu thereof, for damage to the Mortgaged Property (collectively, the "*Insurance Proceeds*");

(h)     Condemnation Awards.  Subject to Mortgagor's rights with respect to restoration, all condemnation awards, including interest thereon, which may heretofore and hereafter be made with respect to the Mortgaged Property by reason of any taking or condemnation, whether from the exercise of the right of eminent domain (including, but not limited to, any transfer made in lieu of or in anticipation of the exercise of the right), or for a change of grade, or for any other injury to or decrease in the value of the Mortgaged Property (collectively, the "*Awards*");

(i)     Tax Protest.  All refunds, rebates or credits received by Mortgagor in connection with reduction in real estate taxes and assessments charged against the Mortgaged Property as a result of tax protest or any applications or proceedings for reduction;

(j)     Agreements.  To the extent assignable in accordance with their express terms, all agreements, contracts, certificates, instruments, franchises, permits, licenses, and other documents, now or hereafter entered into, and all rights therein and thereto, respecting or pertaining to the use, occupation, design, construction, development, management or operation of the Land and any part thereof and any Improvements or any business or activity conducted on the Land and any part thereof (including, without limitation, all permits, licenses, variances and other rights and approvals issued by or obtained from any governmental authority or other person or entity in connection with the development of the Land or the construction or repair of the Improvements) and all right, title and interest of Mortgagor therein and thereunder, including, without limitation, the right, upon the occurrence or during the continuance of an Event of Default (as defined in the Loan Agreement), to receive and collect any sums payable to Mortgagor thereunder;

(k)     Intangibles.  All trade names, trademarks, service marks, logos and copyrights, goodwill, books and records, advertising materials, telephone exchange numbers identified in such materials, and all other general intangibles and payment intangibles relating to or used in connection with the operation of the Real Property and the Personal Property; provided that Mortgagor does not hereby mortgage, grant, bargain, sell, pledge, assign, warranty, transfer or convey, and Mortgagee shall not have any rights to use, the name of Mortgagor, any derivations thereof, or any trade names, trademarks, service marks, logos or copyrights associated therewith;

(l)     Mortgagor Accounts.  All right, title and interest of Mortgagor, if any, arising from the operation of the Real Property in and to all payments for goods or property sold or leased or for services rendered, whether or not yet earned by performance, and whether or not evidenced by an instrument or chattel paper, (hereinafter referred to as "*Accounts Receivable*")

Mortgage – IL

4

including, without limiting the generality of the foregoing, (i) all accounts, contract rights, book debts, and notes arising from the operation of the Real Property or arising from the sale, lease or exchange of goods or other property and/or the performance of services, (ii) Mortgagor's rights in, to and under all purchase orders for goods, services or other property to be used in connection with the operation of the Real Property, (iii) Mortgagor's rights to any goods, services or other property to be used in connection with the operation of the Real Property represented by any of the foregoing, (iv) monies due to or to become due to Mortgagor under all contracts for the sale, lease or exchange of Personal Property, and (v) all collateral security and guaranties of any kind given by any party with respect to any of the foregoing. Accounts Receivable shall include those now existing or hereafter created, substitutions therefor, proceeds (whether cash or non-cash, movable or immovable, tangible or intangible) received upon the sale, exchange, transfer, collection or other disposition or substitution thereof and any and all of the foregoing and proceeds therefrom;

(m) <u>Reserve Accounts</u>. All reserves, escrows and deposit accounts required in relation to the Land and the Improvements under the Loan Agreement or the other Loan Documents and all cash, checks, drafts, certificates, securities, investment property, financial assets, instruments and other property held therein from time to time and all proceeds, products, distributions or dividends or substitutions thereon and thereof;

(n) <u>Miscellaneous</u>. All (i) plans and specifications (to the extent owned by Mortgagor) for the Improvements; (ii) Mortgagor's rights, but not liability for any breach by Mortgagor, under all insurance policies (or additional or supplemental coverage related thereto, including from an insurance provider meeting the requirements of the Loan Documents or from or through any state or federal government sponsored program or entity); (iii) deposits and deposit accounts arising from or related to any transactions related to the Real Property (including but not limited to Mortgagor's rights in deposits with respect to utility services to the Real Property), rebates or refunds of impact fees or other taxes, assessments or charges, money, accounts (including deposit accounts), instruments, documents, promissory notes and chattel paper (whether tangible or electronic) arising from or by virtue of any transactions related to the Real Property, and any account or deposit account from which Mortgagor may from time to time debit and/or credit payments due with respect to the Loan; (iv) permits, licenses, franchises, certificates, development rights, commitments and rights for utilities, and other rights and privileges obtained in connection with the Real Property; (v) subject to the rights of others therein and to the extent received by Mortgagor, as-extracted collateral produced from or allocated to the Land including, without limitation, oil, gas and other hydrocarbons and other minerals and all products processed or obtained therefrom, and the proceeds thereof; and (vi) engineering, title, and other related data concerning the Mortgaged Property which are in the possession of Mortgagor and in which Mortgagor can grant a security interest.

(o) <u>Proceeds</u>. All proceeds of any of the foregoing items set forth in **Sections 1.1(a) through 1.1(o)** including, without limitation, Insurance Proceeds and Awards, into cash or liquidation claims;

(p) <u>Other Rights</u>. Any and all other rights of Mortgagor in and to the items set forth in **Sections 1.1(a) through 1.1(p)** above.

**Section 1.2.** <u>ASSIGNMENT OF RENTS</u>. Mortgagor hereby absolutely and unconditionally assigns, sells, transfers and conveys to Mortgagee, for the benefit of Mortgagee, all Rents and all of Mortgagor's rights in and under all Leases. This assignment is an absolute assignment and not an assignment for additional security only. So long as no Event of Default has occurred and is continuing,

<u>Mortgage – IL</u>

Mortgagor shall have a license (which license shall terminate automatically and without notice upon the occurrence of an Event of Default) to collect, but not prior to accrual, the Rents under the Leases and, where applicable, subleases, such Rents to be held in trust for Mortgagee and to otherwise deal with all Leases as permitted by this Security Instrument. Each month, provided no Event of Default has occurred and is continuing, Mortgagor may retain such Rents as were collected that month and held in trust for Mortgagee for the ratable benefit of Mortgagee; *provided, however, that* all Rents collected by Mortgagor shall be applied to the ordinary and necessary expenses of owning and operating the Mortgaged Property or for any purpose not prohibited by the Loan Agreement. Upon the revocation of such license upon the occurrence of an Event of Default, and for so long as such Event of Default shall be continuing, all Rents thereafter collected shall be paid directly to Mortgagee and not through Mortgagor, all without the necessity of any further action by Mortgagee, including, without limitation, any action to obtain possession of the Land, Improvements or any other portion of the Mortgaged Property or any action for the appointment of a receiver. Mortgagor hereby authorizes and directs the tenants under the Leases to pay Rents to Mortgagee upon written demand by Mortgagee, without further consent of Mortgagor, without any obligation on the part of such tenants to determine whether an Event of Default has in fact occurred and regardless of whether Mortgagee has taken possession of any portion of the Mortgaged Property, and the tenants may rely upon any written statement delivered by Mortgagee to the tenants. Any such payments to Mortgagee shall constitute payments to Mortgagor under the Leases, and Mortgagor hereby irrevocably appoints Mortgagee as its attorney-in-fact to do all things, during the continuance of an Event of Default, which Mortgagor might otherwise do with respect to the Mortgaged Property and the Leases thereon, including, without limitation, (a) collecting Rents with or without suit and applying the same, less expenses of collection, to any of the Secured Obligations or to expenses of operating and maintaining the Mortgaged Property (including reasonable reserves for anticipated expenses), at the option of Mortgagee, all in such manner as may be determined by Mortgagee, or at the option of Mortgagee, holding the same as security for the payment of the Secured Obligations, and (b) employing agents therefor and paying such agents reasonable compensation for their services. The curing of such Event of Default, unless other Events of Default also then exist, shall entitle Mortgagor to recover its aforesaid license to do any such things which Mortgagor might otherwise do with respect to the Mortgaged Property and the Leases thereon and to again collect such Rents. However, notwithstanding the provisions of this *Section 1.2*, no credit shall be given by Mortgagee for any sum or sums received from the Rents of the Mortgaged Property until the money collected is actually received by Mortgagee at its principal office, or at such other place as Mortgagee shall designate in writing, and no such credit shall be given for any uncollected Rents or other uncollected amounts or bills, nor shall such credit be given for any Rents derived from the Mortgaged Property after foreclosure or other transfer of the Mortgaged Property (or part thereof from which Rents are derived pursuant to this Security Instrument or by agreement) to Mortgagor or any other third party. Receipt of Rents by Mortgagee shall not be deemed to constitute a pro-tanto payment of the indebtedness evidenced by, or arising under, this Security Instrument, the Note, the Loan Agreement or any of the other Loan Documents, but shall be applied as provided above. The powers and rights granted in this *Section 1.2* shall be in addition to the other remedies herein provided for upon the occurrence of an Event of Default and may be exercised independently of or concurrently with any of said remedies. Nothing in the foregoing shall be construed to impose any obligation upon Mortgagee to exercise any power or right granted in this *Section 1.2* or to assume any liability under any lease of any part of the Mortgaged Property and no liability shall attach to Mortgagee for failure or inability to collect any Rents under any such Lease. Rents shall not be credited against the Secured Obligations except to the extent actually received by Mortgagee. The assignment contained in this *Section 1.2* shall become null and void upon the release of this Security Instrument. Mortgagee's acceptance of this assignment shall not be deemed to constitute Mortgagee as a "mortgagee in possession," nor obligate Mortgagee to appear in or defend any proceeding relating to any Lease or to the Mortgaged Property, or to take any action hereunder, expend any money, incur any expenses, or perform any obligation or liability under any Lease, or assume any obligation for any deposit delivered to Mortgagor by any tenant and not as such delivered to and accepted by Mortgagee. Except injury or

Mortgage – IL

6

damage resulting from Mortgagee's gross negligence or willful misconduct, as determined by a court of competent jurisdiction, Mortgagee shall not be liable, for any injury or damage to person or property in or about the Mortgaged Property, or for Mortgagee's failure to collect or to exercise diligence in collecting Rents, but shall be accountable only for Rents that it shall actually receive. Neither the assignment of Leases and Rents nor enforcement of Mortgagee's rights regarding Leases and Rents (including collection of Rents) nor possession of the Mortgaged Property by Mortgagee nor Mortgagee's consent to or approval of any Lease (nor all of the same), shall render Mortgagee liable on any obligation under or with respect to any Lease or constitute affirmation of, or any subordination to, any Lease, occupancy, use or option. If Mortgagee seeks or obtains any judicial relief regarding Rents or Leases, the same shall in no way prevent the concurrent or, to the extent permitted by applicable law, subsequent employment of any other appropriate rights or remedies nor shall same constitute an election of judicial relief for any foreclosure or any other purpose. Mortgagee neither has nor assumes any obligations as lessor or landlord with respect to any Lease. The rights of Mortgagee under this *Section 1.2* shall be cumulative of all other rights of Mortgagee under the Loan Agreement, the Loan Documents, or otherwise.

**Section 1.3.** SECURITY AGREEMENT. This Security Instrument is both a real property deed of trust and a "security agreement" within the meaning of the Uniform Commercial Code. The Mortgaged Property includes both real and personal property and all other rights and interests, whether tangible or intangible in nature, of Mortgagor in the Mortgaged Property. By executing and delivering this Security Instrument, Mortgagor hereby grants to Mortgagee, as security for the Secured Obligations (hereinafter defined), a security interest in the Personal Property to the full extent that the Personal Property may be subject to the Uniform Commercial Code. This Security Instrument shall also be effective as a financing statement covering Mortgagor's interest in as-extracted minerals or the like (including oil and gas) and accounts subject to Uniform Commercial Code, as amended, and is to be filed for record in the real estate records of the county where the Mortgaged Property is situated. The mailing address of Mortgagor and the address of Mortgagee from which information concerning the security interest may be obtained are set forth above.

**Section 1.4.** FIXTURE FILING. Without in any manner limiting the generality of any of the other provisions of this Security Instrument: (a) some portions of the goods described or to which reference is made herein are or are to become fixtures on the Land described or to which reference is made herein or on *Exhibit A* attached to this Security Instrument; (b) this Security Instrument is to be filed of record in the real estate records as a financing statement and shall constitute a "fixture filing" for purposes of the Uniform Commercial Code; and (c) Mortgagor is the record owner of the real estate or interests in the real estate constituting the Mortgaged Property hereunder. Information concerning the security interest herein granted may be obtained at the addresses set forth on the first page hereof. The address of the Debtor (Mortgagor) is set forth on the first page hereof and the address of the Secured Party (Mortgagee) is set forth below. In that regard, the following information is provided:

| | |
|---|---|
| Name of Debtor: | NORTHWEST CAPITAL HOLDINGS, LLC |
| Type of Organization: | an Illinois limited liability company |
| State: | Illinois |
| Organizational ID Number: | 05052815 |
| | |
| Name of Secured Party: | MIDLAND STATES BANK |
| Type of Organization: | an Illinois banking corporation |
| State: | Illinois |
| Address of Secured Party: | 100 N. Chicago Street |
| | Joliet, Illinois 60432 |

Mortgage – IL

**Section 1.5.** CONDITIONS TO GRANT. TO HAVE AND TO HOLD the above granted and described Mortgaged Property unto Mortgagee and its successors and assigns for and on behalf of and to the use and benefit of Mortgagee, as described herein, and their successors and assigns, forever; to secure payment to Mortgagee of the Secured Obligations; PROVIDED, HOWEVER, these presents are upon the express condition that, if Mortgagee shall be paid the Guarantor Obligations at the time and in the manner provided in the Loan Agreement, the Note, this Security Instrument, the Guaranties, and the other Loan Documents, and if Mortgagor shall pay and perform Secured Obligations as set forth in the Loan Agreement, the Note, and this Security Instrument, and the other Loan Documents, these presents and the estate hereby granted shall cease, terminate and be void, and Mortgagee shall promptly execute and deliver to Mortgagor for recording at Mortgagor's expense among the appropriate public records a release of this Security Instrument in recordable form.

**Section 1.6.** GRANTS TO MORTGAGEE. This Security Instrument and the grants, assignments and transfers made to Mortgagee in this *Article 1* shall inure to Mortgagee under the Loan Agreement.

### Article 2 — DEBT AND OBLIGATIONS SECURED

**Section 2.1.** OBLIGATIONS. This Security Instrument and the grants, assignments and transfers made in *Article 1* are given for the purpose of securing the Secured Obligations and the Guarantor Obligations.

**Section 2.2.** OTHER OBLIGATIONS. This Security Instrument and the grants, assignments and transfers made in *Article 1* of this Security Instrument are also given for the purpose of securing the performance of the following (collectively, the "*Other Obligations*"): (a) all other obligations of Mortgagor contained herein; (b) such future or additional advances for construction, improvements, preservation, maintenance and operation of the Mortgaged Property and the security for payment of the Guarantor Obligations as may be made by Mortgagor or any Guarantor in connection with or pursuant to the Loan Agreement or the other Loan Documents, whether such future advances or re-advances, if any, are obligatory or are to be made at any Mortgagee's option, to Mortgagor; and (c) the full and punctual payment when due of all future advances that may subsequently be made to Mortgagor evidenced by the Loan Agreement, the Note, or any other Loan Documents or other promissory notes, and all renewals and extensions thereof, including without limitation, all present and future loans under the Loan Documents; provided, however, that nothing contained herein shall create an obligation on the part of Mortgagee to make future advances or re-advances, if any, to Mortgagor.

**Section 2.3.** OBLIGATIONS AND OTHER OBLIGATIONS. Mortgagor's and each Guarantor's (as applicable) obligations for the payment of the Liabilities (as defined in the Loan Agreement) and the Guarantor Obligations and any other obligations under the Note, the Loan Agreement, and the other Loan Documents shall be referred to collectively herein as the "*Secured Obligations*."

**Section 2.4.** PAYMENT OF OBLIGATIONS AND FINAL MATURITY DATE. Mortgagor will pay or, as applicable, perform the Secured Obligations at the time and in the manner provided in this Security Instrument. The initial maturity date for the Secured Obligations is twenty four (24) consecutive months from the date of the Note or as otherwise provided in the Loan Agreement.

Mortgage – IL

## Article 3 — PROPERTY COVENANTS

Mortgagor covenants and agrees that:

**Section 3.1.** INSURANCE. Mortgagor shall obtain and maintain, or cause to be obtained and maintained, in full force and effect at all times insurance with respect to Mortgagor and the Mortgaged Property as required pursuant to the Loan Agreement.

**Section 3.2.** TAXES AND OTHER CHARGES. Mortgagor shall pay or cause to be paid all real estate and personal property taxes, assessments, water rates or sewer rents (collectively, "*Taxes*"), ground rents, maintenance charges, impositions (other than Taxes), and any other charges, including, without limitation, vault charges and license fees for the use of vaults, chutes and similar areas adjoining the Mortgaged Property (collectively, "*Other Charges*"), now or hereafter levied or assessed or imposed against the Mortgaged Property or any part thereof in accordance with the Loan Agreement.

**Section 3.3.** LEASES. Mortgagor shall not (and shall not permit any other applicable party to) enter in any Leases for all or any portion of the Mortgaged Property unless in accordance with the provisions of the Loan Agreement.

**Section 3.4.** WARRANTY OF TITLE. Mortgagor has good, indefeasible, and insurable title to the Mortgaged Property and has the right to mortgage, grant, bargain, sell, pledge, assign, warrant, transfer and convey the same. Mortgagor possesses an unencumbered fee simple absolute estate in the Land and the Improvements except for the Permitted Encumbrances (defined below). This Security Instrument, when properly recorded in the appropriate records, together with any Uniform Commercial Code financing statements required to be filed in connection therewith, will create (a) a valid, perfected first priority Lien on the Mortgaged Property, subject only to Permitted Encumbrances and (b) perfected security interests in and to, and perfected collateral assignments of, all of Mortgagor's right, title and interest in and to all personalty located on the Mortgaged Property (including the Leases), all in accordance with the terms thereof, in each case subject only to any applicable Permitted Encumbrances. Subject to the Permitted Encumbrances, Mortgagor shall forever warrant, defend and preserve the title and the validity and priority of the Lien of this Security Instrument and shall forever warrant and defend the same to Mortgagee against the claims of all parties whomsoever. As used herein, the term "*Permitted Encumbrances*" shall mean, collectively, (i) the lien and security interests created by the Loan Documents, (ii) all liens, encumbrances and other matters disclosed in Mortgagee's title insurance policy issued in connection with the Loan, (iii) liens, if any, for Taxes imposed by any governmental authority not yet due or delinquent, (iv) such other title and survey exceptions as Mortgagee has approved or may approve in writing in Mortgagee's sole discretion, and (v) the Leases. Notwithstanding the above, Mortgagor may grant, with Mortgagee's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed, easements and other rights necessary or desirable for the operation and development of the Mortgaged Property on the condition that the granting of such easements and other rights shall not, individually or in the aggregate, materially interfere with the benefits intended to be provided by this Security Instrument, materially and adversely affect the marketability of the Mortgaged Property, or materially impair the use or operation of the Mortgaged Property, and any such easement or other right consented to by Mortgagee shall constitute a Permitted Encumbrance.

**Section 3.5.** ADDITIONS TO SECURITY. All right, title and interest of Mortgagor in and to all Improvements hereafter constructed or placed on the Mortgaged Property and in and to any Personal Property hereafter acquired shall, without any further mortgage, conveyance, assignment or other act by Mortgagor, become subject to the lien of this Security Instrument as fully and completely, and with the same effect, as though now owned by Mortgagor and specifically described in the granting clauses hereof.

Mortgage – IL

9

Mortgagor agrees, however, to execute and deliver to Mortgagee and such further documents as may be required by the terms of the Loan Agreement and the other Loan Documents.

## Article 4 — FURTHER ASSURANCES

**Section 4.1.** AUTHORIZATION TO FILE FINANCING STATEMENTS; POWER OF ATTORNEY. Mortgagor hereby authorizes Mortgagee at any time and from time to time to file any initial financing statements, amendments thereto and continuation statements as authorized by applicable law, as applicable to all or part of the Personal Property and as necessary or required in connection herewith. For purposes of such filings, Mortgagor agrees to furnish any information reasonably requested by Mortgagee promptly upon request by Mortgagee. Mortgagor hereby irrevocably constitutes and appoints Mortgagee and any officer or agent of Mortgagee, with full power of substitution, as Mortgagor's true and lawful attorneys-in-fact with full irrevocable power and authority in the place and stead of Mortgagor or in Mortgagor's own name to execute in Mortgagor's name any such documents and otherwise to carry out the purposes of this *Section 4.1*, to the extent that Mortgagor's authorization above is not sufficient and Mortgagor fails or refuses to promptly execute such documents. To the extent permitted by law, Mortgagor hereby ratifies all acts said attorneys-in-fact have lawfully done in the past or shall lawfully do or cause to be done in the future by virtue hereof. This power of attorney is a power coupled with an interest and shall be irrevocable.

## Article 5 — DUE ON SALE/ENCUMBRANCE

**Section 5.1.** NO SALE/ENCUMBRANCE. Except in accordance with the express terms and conditions contained in the Loan Agreement, Mortgagor shall not cause or permit a sale, conveyance, mortgage, grant, bargain, encumbrance, pledge, assignment, or grant of any options with respect to, or any other transfer or disposition (directly or indirectly, voluntarily or involuntarily, by operation of law or otherwise, and whether or not for consideration or of record) of a legal or beneficial interest in the Mortgaged Property or any part thereof.

## Article 6 — RELEASE OF PROPERTY

**Section 6.1.** RELEASE OF PROPERTY. Mortgagor shall not be entitled to a release of any portion of the Mortgaged Property from the Lien of this Security Instrument except in accordance with *Section 1.5* hereof or otherwise in accordance with the terms and conditions of the Loan Agreement.

## Article 7 — DEFAULT

**Section 7.1.** EVENT OF DEFAULT. The term "Event of Default" as used in this Security Instrument shall have the meaning assigned to such term in the Loan Agreement.

## Article 8 — RIGHTS AND REMEDIES UPON DEFAULT

**Section 8.1.** REMEDIES. Upon the occurrence and during the continuance of any Event of Default, Mortgagor agrees that Mortgagee may take such action, without notice or demand, as it deems advisable to protect and enforce its rights against Mortgagor, any Guarantor or any other party liable for the payment of the Secured Obligations (as applicable) and in and to the Mortgaged Property, including, but not limited to, any one or more of the following actions, each of which may be pursued concurrently or otherwise, at such time and in such order as Mortgagee may determine, in its sole discretion, without impairing or otherwise affecting the other rights and remedies of Mortgagee:

Mortgage – IL

(a)     declare the entire unpaid Secured Obligations to be immediately due and payable;

(b)     institute proceedings, judicial or otherwise, for the complete foreclosure of this Security Instrument under any applicable provision of law, in which case the Mortgaged Property or any interest therein may be sold for cash or upon credit in one or more parcels or in several interests or portions and in any order or manner;

(c)     with or without entry, to the extent permitted and pursuant to the procedures provided by applicable law, institute proceedings for the partial foreclosure of this Security Instrument for the portion of the Secured Obligations then due and payable, subject to the continuing lien and security interest of this Security Instrument for the balance of the Secured Obligations not then due, unimpaired and without loss of priority;

(d)     sell for cash or upon credit the Mortgaged Property or any part thereof and all estate, claim, demand, right, title and interest of Mortgagor therein and rights of redemption thereof, pursuant to power of sale or otherwise, at one or more sales, as an entirety or in parcels, at such time and place, upon such terms and after such notice thereof as may be required or permitted by law;

(e)     institute an action, suit or proceeding in equity for the specific performance of any covenant, condition or agreement contained herein, in the Loan Agreement or in the other Loan Documents;

(f)     recover judgment on the Secured Obligations either before, during or after any proceedings for the enforcement of this Security Instrument or the other Loan Documents;

(g)     apply to a court of competent jurisdiction for the appointment of a receiver, liquidator or conservator of the Mortgaged Property, without notice and without regard for the adequacy of the security for the Secured Obligations and without regard for the solvency of Mortgagor, any Guarantor (as applicable) or any other party liable for the payment of the Secured Obligations;

(h)     the license granted to Mortgagor under *Section 1.2* hereof shall automatically be revoked (for so long as an Event of Default shall be continuing) and Mortgagee may enter into or upon the Mortgaged Property, either personally or by its agents, nominees or attorneys and dispossess Mortgagor and its agents and servants therefrom, without liability for trespass, damages or otherwise and exclude Mortgagor and its agents or servants wholly therefrom, and take possession of all books, records and accounts relating thereto and Mortgagor agrees to surrender possession of the Mortgaged Property and of such books, records and accounts to Mortgagee upon demand, and thereupon Mortgagee may (i) use, operate, manage, control, insure, maintain, repair, restore and otherwise deal with all and every part of the Mortgaged Property and conduct the business thereat; (ii) complete any construction undertaken by Mortgagor on the Mortgaged Property in such manner and form as Mortgagee deems advisable; (iii) make alterations, additions, renewals, replacements and improvements to or on the Mortgaged Property; (iv) exercise all rights and powers of Mortgagor with respect to the Mortgaged Property, whether in the name of Mortgagor or otherwise, including, without limitation, the right to make, cancel, enforce or modify Leases, obtain and evict tenants, and demand, sue for, collect and receive all Rents of the Mortgaged Property and every part thereof; (v) require Mortgagor to pay monthly in advance to Mortgagee, or any receiver appointed to collect the Rents, the fair and reasonable rental value for the use and occupation of such part of the Mortgaged Property as may be

occupied by Mortgagor; (vi) require Mortgagor to vacate and surrender possession of the Mortgaged Property to Mortgagee or to such receiver and, in default thereof, Mortgagor may be evicted by summary proceedings or otherwise; and (vii) apply the receipts from the Mortgaged Property to the payment of the Secured Obligations, in such order, priority and proportions as Mortgagee shall deem appropriate in its sole discretion after deducting therefrom all expenses (including reasonable attorneys' fees) incurred in connection with the aforesaid operations and all amounts necessary to pay the Taxes, Other Charges, insurance and other expenses in connection with the Mortgaged Property, as well as just and reasonable compensation for the services of Mortgagee, and its respective counsel, agents and employees;

(i)     exercise any and all rights and remedies granted to a secured party upon default under the Uniform Commercial Code, including, without limiting the generality of the foregoing: (i) the right to take possession of the Personal Property or any part thereof, and to take such other measures as Mortgagee may deem necessary for the care, protection and preservation of the Personal Property, and (ii) request Mortgagor at its expense to assemble the Personal Property and make it available to Mortgagee at a convenient place acceptable to Mortgagee. Any notice of sale, disposition or other intended action by Mortgagee with respect to the Personal Property sent to Mortgagor in accordance with the provisions hereof at least ten (10) days prior to such action shall constitute commercially reasonable notice to Mortgagor;

(j)     apply any sums then deposited or held in escrow or otherwise by or on behalf of Mortgagee in accordance with the terms of the Loan Agreement, this Security Instrument or any of the other Loan Documents to the payment of the following items in any order in its sole discretion: (i) Taxes and Other Charges; (ii) insurance premiums; (iii) interest on the unpaid principal balance of the Note; (iv) amortization of the unpaid principal balance of the Note; (v) all other sums payable pursuant to the Loan Agreement, this Security Instrument and the other Loan Documents, including without limitation advances made by Mortgagee pursuant to the terms of this Security Instrument;

(k)     surrender the insurance policies maintained pursuant to the Loan Agreement, collect the unearned insurance premiums for such insurance policies and apply such sums as a credit on the Secured Obligations in such priority and proportion as Mortgagee in its discretion shall deem proper, and in connection therewith, Mortgagor hereby appoints Mortgagee as agent and attorney-in-fact (which is coupled with an interest and is therefore irrevocable) for Mortgagor to collect such insurance premiums;

(l)     apply the undisbursed balance of any deposit made by Mortgagor with Mortgagee in connection with the restoration of the Mortgaged Property after a casualty thereto or condemnation thereof, together with interest thereon, to the payment of the Secured Obligations in such order, priority and proportions as Mortgagee shall deem to be appropriate in its discretion; or

(m)     pursue such other remedies as Mortgagee may have under this Security Instrument, the Loan Documents, at law or in equity.

In the event of a sale, by foreclosure, power of sale or otherwise, of less than all of Mortgaged Property, this Security Instrument shall continue as a lien and security interest on the remaining portion of the Mortgaged Property unimpaired and without loss of priority.

**Section 8.2.**    APPLICATION OF PROCEEDS.    The purchase money, proceeds and avails of any disposition of the Mortgaged Property, and or any part thereof, or any other sums collected by Mortgagee

Mortgage – IL

12

on behalf of Mortgagee pursuant to the Loan Agreement, this Security Instrument or the other Loan Documents, shall be applied by Mortgagee in accordance with the Loan Agreement.

**Section 8.3.** RIGHT TO CURE DEFAULTS. Upon the occurrence and during the continuance of any Event of Default, Mortgagee may, but without any obligation to do so and without notice to or demand on Mortgagor and without releasing Mortgagor from any obligation hereunder, make any payment or do any act required of Mortgagor hereunder in such manner and to such extent as Mortgagee may deem necessary to protect the security hereof. Mortgagee is authorized to enter upon the Mortgaged Property for such purposes, or appear in, defend, or bring any action or proceeding to protect its interest in the Mortgaged Property or to foreclose this Security Instrument or collect the Secured Obligations, and the cost and expense thereof (including reasonable attorneys' fees to the extent permitted by law), with interest as provided in this *Section 8.3*, shall constitute a portion of the Secured Obligations and shall be due and payable to Mortgagee upon demand. All such costs and expenses incurred by Mortgagee in remedying such Event of Default or such failed payment or act or in appearing in, defending, or bringing any such action or proceeding shall bear interest at any default rate specified in the Loan Agreement, if any (the "*Default Rate*"), for the period after notice from Mortgagee that such cost or expense was incurred to the date of payment to Mortgagee. All such costs and expenses incurred by Mortgagee together with interest thereon calculated at the Default Rate shall be deemed to constitute a portion of the Secured Obligations and be secured by this Security Instrument and the other Loan Documents and shall be immediately due and payable upon demand by Mortgagee therefor.

**Section 8.4.** ACTIONS AND PROCEEDINGS. Upon the occurrence and during the continuance of an Event of Default, Mortgagee has the right to appear in and defend any action or proceeding brought with respect to the Mortgaged Property and to bring any action or proceeding, in the name and on behalf of Mortgagor, which Mortgagee, in its discretion, decides should be brought to protect its interest in the Mortgaged Property.

**Section 8.5.** RECOVERY OF SUMS REQUIRED TO BE PAID. Mortgagee shall have the right from time to time, upon the occurrence and during the continuance of an Event of Default, to take action to recover any sum or sums which constitute a part of the Secured Obligations as the same become due, without regard to whether or not the balance of the Secured Obligations shall be due, and without prejudice to the rights of Mortgagee thereafter to bring an action of foreclosure, or any other action, for a default or defaults by Mortgagor existing at the time such earlier action was commenced.

**Section 8.6.** OTHER RIGHTS, ETC.

(a)     The failure of Mortgagee to insist upon strict performance of any term hereof shall not be deemed to be a waiver of any term of this Security Instrument. Mortgagor shall not be relieved of Mortgagor's obligations hereunder by reason of (i) the failure of Mortgagee to comply with any request of Mortgagor or any guarantor or indemnitor with respect to the Loan to take any action to foreclose this Security Instrument or otherwise enforce any of the provisions hereof or of the Loan Agreement, the Note or the other Loan Documents, (ii) the release, regardless of consideration, of the whole or any part of the Mortgaged Property, or of any party liable for the Secured Obligations or any portion thereof, or (iii) any agreement or stipulation by Mortgagee extending the time of payment or otherwise modifying or supplementing the terms of the Loan Agreement, this Security Instrument or the other Loan Documents.

(b)     It is agreed that the risk of loss or damage to the Mortgaged Property is on Mortgagor, and Mortgagee shall have any liability whatsoever for decline in the value of the Mortgaged Property, for failure to maintain the insurance policies required to be maintained pursuant to the Loan Agreement, or for failure to determine whether insurance in force is

Mortgage – IL

13

adequate as to the amount of risks insured. Possession by Mortgagee shall not be deemed an election of judicial relief if any such possession is requested or obtained with respect to any Mortgaged Property or collateral not in Mortgagee's possession.

(c)     Mortgagee may resort for the payment of the Secured Obligations to any other security held by Mortgagor or any Guarantors in such order and manner as Mortgagee, in its discretion, may elect. Mortgagee may take action to recover the Secured Obligations, or any portion thereof, or to enforce any covenant hereof without prejudice to the right of Mortgagee thereafter to foreclose this Security Instrument. The rights of Mortgagee under this Security Instrument shall be separate, distinct and cumulative and none shall be given effect to the exclusion of the others. No act of Mortgagee shall be construed as an election to proceed under any one provision herein to the exclusion of any other provision. Mortgagee shall not be limited exclusively to the rights and remedies herein stated but shall be entitled to every right and remedy now or hereafter afforded at law or in equity.

(d)     In the event of a foreclosure sale, the Personal Property and the Mortgaged Property may, at the option of Mortgagee, be sold as a whole.

**Section 8.7.**     RIGHT TO RELEASE ANY PORTION OF THE PROPERTY. Mortgagee may release any portion of the Mortgaged Property for such consideration as Mortgagee may require without, as to the remainder of the Mortgaged Property, in any way impairing or affecting the lien or priority of this Security Instrument, or improving the position of any subordinate lienholder with respect thereto, except to the extent that the obligations hereunder shall have been reduced by the actual monetary consideration, if any, received by Mortgagee for such release, and may accept by assignment, pledge or otherwise any other property in place thereof as Mortgagee may require without being accountable for so doing to any other lienholder. This Security Instrument shall continue as a lien and security interest in the remaining portion of the Mortgaged Property.

**Section 8.8.**     RIGHT OF ENTRY. Upon reasonable notice to Mortgagor and subject to the Leases and rights of any tenants or other occupants then in occupancy of all or any part of the Mortgaged Property, Mortgagee and its agents shall have the right to enter and inspect the Mortgaged Property at all reasonable times.

**Section 8.9.**     BANKRUPTCY.

(a)     Upon the occurrence and during the continuance of an Event of Default, Mortgagee shall have the right to proceed in its own name or in the name of Mortgagee or in the name of Mortgagor in respect of any claim, suit, action or proceeding relating to the rejection of any Lease, including, without limitation, the right to file and prosecute, to the exclusion of Mortgagor, any proofs of claim, complaints, motions, applications, notices and other documents, in any case in respect of the lessee under such Lease under the Bankruptcy Code (defined below).

(b)     If there shall be filed by or against Mortgagor a petition under 11 U.S.C. §101 et seq., as the same may be amended from time to time (the "***Bankruptcy Code***"), and Mortgagor, as lessor under any Lease, shall determine to reject such Lease pursuant to Section 365(a) of the Bankruptcy Code, then Mortgagor shall give Mortgagee not less than ten (10) days' prior notice of the date on which Mortgagor shall apply to the bankruptcy court for authority to reject the Lease. Mortgagee shall have the right, but not the obligation, to serve upon Mortgagor within such ten-day period a notice stating that (i) Mortgagee demands that Mortgagor assume and assign the Lease to Mortgagee pursuant to Section 365 of the Bankruptcy Code and (ii) Mortgagee covenants to cure or provide adequate assurance of future performance under the

Mortgage – IL

Lease. If Mortgagee serves upon Mortgagor the notice described in the preceding sentence, Mortgagor shall not seek to reject the Lease and shall comply with the demand provided for in *clause (i)* of the preceding sentence within thirty (30) days after the notice shall have been given, subject to the performance by Mortgagee of the covenant provided for in *clause (ii)* of the preceding sentence.

### Article 9 — INTENTIONALLY OMITTED

### Article 10 — WAIVERS

**Section 10.1.** MARSHALLING AND OTHER MATTERS. Mortgagor hereby waives, to the extent permitted by law, the benefit of all legal requirements now or hereafter in force regarding appraisement, valuation, stay, extension, reinstatement and redemption and all rights of marshalling in the event of any sale hereunder of the Mortgaged Property or any part thereof or any interest therein. Further, to the extent permitted by law, Mortgagor hereby expressly waives any and all rights of redemption from sale under any order or decree of foreclosure of this Security Instrument on behalf of Mortgagor, and on behalf of each and every party acquiring any interest in or title to the Mortgaged Property subsequent to the date of this Security Instrument and on behalf of all parties to the extent permitted by legal requirements.

**Section 10.2.** WAIVER OF NOTICE. Mortgagor shall not be entitled to any notices of any nature whatsoever from Mortgagee except with respect to matters for which this Security Instrument, the Loan Agreement or any of the other Loan Documents specifically and expressly provides for the giving of notice by Mortgagee to Mortgagor and except with respect to matters for which Mortgagor is not permitted by legal requirements to waive its right to receive notice, and Mortgagor hereby expressly waives the right to receive any notice from Mortgagee with respect to any matter for which this Security Instrument, the Loan Agreement or any of the other Loan Documents does not specifically and expressly provide for the giving of notice by Mortgagee to Mortgagor.

**Section 10.3.** SOLE DISCRETION OF MORTGAGEE. Whenever pursuant to this Security Instrument, Mortgagee exercises any right given to it to approve or disapprove, or any arrangement or term is to be satisfactory to Mortgagee, the decision of Mortgagee to approve or disapprove or to decide whether arrangements or terms are satisfactory or not satisfactory shall (except as is otherwise specifically herein provided) be in the sole (but reasonable) discretion of Mortgagee and shall be final and conclusive.

**Section 10.4.** WAIVER OF TRIAL BY JURY. **TO THE EXTENT PERMITTED BY APPLICABLE LAW, MORTGAGOR AND MORTGAGEE EACH HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THE LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY MORTGAGOR AND MORTGAGEE, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. EACH OF MORTGAGEE AND MORTGAGOR IS HEREBY AUTHORIZED TO FILE A COPY OF THIS *SECTION 10.4* IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY MORTGAGOR AND MORTGAGEE.**

**Section 10.5.** WAIVER OF FORECLOSURE DEFENSE. To the extent permissible under applicable law, Mortgagor hereby waives any defense Mortgagor might assert or have by reason of Mortgagee's

Mortgage – IL

failure to make any tenant or lessee of the Mortgaged Property a party defendant in any foreclosure proceeding or action instituted by Mortgagee.

## Article 11 — CROSS-COLLATERALIZATION

**Section 11.1.** CROSS-COLLATERALIZATION. Mortgagor acknowledges that the Secured Obligations are secured by this Security Instrument together with certain other property given by Mortgagor and/or any Guarantors (as applicable) to Mortgagee (whether one or more, collectively, the "*Other Liens*") encumbering the real and personal property more particularly described in and/or pursuant to the applicable Loan Documents (such real and personal property, collectively, the "*Other Properties*"), all as more specifically set forth in the Loan Agreement and/or applicable Loan Documents. Upon the occurrence and during the continuance of an Event of Default, Mortgagee shall have the right to institute a proceeding or proceedings for the total or partial foreclosure of this Security Instrument and any or all of the Other Liens whether by court action, power of sale or otherwise, under any applicable provision of law, for all of the Secured Obligations and the lien and the security interest created by the Other Liens shall continue in full force and effect without loss of priority as a lien and security interest securing the payment of that portion of the Secured Obligations then due and payable but still outstanding. Mortgagor acknowledges and agrees that the Mortgaged Property and the Other Properties may be located in one or more States and/or counties, and therefore Mortgagee shall be permitted to enforce payment of the Secured Obligations and the performance of any term, covenant or condition of the Note, the Loan Agreement, this Security Instrument, the Loan Documents or the Other Liens and exercise any and all rights and remedies under the Note, the Loan Agreement, this Security Instrument, the other Loan Documents or the Other Liens, or as provided by law or at equity, by one or more proceedings, whether contemporaneous, consecutive or both, to be determined by Mortgagee, in its sole discretion, in any one or more of the States or counties in which the Mortgaged Property or any of the Other Properties are located. Neither the acceptance of this Security Instrument, the other Loan Documents or the Other Liens nor the enforcement thereof in any one State or county, whether by court action, foreclosure, power of sale or otherwise, shall prejudice or in any way limit or preclude enforcement by court action, foreclosure, power of sale or otherwise, of the Loan Agreement, the Note, this Security Instrument, the other Loan Documents, or any Other Liens through one or more additional proceedings in that State or county or in any other State or county. Any and all sums received by Mortgagee under the Loan Agreement, the Note, this Security Instrument and the other Loan Documents shall be applied to the Secured Obligations in such order and priority as set forth in the Loan Agreement, without regard to any portion of the Loan allocated to any Mortgaged Property or any of the Other Properties or the appraised value of the Mortgaged Property or any of the Other Properties.

## Article 12 — MORTGAGEE AND NOTICES

**Section 12.1.** FAILURE TO ACT. Notwithstanding anything to the contrary contained herein or in any of the other Loan Documents, the failure of Mortgagee to take any action hereunder or under any of the other Loan Documents shall not (a) be deemed to be a waiver of any term or condition of this Security Instrument or any of the other Loan Documents, (b) adversely affect any rights of Mortgagee hereunder or under any of the other Loan Documents, or (c) relieve Mortgagor of any of Mortgagor's obligations hereunder or under any of the other Loan Documents.

**Section 12.2.** NOTICES. Except as otherwise provided by applicable law, all notices or other written communications hereunder shall be delivered in accordance with the applicable terms and conditions of the Loan Agreement.

Mortgage – IL

16

## Article 13 — APPLICABLE LAW

**Section 13.1. GOVERNING LAW. EXCEPT TO THE EXTENT THE UNIFORM COMMERCIAL CODE REQUIRES APPLICATION OF THE LAW OF ANOTHER JURISDICTION, THIS SECURITY INSTRUMENT SHALL BE GOVERNED BY AND CONSTRUED AND ENFORCED ACCORDING TO THE LAWS (WITHOUT GIVING EFFECT TO THE CONFLICT OF LAW PRINCIPLES THEREOF) OF THE STATE WHERE THE MORTGAGED PROPERTY IS LOCATED. WHENEVER REFERENCE IS MADE TO THE LOAN AGREEMENT OR OTHER LOAN DOCUMENTS, THOSE INSTRUMENTS SHALL BE DEEMED TO BE GOVERNED BY AND CONSTRUED ACCORDING TO THE INTERNAL LAWS OF THE STATE OF ILLINOIS, PURSUANT TO THE TERMS AS EACH INSTRUMENT SO PROVIDES.**

**Section 13.2.** PROVISIONS SUBJECT TO APPLICABLE LAW. All rights, powers and remedies provided in this Security Instrument may be exercised only to the extent that the exercise thereof does not violate any applicable provisions of law and are intended to be limited to the extent necessary so that they will not render this Security Instrument invalid, unenforceable or not entitled to be recorded, registered or filed under the provisions of any applicable law. If any term of this Security Instrument or any application thereof shall be invalid or unenforceable, the remainder of this Security Instrument and any other application of the term shall not be affected thereby.

## Article 14 — DEFINITIONS

**Section 14.1.** GENERAL DEFINITIONS. Unless the context clearly indicates a contrary intent or unless otherwise specifically provided herein, words used in this Security Instrument may be used interchangeably in singular or plural form and

(a) the word "*Mortgagor*" shall mean each Mortgagor and any subsequent owner or owners of the Mortgaged Property or any part thereof or any interest therein;

(b) the word "*Mortgagee*" shall mean Mortgagee and any of Mortgagee's successors and assigns;

(c) the words "*Mortgaged Property*" shall include any portion of the Mortgaged Property and any interest therein;

(d) the words "*Other Properties*" shall include any portion of the Other Properties and any interest therein;

(e) the phrases "*attorneys' fees*," "*legal fees*," and "*counsel fees*" shall include any and all attorneys', paralegal and law clerk fees and disbursements, including, but not limited to, fees and disbursements at the pre-trial, trial and appellate levels incurred or paid by Mortgagee in protecting its interest in the Mortgaged Property, the Leases and the Rents and enforcing its rights hereunder; and

(f) All pronouns and variations thereof shall be deemed to refer to masculine, feminine, neuter, singular, or plural, as the identity of a person or persons may require. Whenever the word "*or*" is used in this Security Instrument, it shall not be deemed exclusive.

Mortgage – IL

## Article 15 — MISCELLANEOUS PROVISIONS

**Section 15.1.** NO ORAL CHANGE. This Security Instrument, and any provisions hereof, may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Mortgagor or Mortgagee, but only by an agreement in writing signed by Mortgagor and Mortgagee in accordance with the Loan Agreement.

**Section 15.2.** SUCCESSORS AND ASSIGNS. This Security Instrument shall be binding upon and inure to the benefit of Mortgagor, Mortgagee and their respective successors and assigns forever.

**Section 15.3.** INAPPLICABLE PROVISIONS. If any term, covenant or condition of the Loan Agreement, the Note or this Security Instrument is held to be invalid, illegal or unenforceable in any respect, the Loan Agreement, the Note and this Security Instrument shall be construed without such provision.

**Section 15.4.** HEADINGS, ETC. The headings and captions of various Sections of this Security Instrument are for convenience of reference only and are not to be construed as defining or limiting, in any way, the scope or intent of the provisions hereof.

**Section 15.5.** NUMBER AND GENDER. Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns shall include the plural and vice versa.

**Section 15.6.** ENTIRE AGREEMENT. This Security Instrument and the other Loan Documents contain the entire agreement of the parties hereto and thereto in respect of the transactions contemplated hereby and thereby, and all prior agreements among or between such parties, whether oral or written, are superseded by the terms of this Security Instrument and the other Loan Documents.

**Section 15.7.** LIMITATION ON MORTGAGEE'S RESPONSIBILITY. No provision of this Security Instrument shall operate to place any obligation or liability for the control, care, management or repair of the Mortgaged Property upon Mortgagee, nor shall it operate to make Mortgagee responsible or liable for any waste committed on the Mortgaged Property by the tenants or any other occupant or party, or for any dangerous or defective condition of the Mortgaged Property, or for any negligence in the management, upkeep, repair or control of the Mortgaged Property resulting in loss or injury or death to any tenant, licensee, employee or stranger. Nothing herein contained shall be construed as constituting Mortgagee a "Mortgagee in possession."

**Section 15.8.** AGREEMENT OF THE PARTIES. EACH OF THE PARTIES HERETO SPECIFICALLY ACKNOWLEDGES AND AGREES (a) THAT IT HAS A DUTY TO READ THIS SECURITY INSTRUMENT AND THAT IT IS CHARGED WITH NOTICE AND KNOWLEDGE OF THE TERMS HEREOF, (b) THAT IT HAS IN FACT READ THIS SECURITY INSTRUMENT AND IS FULLY INFORMED AND HAS FULL NOTICE AND KNOWLEDGE OF THE TERMS, CONDITIONS AND EFFECTS OF THIS SECURITY INSTRUMENT, (c) THAT IT HAS BEEN REPRESENTED BY LEGAL COUNSEL OF ITS CHOICE THROUGHOUT THE NEGOTIATIONS PRECEDING ITS EXECUTION OF THIS SECURITY INSTRUMENT AND HAS RECEIVED THE ADVICE OF SUCH COUNSEL IN CONNECTION WITH ENTERING INTO THIS SECURITY INSTRUMENT, AND (d) THAT IT RECOGNIZES THAT CERTAIN OF THE TERMS OF THIS SECURITY INSTRUMENT PROVIDE FOR (i) CERTAIN WAIVERS AND FOR (ii) THE ASSUMPTION BY ONE PARTY OF, AND/OR RELEASE OF THE OTHER PARTY FROM, CERTAIN LIABILITIES THAT SUCH PARTY MIGHT OTHERWISE BE RESPONSIBLE FOR UNDER THE LAW. EACH PARTY HERETO FURTHER AGREES AND COVENANTS THAT IT

Mortgage – IL

WILL NOT CONTEST THE VALIDITY OR ENFORCEABILITY OF ANY SUCH PROVISIONS OF THIS SECURITY INSTRUMENT ON THE BASIS THAT THE PARTY HAD NO NOTICE OR KNOWLEDGE OF SUCH PROVISION OR THAT SUCH PROVISIONS ARE NOT "CONSPICUOUS."

**Section 15.9.** CONFLICT. In the event of any inconsistencies between the terms and conditions of this Security Instrument and the terms and conditions of the Loan Agreement, the terms and conditions of the Loan Agreement shall control and be binding.

### Article 16 — STATUS OF MORTGAGOR

**Section 16.1.** STATUS OF MORTGAGOR. Mortgagor's exact legal name is correctly set forth in the first paragraph of this Security Instrument and the signature block at the end of this Security Instrument. Mortgagor is an organization of the type specified in the first paragraph of this Security Instrument. Mortgagor is incorporated in or organized under the laws of the state specified in *Section 1.4* of this Security Instrument. Mortgagor's principal place of business and chief executive office, and the place where Mortgagor kept its principal books and records, including recorded data of any kind or nature, regardless of the medium or recording, including software, and writings, has been for the preceding four months (or, if less, the entire period of the existence of Mortgagor) the address shown on the first page of this Security Instrument. Mortgagor's organizational identification number, if any, assigned by the state of incorporation or organization is correctly set forth in *Section 1.4* of this Security Instrument. Mortgagor will not change or permit to be changed (a) Mortgagor's name, (b) Mortgagor's identity (including its trade name or names), (c) Mortgagor's principal place of business set forth on the first page of this Security Instrument, (d) Mortgagor's state of organization, or (e) Mortgagor's organizational number, in each case, without notifying Mortgagee of such change in writing at least thirty (30) days prior to the effective date of such change. If Mortgagor does not now have an organizational identification number and later obtains one, Mortgagor promptly shall notify the Mortgagee of such organizational identification number. Mortgagor will not change its organizational structure, except as permitted in the Loan Agreement.

*[The remainder of this page left intentionally blank. Signature Page follows]*

Mortgage – IL

**IN WITNESS WHEREOF**, this Security Instrument has been executed by the undersigned as of the day and year first above written.

MORTGAGOR:

NORTHWEST CAPITAL HOLDINGS, LLC,
an Illinois limited liability company

By: X _Edward_ _____
         Edward J. Streit, Manager

STATE OF _Illinois_        )
                          )
COUNTY OF _Kane_      )

I, _____Karrsten Goettel_____, a Notary Public of the County and State aforesaid, certify that Edward J. Streit personally came before me and, being by me duly sworn, acknowledged that he is the Manager of NORTHWEST CAPITAL HOLDINGS, LLC, an Illinois limited liability company, and that by authority duly given and as the act of said company, the foregoing instrument was signed in its name by him.

Witness my hand and official stamp or seal this _24th_ day of February, 2016.

> "OFFICIAL SEAL"
> KARRSTEN GOETTEL
> Notary Public, State of Illinois
> My Commission Expires 10/20/18

_____
NOTARY PUBLIC IN AND FOR
THE STATE OF _Illinois_

The Address of Mortgagee is:

Midland States Bank
100 N. Chicago Street
Joliet, Illinois  60432

_Signature Page to Mortgage, Assignment Of Leases And Rents, Security Agreement And Fixture Filing_

## Exhibit A

## DESCRIPTION OF LAND

THE WESTERLY 625 FEET AND THE EASTERLY 345 FEET OF LOT 1 IN PINEBROOK SUBDIVISION, BEING A PART OF THE SOUTHWEST QUARTER OF SECTION 8, TOWNSHIP 15 NORTH, RANGE 5 WEST OF THE THIRD PRINCIPAL MERIDIAN.

SITUATED IN SANGAMON COUNTY, ILLINOIS.

SUBJECT to any and all easements, restrictions, covenants and rights-of-way of record.

Address:                    1833 Seven Pines Road, Springfield, IL 62704

APN/Parcel ID(s):      22-08-0-351-001

Mortgage – Exhibit A

<u>FIRST LOAN MODIFICATION AGREEMENT</u>

THIS FIRST LOAN MODIFICATION AGREEMENT (this "***Agreement***") is made and entered into as of February 24, 2018, by and between NORTHWEST CAPITAL HOLDINGS, LLC, an Illinois limited liability company ("***Borrower***"), and MIDLAND STATES BANK, an Illinois state chartered bank ("***Lender***").

<u>RECITALS:</u>

A.    Borrower is the owner of a two hundred twenty (220) unit market rate multifamily residential complex known as Westbrook Apartments located at 1833 Seven Pines Road in Springfield, Illinois 62704 (together with all real estate and improvements thereon, the "***Property***").

B.    Lender made a loan to Borrower known as Loan No. ▮▮▮▮▮0853 in the original principal amount of $8,600,000 (the "***Loan***") to finance, among other things, the acquisition and construction of the Property.

C.    The Loan is evidenced, secured, and/or guaranteed by, among other things, a Promissory Note dated February 24, 2016 made by Borrower and payable to order of Lender in the original principal amount of $8,600,000 (the "***Note***"), a Loan Agreement dated February 24, 2016 by and between Borrower and Lender in connection therewith (the "***Loan Agreement***"), a Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated February 24, 2016 made, granted and executed by Borrower to, in favor of, and for the benefit of, Lender (the "***Mortgage***"), and an Unconditional Continuing Guaranty of Unlimited Obligations and Security Agreement dated February 24, 2016 made and executed by Jacqueline A. Streit ("***Guarantor***") to, in favor of, and for the benefit of, Lender (the "***Guaranty***", and together with all other documents, instruments and agreements evidencing, securing, and/or guaranteeing the Loan and Note, and further together with all modifications, amendments, extensions, change in terms, renewals, replacements, restatements, refinancings, supplements, substitutions, and assignments thereof, the "***Loan Documents***").

D.    Borrower and Lender desire to extend the maturity and maturity date of the Loan and the Note, upon the terms and conditions contained herein, in order to provide sufficient time for Borrower and/or Guarantor to submit required financial statements, tax returns, and other financial information to Lender as required under the Loan Documents and for Lender to obtain an appraisal of the Property.

NOW, THEREFORE, in consideration of the premises, promises, covenants and agreements herein contained, and for valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereby act and agree as follows:

<u>AGREEMENT:</u>

1.    <u>Affirmation of Recitals; Definitions</u>. The recitals preceding this Agreement are true and correct statements of fact and are incorporated herein by this reference. Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the applicable Loan Documents.

9527748.1

1

Case 20-00532 Doc 1 Part 5 Filed 07/01/20 Entered 07/01/20 07:10 Desc Attachment First Loan Modification Agreement Page 46 of 95

Case 20-05334 Claim 5 Part 1 Filed 05/08/20 Desc Attachment First Loan Modification Agreement Page 2 of 5

2.     Maturity; Maturity Date. The Loan and the Note, the Loan Agreement, and the other Loan Documents are hereby modified to reflect that the maturity date of the Loan and the Note shall be May 24, 2018.

3.     Reaffirmation of Loan, Indebtedness, Loan Documents, and Lender's Security Interests. Borrower and Guarantor hereby ratify and reaffirm: (a) the Loan, the Note, the Loan Agreement, the Mortgage, the Guaranty, and the other Loan Documents, and the payment of indebtedness by Borrower and performance of obligations by Borrower and Guarantor thereunder; (b) the unpaid principal balance, accrued interest and other sums and amounts under the Loan and the Loan Documents on the date hereof in the amount of $8,191,994.52; and (c) Lender's security interests in any and all Collateral and other items evidencing, securing and/or guaranteeing the Loan, the Note, and the other Loan Documents.

4.     Loan Documents Unimpaired; No Novation; No Release of Security Interests; Joint and Several Liability. Borrower, Guarantor, and Lender hereby acknowledge and agree that the modification of the Loan, the Note, and the other Loan Documents pursuant to this Agreement: (a) shall not otherwise modify or amend the Loan, the Note, the Loan Agreement, the Mortgage, the Guaranty, and the other Loan Documents except as specifically and expressly provided herein; (b) shall not operate to release, waive, satisfy, discharge or terminate the obligations for payment of the indebtedness and performance of the obligations by Borrower and Guarantor and any other guarantors or other of their obligors to Lender under the Loan, the Note, the Loan Agreement, the Mortgage, the Guaranty, and the other Loan Documents; (c) shall not operate to modify, amend, waive, or terminate any of the rights and remedies of Lender under the Loan, the Note, the Loan Agreement, the Mortgage, the Guaranty, and the other Loan Documents; and (d) shall not operate to release any of Lender's security interests and Collateral evidencing, securing and/or guaranteeing the Loan, the Note, the Loan Agreement, the Mortgage, the Guaranty, and the other Loan Documents. This Agreement is executed as a modification only and not as a novation; and except as herein provided, all terms and conditions, covenants and obligations under the Loan, the Note, the Loan Agreement, the Mortgage, the Guaranty, and the other Loan Documents, and of any other promissory note, deed of trust, mortgage, security agreement or other documents of lien or encumbrance of Borrower or collateral being held by or granted in favor of Lender and all guarantees in favor of Lender shall remain in full force and effect and unmodified. Should any of the terms of the Note conflict with this Agreement, then the terms of this Agreement shall control. If Borrower consists of more than one party, all such parties shall be jointly and severally liable and responsible for all promises, covenants, agreements, and other obligations set forth herein and in the Note and the other Loan Documents.

5.     Payment of Lender's Out of Pocket Expenses. Borrower agrees to pay to Lender all of Lender's out of pocket expenses incurred by Lender pertaining to, arising out of, or touching upon this Agreement, including, but not limited to, attorneys' fees, appraisal fees, and title commitment/policy fees which such sums are included in the increased Loan as modified by this Agreement.

6.     Release. For good and sufficient consideration, including the execution of this Agreement as well as other documents signed in connection with this Agreement, the adequacy and sufficiency of which is hereby acknowledged, Borrower, and its respective past, present and

9527748.1

2

future predecessors, successors, assigns, affiliates, subsidiaries, and parents, and all of their respective past, present and future officers, directors, shareholders, partners, members, managers, trustees, beneficiaries, employees, agents, attorneys, accountants, agents, legal representatives, designees, successors and assigns, jointly and severally (collectively the "***Releasing Parties***") agree to release, remise, acquit and forever discharge Lender and to indemnify, defend, and hold harmless Lender, and its respective past, present and future predecessors, successors, assigns, affiliates, subsidiaries, and parents, and all of their respective past, present and future participants, officers, directors, shareholders, partners, members, managers, trustees, beneficiaries, employees, agents, attorneys, accountants, agents, legal representatives, designees, heirs, legatees, devisees, estates, executors, successors and assigns, and all other persons and entities whomsoever they may be, jointly and severally (collectively the "***Lender Released Parties***"), of and from any and all accounts, actions, causes of action, claims, contracts, controversies, covenants, damages, debts, demands, fees, costs, expenses, fines, penalties, judgments, orders, liabilities, and obligations whatsoever, in contract, law or in equity, absolute or contingent, direct or indirect, disputed or otherwise, whether now known or unknown, liquidated or unliquidated which the Releasing Parties now have, ever had, may have or could assert against the Lender Released Parties for, upon or by reason of any matter, cause or thing whatsoever arising prior to the date of this Agreement including, but not limited to, the business, operations or functioning of the Lender Released Parties and any errors, acts, omissions, negligence or willful misconduct but only to the extent that the same directly relate to or arise out of the Loan, the Note and the other Loan Documents as of the date of this Agreement.

    7.    <u>Representations and Warranties.</u>

    (a)    Borrower and Guarantor, as applicable, each represent and warrant to Lender that:

    (i)    the concepts embodied in this Agreement have been independently negotiated, that it at all times has been represented by counsel of its own choice or has had the opportunity to be represented by counsel of its own choice, that this Agreement is satisfactory to and in the best interest of Borrower and Guarantor, and that Borrower and Guarantor have actively requested that Lender enter into this Agreement. Borrower and Guarantor shall be responsible to pay for its own attorneys' fees, costs and expenses in connection with the preparation, negotiation and execution of this Agreement, and in connection with the consummation of the transactions contemplated in this Agreement.

    (ii)    it has the legal power and ability to enter into and perform this Agreement, that all actions required in connection with the authorization, execution, delivery and performance of this Agreement have been duly taken, and that when executed and delivered, this Agreement shall constitute its valid and binding obligation.

    (iii)    all financial and tax disclosures and information provided by or on behalf of Borrower and Guarantor and any other guarantors or other of their obligors under the Note and the other Loan Documents to Lender in connection with the negotiations culminating in the execution of this Agreement and the transactions contemplated hereby, are and were true, accurate and complete in all respects.

9527748.1

(iv)    Lender has reasonably relied upon the truth and accuracy of the financial and tax disclosures and information provided by or on behalf of Borrower and Guarantor and any other guarantors or other of their obligors to Lender in agreeing to enter into this Agreement.

(v)    if Borrower or Guarantor has made any false, incorrect, incomplete, or inaccurate covenants, representations, or warranties of Borrower or Guarantor or any other guarantors or other of their obligors under the Note and the other Loan Documents regarding the financial or tax condition upon which Lender has relied, this Agreement shall be null and void at Lender's election.

(b)    Lender represents and warrants that Lender is the sole holder and owner of the Note and the other Loan Documents with full power and authority to enter into and perform this Agreement for the uses and purposes herein set forth, that all actions required in connection with the authorization, execution, delivery and performance of this Agreement have been duly taken, and that when executed and delivered, this Agreement shall constitute its valid and binding obligation.

8.    <u>Binding Effect; Entire Agreement</u>. This Agreement shall inure to the benefit of, and shall be binding upon, the respective successors, heirs and permitted assigns of the parties hereto pursuant to the terms of the Note and the Loan Documents. This Agreement and the documents executed and delivered pursuant hereto, constitute the entire agreement among the parties and may be amended only by a writing signed on behalf of each Party.

9.    <u>Multiple Counterparts</u>. This Agreement may be signed in one or more counterparts, each of which shall be deemed an original. This Agreement shall be deemed fully executed and effective when all of the parties hereto have executed and delivered to each of the other parties hereto at least one of its original executed counterpart of this Agreement even though no single counterpart bears the signatures of each and every Party hereto.

10.    <u>Severability</u>. Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision in this Agreement shall be prohibited by or declared to be invalid under any applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision and the remaining provisions of this Agreement. The representations, warranties, covenants and obligations of the parties herein (including the Release herein) shall survive the termination of this Agreement.

{Remainder of page intentionally left blank; signature page to follow}

9527748.1

4

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the day and year first above written.

BORROWER:

NORTHWEST CAPITAL HOLDINGS, LLC,
an Illinois limited liability company

By: _Edward J. Streit_

Edward J. Streit, Manager

LENDER:

MIDLAND STATES BANK,
an Illinois banking corporation

By: _____

Jason Mansker, Authorized Signatory

ACKNOWLEDGEMENT AND CONSENT OF GUARANTOR

By: _Jacqueline A. Streit_

Jacqueline A. Streit, an individual

5

9527748.1

## SECOND LOAN MODIFICATION AGREEMENT

THIS SECOND LOAN MODIFICATION AGREEMENT (this "*Agreement*") is made and entered into as of May 24, 2018, by and between NORTHWEST CAPITAL HOLDINGS, LLC, an Illinois limited liability company ("*Borrower*"), and MIDLAND STATES BANK, an Illinois state chartered bank ("*Lender*").

## RECITALS:

A.      Borrower is the owner of a two hundred twenty (220) unit market rate multifamily residential complex known as Westbrook Apartments located at 1833 Seven Pines Road in Springfield, Illinois 62704 (together with all real estate and improvements thereon, the "*Property*").

B.      Lender made a loan to Borrower known as Loan No. ▮▮▮▮0853 in the original principal amount of $8,600,000 (the "*Loan*") to finance, among other things, the acquisition and construction of the Property.

C.      The Loan is evidenced, secured, and/or guaranteed by, among other things, a Promissory Note dated February 24, 2016 made by Borrower and payable to order of Lender in the original principal amount of $8,600,000 (the "*Note*"), a Loan Agreement dated February 24, 2016 by and between Borrower and Lender in connection therewith (the "*Loan Agreement*"), a Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated February 24, 2016 made, granted and executed by Borrower to, in favor of, and for the benefit of, Lender (the "*Mortgage*"), and an Unconditional Continuing Guaranty of Unlimited Obligations and Security Agreement dated February 24, 2016 made and executed by Jacqueline A. Streit ("*Guarantor*") to, in favor of, and for the benefit of, Lender (the "*Guaranty*", and together with all other documents, instruments and agreements evidencing, securing, and/or guaranteeing the Loan and Note, and further together with all modifications (including the First Loan Modification as defined herein), amendments, extensions, change in terms, renewals, replacements, restatements, refinancings, supplements, substitutions, and assignments thereof, the "*Loan Documents*").

D.      The Loan and the Note, the Loan Agreement, and the other Loan Documents were amended by that certain First Loan Modification Agreement dated February 24, 2018 between Borrower and Lender (the "*First Loan Modification*", and made a part of the "Loan Documents"), which extended the maturity date of the Loan to May 24, 2018.

E.      Borrower and Lender desire to further extend the maturity and maturity date of the Loan and the Note, upon the terms and conditions contained herein, in order to provide sufficient time for Lender to continue to review the appraisal of the Property obtained on or about April 26, 2018 including, without limitation, to answer various questions that arose during Lender's initial review of the appraisal.

NOW, THEREFORE, in consideration of the premises, promises, covenants and agreements herein contained, and for valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereby act and agree as follows:

9821352.1

AGREEMENT:

    1.    <u>Affirmation of Recitals; Definitions</u>. The recitals preceding this Agreement are true and correct statements of fact and are incorporated herein by this reference. Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the applicable Loan Documents.

    2.    <u>Maturity; Maturity Date</u>. The Loan and the Note, the Loan Agreement, and the other Loan Documents are hereby modified to reflect that the maturity date of the Loan and the Note shall be August 24, 2018.

    3.    <u>Reaffirmation of Loan, Indebtedness, Loan Documents, and Lender's Security Interests</u>. Borrower and Guarantor hereby ratify and reaffirm: (a) the Loan, the Note, the Loan Agreement, the Mortgage, the Guaranty, and the other Loan Documents, and the payment of indebtedness by Borrower and performance of obligations by Borrower and Guarantor thereunder; (b) Lender's security interests in any and all Collateral and other items evidencing, securing and/or guaranteeing the Loan, the Note, and the other Loan Documents; and (c) the unpaid principal balance, accrued interest and other sums and amounts under the Loan and the Loan Documents as of May 23, 2018 as follows:

| | |
|---|---|
| Current Balance | $8,162,117.78 |
| Accrued Interest | $21,972.59 |
| Late Charges | $2,398.97 |
| Escrow Balance | $58,671.61 |
| | |
| Total Payoff | $8,245,160.95 |

    4.    <u>Loan Documents Unimpaired; No Novation; No Release of Security Interests; Joint and Several Liability</u>. Borrower, Guarantor, and Lender hereby acknowledge and agree that the modification of the Loan, the Note, and the other Loan Documents pursuant to this Agreement: (a) shall not otherwise modify or amend the Loan, the Note, the Loan Agreement, the Mortgage, the Guaranty, and the other Loan Documents except as specifically and expressly provided herein; (b) shall not operate to release, waive, satisfy, discharge or terminate the obligations for payment of the indebtedness and performance of the obligations by Borrower and Guarantor and any other guarantors or other of their obligors to Lender under the Loan, the Note, the Loan Agreement, the Mortgage, the Guaranty, and the other Loan Documents; (c) shall not operate to modify, amend, waive, or terminate any of the rights and remedies of Lender under the Loan, the Note, the Loan Agreement, the Mortgage, the Guaranty, and the other Loan Documents; and (d) shall not operate to release any of Lender's security interests and Collateral evidencing, securing and/or guaranteeing the Loan, the Note, the Loan Agreement, the Mortgage, the Guaranty, and the other Loan Documents. This Agreement is executed as a modification only and not as a novation; and except as herein provided, all terms and conditions, covenants and obligations under the Loan, the Note, the Loan Agreement, the Mortgage, the Guaranty, and the other Loan Documents, and of any other promissory note, deed of trust, mortgage, security agreement or other documents of lien or encumbrance of Borrower or collateral being held by or granted in favor of Lender and all guarantees in favor of Lender shall remain in full force and effect and unmodified. Should any of the terms of the Note conflict with

this Agreement, then the terms of this Agreement shall control. If Borrower consists of more than one party, all such parties shall be jointly and severally liable and responsible for all promises, covenants, agreements, and other obligations set forth herein and in the Note and the other Loan Documents.

5.    <u>Payment of Lender's Out of Pocket Expenses</u>. Borrower agrees to pay to Lender all of Lender's out of pocket expenses incurred by Lender pertaining to, arising out of, or touching upon this Agreement, including, but not limited to, attorneys' fees, appraisal fees, and title commitment/policy fees which such sums are included in the increased Loan as modified by this Agreement.

6.    <u>Release</u>. For good and sufficient consideration, including the execution of this Agreement as well as other documents signed in connection with this Agreement, the adequacy and sufficiency of which is hereby acknowledged, Borrower, and its respective past, present and future predecessors, successors, assigns, affiliates, subsidiaries, and parents, and all of their respective past, present and future officers, directors, shareholders, partners, members, managers, trustees, beneficiaries, employees, agents, attorneys, accountants, agents, legal representatives, designees, successors and assigns, jointly and severally (collectively the "***Releasing Parties***") agree to release, remise, acquit and forever discharge Lender and to indemnify, defend, and hold harmless Lender, and its respective past, present and future predecessors, successors, assigns, affiliates, subsidiaries, and parents, and all of their respective past, present and future participants, officers, directors, shareholders, partners, members, managers, trustees, beneficiaries, employees, agents, attorneys, accountants, agents, legal representatives, designees, heirs, legatees, devisees, estates, executors, successors and assigns, and all other persons and entities whomsoever they may be, jointly and severally (collectively the "***Lender Released Parties***"), of and from any and all accounts, actions, causes of action, claims, contracts, controversies, covenants, damages, debts, demands, fees, costs, expenses, fines, penalties, judgments, orders, liabilities, and obligations whatsoever, in contract, law or in equity, absolute or contingent, direct or indirect, disputed or otherwise, whether now known or unknown, liquidated or unliquidated which the Releasing Parties now have, ever had, may have or could assert against the Lender Released Parties for, upon or by reason of any matter, cause or thing whatsoever arising prior to the date of this Agreement including, but not limited to, the business, operations or functioning of the Lender Released Parties and any errors, acts, omissions, negligence or willful misconduct but only to the extent that the same directly relate to or arise out of the Loan, the Note and the other Loan Documents as of the date of this Agreement.

7.    <u>Representations and Warranties</u>.

(a)    Borrower and Guarantor, as applicable, each represent and warrant to Lender that:

(i)    the concepts embodied in this Agreement have been independently negotiated, that it at all times has been represented by counsel of its own choice or has had the opportunity to be represented by counsel of its own choice, that this Agreement is satisfactory to and in the best interest of Borrower and Guarantor, and that Borrower and Guarantor have actively requested that Lender enter into this Agreement. Borrower and Guarantor shall be responsible to pay for its own attorneys' fees, costs and expenses in

3

connection with the preparation, negotiation and execution of this Agreement, and in connection with the consummation of the transactions contemplated in this Agreement.

(ii)     it has the legal power and ability to enter into and perform this Agreement, that all actions required in connection with the authorization, execution, delivery and performance of this Agreement have been duly taken, and that when executed and delivered, this Agreement shall constitute its valid and binding obligation.

(iii)     all financial and tax disclosures and information provided by or on behalf of Borrower and Guarantor and any other guarantors or other of their obligors under the Note and the other Loan Documents to Lender in connection with the negotiations culminating in the execution of this Agreement and the transactions contemplated hereby, are and were true, accurate and complete in all respects.

(iv)     Lender has reasonably relied upon the truth and accuracy of the financial and tax disclosures and information provided by or on behalf of Borrower and Guarantor and any other guarantors or other of their obligors to Lender in agreeing to enter into this Agreement.

(v)     if Borrower or Guarantor has made any false, incorrect, incomplete, or inaccurate covenants, representations, or warranties of Borrower or any other guarantors or other of their obligors under the Note and the other Loan Documents regarding the financial or tax condition upon which Lender has relied, this Agreement shall be null and void at Lender's election.

(b)     Lender represents and warrants that Lender is the sole holder and owner of the Note and the other Loan Documents with full power and authority to enter into and perform this Agreement for the uses and purposes herein set forth, that all actions required in connection with the authorization, execution, delivery and performance of this Agreement have been duly taken, and that when executed and delivered, this Agreement shall constitute its valid and binding obligation.

8.     Binding Effect; Entire Agreement. This Agreement shall inure to the benefit of, and shall be binding upon, the respective successors, heirs and permitted assigns of the parties hereto pursuant to the terms of the Note and the Loan Documents. This Agreement and the documents executed and delivered pursuant hereto, constitute the entire agreement among the parties and may be amended only by a writing signed on behalf of each Party.

9.     Multiple Counterparts. This Agreement may be signed in one or more counterparts, each of which shall be deemed an original. This Agreement shall be deemed fully executed and effective when all of the parties hereto have executed and delivered to each of the other parties hereto at least one of its original executed counterpart of this Agreement even though no single counterpart bears the signatures of each and every Party hereto.

10.     Severability. Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision in this Agreement shall be prohibited by or declared to be invalid under any applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without

9821352.1

4

invalidating the remainder of such provision and the remaining provisions of this Agreement. The representations, warranties, covenants and obligations of the parties herein (including the Release herein) shall survive the termination of this Agreement.

11.   WAIVER OF JURY TRIAL. TO THE FULLEST EXTENT PERMITTED BY LAW, AND AS SEPARATELY BARGAINED-FOR CONSIDERATION TO THE LENDER, BORROWER HEREBY WAIVES ANY RIGHT TO A TRIAL BY JURY (WHICH LENDER ALSO WAIVES) IN ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHTS UNDER THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR RELATING THERETO OR ARISING FROM THE LENDING RELATIONSHIP WHICH IS THE SUBJECT OF THIS AGREEMENT AND AGREE THAT ANY SUCH ACTION OR PROCEEDING SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY.

12.   Jointly Drafted. This Agreement has been jointly drafted by all of the parties, and in the event of any dispute arising out of this Agreement, no party will have any right to argue any rule of construction or interpretation against any other party claiming the benefit or detriment of being a draftsperson.

{remainder of page intentionally left blank; signature page to follow}

9821352.1

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the day and year first above written.

BORROWER:

NORTHWEST CAPITAL HOLDINGS, LLC,
an Illinois limited liability company

By: _____
          Edward J. Streit, Manager

LENDER:

MIDLAND STATES BANK,
an Illinois banking corporation

By: _____
          Jason Mansker, Authorized Signatory

ACKNOWLEDGEMENT AND CONSENT OF GUARANTOR:

By: _____
          Jacqueline A. Streit, an individual

9821352.1

## THIRD LOAN MODIFICATION AGREEMENT

THIS THIRD LOAN MODIFICATION AGREEMENT (this "***Agreement***") is made and entered into as of August 24, 2018 (the "***Effective Date***"), by and between NORTHWEST CAPITAL HOLDINGS, LLC, an Illinois limited liability company ("***Borrower***"), and MIDLAND STATES BANK, an Illinois state chartered bank ("***Lender***").

## RECITALS:

A.      Borrower is the owner of a two hundred twenty (220) unit market rate multifamily residential complex known as Westbrook Apartments located at 1833 Seven Pines Road in Springfield, Illinois 62704 (together with all real estate and improvements thereon, the "***Property***").

B.      Lender made a loan to Borrower known as Loan No. ▓▓▓▓0853 in the original principal amount of $8,600,000 (the "***Loan***") to finance, among other things, the acquisition and construction of the Property.

C.      The Loan is evidenced, secured, and/or guaranteed by, among other things, a Promissory Note dated February 24, 2016 made by Borrower and payable to order of Lender in the original principal amount of $8,600,000 (the "***Note***"), a Loan Agreement dated February 24, 2016 by and between Borrower and Lender in connection therewith, as Modified by the First Loan Modification Agreement dated February 24, 2018 (the "***Loan Agreement***"), a Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated February 24, 2016 made, granted and executed by Borrower to, in favor of, and for the benefit of, Lender (the "***Mortgage***"), and an Unconditional Continuing Guaranty of Unlimited Obligations and Security Agreement dated February 24, 2016 made and executed by Jacqueline A. Streit ("***Guarantor***") to, in favor of, and for the benefit of, Lender (the "***Guaranty***", and together with all other documents, instruments and agreements evidencing, securing, and/or guaranteeing the Loan and Note, and further together with all modifications, amendments, extensions, change in terms, renewals, replacements, restatements, refinancings, supplements, substitutions, and assignments thereof, the "***Loan Documents***").

D.      Borrower and Lender entered into that certain First Loan Modification Agreement dated as of February 24, 2018 and a Second Loan Modification Agreement dated as of May 24, 2018.

E.      Borrower and Lender further desire to modify certain provisions of the Loan and the Loan Documents, upon the terms and conditions contained herein.

NOW, THEREFORE, in consideration of the premises, promises, covenants and agreements herein contained, and for valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereby act and agree as follows:

1

AGREEMENT:

       1.    <u>Affirmation of Recitals; Definitions</u>. The recitals preceding this Agreement are true and correct statements of fact and are incorporated herein by this reference. Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the applicable Loan Documents.

       2.    <u>Maturity; Maturity Date</u>. The Loan and the Note, the Loan Agreement, and the other Loan Documents are hereby modified to reflect that the date of maturity of the Note and the Loan shall be December 24, 2018 (the "***Maturity Date***").

       3.    <u>Operating and Deposit Conditions; Base Rate of Interest</u>. The calculation of the Base Rate of interest is hereby modified as follows:

       (a)    Except as provided in Section 3(b) of this Agreement, the Base Rate of interest shall accrue on the outstanding balance of the Note at a fixed rate of interest equal to five and twenty-five one hundredths percent (5.25%, 525 basis points), per annum, from the Effective Date through the Maturity Date provided that all of the following conditions in Subsections 3(a)(i), (ii), and (iii) below (individually and collectively, the "***Operating and Deposit Conditions***") are satisfied to Lender's satisfaction as of October 10, 2018 (the "***Operating and Deposit Conditions Date***") and continue thereafter to be satisfied to Lender's satisfaction through the Maturity Date:

       (i)    (A) Borrower shall use, keep, and maintain the Operating Account on an active and ongoing basis for the daily, weekly, monthly and annual operating transactions attributable to the Property including, without limitation, that all income, revenues, proceeds, profits, rents, collections, receivables, and receipts derived from the operation of the Property and all of its facilities shall be promptly and directly deposited into the Operating Account upon receipt thereof and all costs, expenses, and other expenditures incurred from the operation of the Property and all of its facilities shall be promptly and directly paid from the Operating Account, and (B) all such deposits into the Operating Account shall be made by means of Lender's remote deposit capture devices, subject to any remote deposit capture services or user agreements of Lender in connection therewith.

       (ii)    Borrower shall have, keep, and maintain on deposit in the Cash Reserve Account or in any other reserve account with Lender subject to any account agreement and/or control agreement of Lender in connection therewith and further subject to the other Loan Documents, cash in the amount of no less than $50,000.

       (iii)    (A) Borrower shall open a new money market account (the "***Money Market Account***") with Lender subject to any account agreement and/or control agreement of Lender in connection therewith and further subject to the other Loan Documents, and (B) Borrower shall have, keep, and maintain

10209352.4

on deposit in the Money Market Account cash in the amount of no less than
$750,000.

(b)  Notwithstanding anything contained herein or in the Loan Documents
to the contrary, should any one or more of the Operating and Deposit Conditions not be
satisfied to Lender's satisfaction at any time and for any or no reason commencing on
the Operating and Deposit Conditions Date through the Maturity Date (an "***Operating
and Deposit Conditions Default***"), then as of the date of the Operating and Deposit
Conditions Default (the "***Operating and Deposit Conditions Default Date***"), without
notice to Borrower of, and without opportunity of Borrower to cure, such Operating
and Deposit Conditions Default, the Base Rate of interest shall be automatically
adjusted as of the Operating and Deposit Conditions Default Date and shall remain in
effect at all times from the Operating and Deposit Conditions Default Date through the
Maturity Date to accrue on the outstanding balance of the Note at a fixed rate of
interest equal to the sum of the 5-Year Libor Swap Rate plus three and twenty-five one
hundredths percent (3.25%, 325 basis points), per annum. The term "***5-Year LIBOR
Swap Rate***", as used herein, shall mean the interest rate which is subject to change
from time to time based on changes in an independent index, which independent index
is the London Interbank Offered Rate for U.S. Dollar deposits published in the Wall
Street Journal as the Five (5) Year LIBOR Swap Rate, or as such interest rate is
otherwise determined by Lender on the applicable date pursuant to Lender's normal
policies and procedures. If for any reason the 5-Year LIBOR Swap Rate is no longer
published by the Wall Street Journal or is otherwise no longer available or Lender is
unable to determine the 5-Year LIBOR Swap Rate, Lender may, in its sole discretion,
select an alternate source or designate a substitute index comparable to the 5-Year
LIBOR Swap Rate to determine an applicable interest rate which is readily available
and verifiable to Lender but is beyond Lender's control. The 5-Year LIBOR Swap
Rate is not necessarily the lowest interest rates charged by Lender on its loans. For
clarity, an Operating and Deposit Conditions Default shall not be curable by Borrower.

(c)  The Base Rate of Interest as provided in this Agreement shall be fixed
for the remaining term of the Note, except as otherwise provided herein, and further
except as provided in the Loan Agreement for purposes of otherwise calculating the
Default Rate or the Maximum Lawful Rate.

4.  Amortization Period; Escrow Portion of Payment.

(a)  The amortization of the Note shall remain unchanged. As of the
Effective Date, the remaining amortization period is equal to two hundred sixty-eight
(268) months.

(b)  The real estate tax escrow portion of the monthly payment on the Note
shall remain unchanged at thirteen thousand four hundred seven and 80/100 Dollars
($13,407.80) per month.

5.  Payment of Lender's Out of Pocket Costs. Borrower agrees to pay to Lender
the following out of pocket costs incurred by Lender in connection with this Agreement,

which such costs shall be due and payable in full by Borrower to Lender upon Borrower's execution and delivery of this Agreement to Lender:

| | |
|---|---|
| Loan extension fee | $30,000.00 |
| Flood Certification | $24.00 |
| Lender's legal fees | $1,958.00 |
| **TOTAL** | **$31,982.00** |

6.      <u>Reaffirmation of Loan, Indebtedness, Loan Documents, and Lender's Security Interests</u>. Borrower and Guarantor hereby ratify and reaffirm: (a) the Loan, the Note, the Loan Agreement, the Mortgage, the Guaranty, and the other Loan Documents, and the payment of indebtedness by Borrower and performance of obligations by Borrower and Guarantor thereunder; (b) the unpaid principal balance, accrued interest and other sums and amounts under the Loan and the Loan Documents as of the Effective Date is in the amount of $8,126,950.31; and (c) Lender's security interests in any and all Collateral and other items evidencing, securing and/or guaranteeing the Loan, the Note, and the other Loan Documents.

7.      <u>Loan Documents Unimpaired; No Novation; No Release of Security Interests; Joint and Several Liability</u>. Borrower, Guarantor, and Lender hereby acknowledge and agree that the modification of the Loan, the Note, and the other Loan Documents pursuant to this Agreement: (a) shall not otherwise modify or amend the Loan, the Note, the Loan Agreement, the Mortgage, the Guaranty, and the other Loan Documents except as specifically and expressly provided herein; (b) shall not operate to release, waive, satisfy, discharge or terminate the obligations for payment of the indebtedness and performance of the obligations by Borrower and Guarantor and any other guarantors or other of their obligors to Lender under the Loan, the Note, the Loan Agreement, the Mortgage, the Guaranty, and the other Loan Documents; (c) shall not operate to modify, amend, waive, or terminate any of the rights and remedies of Lender under the Loan, the Note, the Loan Agreement, the Mortgage, the Guaranty, and the other Loan Documents; and (d) shall not operate to release any of Lender's security interests and Collateral evidencing, securing and/or guaranteeing the Loan, the Note, the Loan Agreement, the Mortgage, the Guaranty, and the other Loan Documents. This Agreement is executed as a modification only and not as a novation; and except as herein provided, all terms and conditions, covenants and obligations under the Loan, the Note, the Loan Agreement, the Mortgage, the Guaranty, and the other Loan Documents, and of any other promissory note, deed of trust, mortgage, security agreement or other documents of lien or encumbrance of Borrower or collateral being held by or granted in favor of Lender and all guarantees in favor of Lender shall remain in full force and effect and unmodified. Should any of the terms of the Note conflict with this Agreement, then the terms of this Agreement shall control. If Borrower consists of more than one party, all such parties shall be jointly and severally liable and responsible for all promises, covenants, agreements, and other obligations set forth herein and in the Note and the other Loan Documents.

8.      <u>Release</u>. For good and sufficient consideration, including the execution of this Agreement as well as other documents signed in connection with this Agreement, the adequacy and sufficiency of which is hereby acknowledged, Borrower, and its respective past, present and future predecessors, successors, assigns, affiliates, subsidiaries, and parents, and

4

all of their respective past, present and future officers, directors, shareholders, partners, members, managers, trustees, beneficiaries, employees, agents, attorneys, accountants, agents, legal representatives, designees, successors and assigns, jointly and severally (collectively the "***Releasing Parties***") agree to release, remise, acquit and forever discharge Lender and to indemnify, defend, and hold harmless Lender, and its respective past, present and future predecessors, successors, assigns, affiliates, subsidiaries, and parents, and all of their respective past, present and future participants, officers, directors, shareholders, partners, members, managers, trustees, beneficiaries, employees, agents, attorneys, accountants, agents, legal representatives, designees, heirs, legatees, devisees, estates, executors, successors and assigns, and all other persons and entities whomsoever they may be, jointly and severally (collectively the "***Lender Released Parties***"), of and from any and all accounts, actions, causes of action, claims, contracts, controversies, covenants, damages, debts, demands, fees, costs, expenses, fines, penalties, judgments, orders, liabilities, and obligations whatsoever, in contract, law or in equity, absolute or contingent, direct or indirect, disputed or otherwise, whether now known or unknown, liquidated or unliquidated which the Releasing Parties now have, ever had, may have or could assert against the Lender Released Parties for, upon or by reason of any matter, cause or thing whatsoever arising prior to the Effective Date including, but not limited to, the business, operations or functioning of the Lender Released Parties and any errors, acts, omissions, negligence or willful misconduct but only to the extent that the same directly relate to or arise out of the Loan, the Note and the other Loan Documents as of the Effective Date.

9.  <u>Representations and Warranties</u>.

(a)  Borrower and Guarantor, as applicable, each represent and warrant to Lender that:

(i)  the concepts embodied in this Agreement have been independently negotiated, that it at all times has been represented by counsel of its own choice or has had the opportunity to be represented by counsel of its own choice, that this Agreement is satisfactory to and in the best interest of Borrower and Guarantor, and that Borrower and Guarantor have actively requested that Lender enter into this Agreement. Borrower and Guarantor shall be responsible to pay for its own attorneys' fees, costs and expenses in connection with the preparation, negotiation and execution of this Agreement, and in connection with the consummation of the transactions contemplated in this Agreement.

(ii)  it has the legal power and ability to enter into and perform this Agreement, that all actions required in connection with the authorization, execution, delivery and performance of this Agreement have been duly taken, and that when executed and delivered, this Agreement shall constitute its valid and binding obligation.

(iii)  all financial and tax disclosures and information provided by or on behalf of Borrower and Guarantor and any other guarantors or other of their obligors under the Note and the other Loan Documents to Lender in connection with the

5

negotiations culminating in the execution of this Agreement and the transactions contemplated hereby, are and were true, accurate and complete in all respects.

(iv)     Lender has reasonably relied upon the truth and accuracy of the financial and tax disclosures and information provided by or on behalf of Borrower and Guarantor and any other guarantors or other of their obligors to Lender in agreeing to enter into this Agreement.

(v)     if Borrower or Guarantor has made any false, incorrect, incomplete, or inaccurate covenants, representations, or warranties of Borrower or Guarantor or any other guarantors or other of their obligors under the Note and the other Loan Documents regarding the financial or tax condition upon which Lender has relied, this Agreement shall be null and void at Lender's election.

(b)     Lender represents and warrants that Lender is the sole holder and owner of the Note and the other Loan Documents with full power and authority to enter into and perform this Agreement for the uses and purposes herein set forth, that all actions required in connection with the authorization, execution, delivery and performance of this Agreement have been duly taken, and that when executed and delivered, this Agreement shall constitute its valid and binding obligation.

10.     Binding Effect; Entire Agreement. This Agreement shall inure to the benefit of, and shall be binding upon, the respective successors, heirs and permitted assigns of the parties hereto pursuant to the terms of the Note and the Loan Documents. This Agreement and the documents executed and delivered pursuant hereto, constitute the entire agreement among the parties and may be amended only by a writing signed on behalf of each Party.

11.     Multiple Counterparts. This Agreement may be signed in one or more counterparts, each of which shall be deemed an original. This Agreement shall be deemed fully executed and effective when all of the parties hereto have executed and delivered to each of the other parties hereto at least one of its original executed counterpart of this Agreement even though no single counterpart bears the signatures of each and every Party hereto.

12.     Severability. Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision in this Agreement shall be prohibited by or declared to be invalid under any applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision and the remaining provisions of this Agreement. The representations, warranties, covenants and obligations of the parties herein (including the Release herein) shall survive the termination of this Agreement.

13.     Submission and Acceptance of Agreement. On or before 5:00 p.m. (Joliet, Illinois time) on August 24, 2018, Lender must receive from Borrower and Guarantor (a) this Agreement, duly executed by Borrower and Guarantor evidencing its respective acceptance and/or acknowledgment hereof, and (b) payment in full of Lender's costs as provided herein; otherwise, this Agreement and any offer made by Lender herein or in connection herewith

6

may be rescinded (and thereby no force or effect whatsoever) by Lender in its sole and absolute discretion.


{Remainder of page intentionally left blank; signature page to follow}


7

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the day and year first above written.

BORROWER:

NORTHWEST CAPITAL HOLDINGS, LLC,
an Illinois limited liability company

By: _____
Edward J. Streit
Title:  Manager

LENDER:

MIDLAND STATES BANK,
an Illinois banking corporation

By: _____
Harry R. McSteen
Title:  Commercial Relationship Manager

**ACKNOWLEDGEMENT AND CONSENT OF GUARANTOR**

By: _____
Jacqueline A. Streit, an individual

10209352.2



## FOURTH LOAN MODIFICATION AGREEMENT

THIS FOURTH LOAN MODIFICATION AGREEMENT (this "*Agreement*") is made and entered into as of December 24, 2018 (the "*Effective Date*"), by and between NORTHWEST CAPITAL HOLDINGS, LLC, an Illinois limited liability company ("*Borrower*"), and MIDLAND STATES BANK, an Illinois state chartered bank ("*Lender*").

### RECITALS:

A.    Borrower is the owner of a two hundred twenty (220) unit market rate multifamily residential complex known as Westbrook Apartments located at 1833 Seven Pines Road in Springfield, Illinois 62704 (together with all real estate and improvements thereon, the "*Property*").

B.    Lender made a loan to Borrower known as Loan No. ███████0853 in the original principal amount of $8,600,000 (the "*Loan*") to finance, among other things, the acquisition and construction of the Property.

C.    The Loan is evidenced, secured, and/or guaranteed by, among other things, a Promissory Note dated February 24, 2016 made by Borrower and payable to order of Lender in the original principal amount of $8,600,000 (the "*Note*"), a Loan Agreement dated February 24, 2016 by and between Borrower and Lender in connection therewith, as Modified by the First Loan Modification Agreement dated February 24, 2018 (the "*Loan Agreement*"), a Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated February 24, 2016 made, granted and executed by Borrower to, in favor of, and for the benefit of, Lender (the "*Mortgage*"), and an Unconditional Continuing Guaranty of Unlimited Obligations and Security Agreement dated February 24, 2016 made and executed by Jacqueline A. Streit ("*Guarantor*") to, in favor of, and for the benefit of, Lender (the "*Guaranty*", and together with all other documents, instruments and agreements evidencing, securing, and/or guaranteeing the Loan and Note, and further together with all modifications, amendments, extensions, change in terms, renewals, replacements, restatements, refinancings, supplements, substitutions, and assignments thereof, the "*Loan Documents*").

D.    Borrower and Lender entered into that certain First Loan Modification Agreement dated as of February 24, 2018, a Second Loan Modification Agreement dated as of May 24, 2018, and a Third Loan Modification Agreement dated as of August 24, 2018.

E.    Borrower and Lender further desire to modify certain provisions of the Loan and the Loan Documents, upon the terms and conditions contained herein.

NOW, THEREFORE, in consideration of the premises, promises, covenants and agreements herein contained, and for valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereby act and agree as follows:

10979046.1

AGREEMENT:

1.  _Affirmation of Recitals; Definitions_. The recitals preceding this Agreement are true and correct statements of fact and are incorporated herein by this reference. Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the applicable Loan Documents.

2.  _Maturity; Maturity Date_. The Loan and the Note, the Loan Agreement, and the other Loan Documents are hereby modified to reflect that the date of maturity of the Note and the Loan shall be March 24, 2019 (the "_**Maturity Date**_").

3.  _Operating and Deposit Conditions; Base Rate of Interest_. The calculation of the Base Rate of interest is hereby modified as follows:

   (a)  Except as provided in Section 3(b) of this Agreement, the Base Rate of interest shall accrue on the outstanding balance of the Note at a fixed rate of interest equal to six and fifty one hundredths percent (6.50%, 650 basis points), per annum, from the Effective Date through the Maturity Date provided that all of the following conditions in Subsections 3(a)(i), (ii), and (iii) below (individually and collectively, the "_**Operating and Deposit Conditions**_") are satisfied to Lender's satisfaction as of December 24, 2018 (the "_**Operating and Deposit Conditions Date**_") and continue thereafter to be satisfied to Lender's satisfaction through the Maturity Date:

      (i)  (A) Borrower shall use, keep, and maintain the Operating Account on an active and ongoing basis for the daily, weekly, monthly and annual operating transactions attributable to the Property including, without limitation, that all income, revenues, proceeds, profits, rents, collections, receivables, and receipts derived from the operation of the Property and all of its facilities shall be promptly and directly deposited into the Operating Account upon receipt thereof and all costs, expenses, and other expenditures incurred from the operation of the Property and all of its facilities shall be promptly and directly paid from the Operating Account, and (B) all such deposits into the Operating Account shall be made by means of Lender's remote deposit capture devices, subject to any remote deposit capture services or user agreements of Lender in connection therewith.

      (ii)  Borrower shall have, keep, and maintain on deposit in the Cash Reserve Account or in any other reserve account with Lender subject to any account agreement and/or control agreement of Lender in connection therewith and further subject to the other Loan Documents, cash in the amount of no less than $50,000.

      (iii)  (A) Borrower shall open a new money market account (the "_**Money Market Account**_") with Lender subject to any account agreement and/or control agreement of Lender in connection therewith and further subject to the other Loan Documents, and (B) Borrower shall have, keep, and maintain

2

on deposit in the Money Market Account cash in the amount of no less than $750,000.

(b)     Notwithstanding anything contained herein or in the Loan Documents to the contrary, should any one or more of the Operating and Deposit Conditions not be satisfied to Lender's satisfaction at any time and for any or no reason commencing on the Operating and Deposit Conditions Date through the Maturity Date (an "*Operating and Deposit Conditions Default*"), then as of the date of the Operating and Deposit Conditions Default (the "*Operating and Deposit Conditions Default Date*"), without notice to Borrower of, and without opportunity of Borrower to cure, such Operating and Deposit Conditions Default, the Base Rate of interest shall be automatically adjusted as of the Operating and Deposit Conditions Default Date and shall remain in effect at all times from the Operating and Deposit Conditions Default Date through the Maturity Date to accrue on the outstanding balance of the Note at a fixed rate of interest equal to the sum of the 5-Year Libor Swap Rate plus three and twenty-five one hundredths percent (3.25%, 325 basis points), per annum. The term "*5-Year LIBOR Swap Rate*", as used herein, shall mean the interest rate which is subject to change from time to time based on changes in an independent index, which independent index is the London Interbank Offered Rate for U.S. Dollar deposits published in the Wall Street Journal as the Five (5) Year LIBOR Swap Rate, or as such interest rate is otherwise determined by Lender on the applicable date pursuant to Lender's normal policies and procedures. If for any reason the 5-Year LIBOR Swap Rate is no longer published by the Wall Street Journal or is otherwise no longer available or Lender is unable to determine the 5-Year LIBOR Swap Rate, Lender may, in its sole discretion, select an alternate source or designate a substitute index comparable to the 5-Year LIBOR Swap Rate to determine an applicable interest rate which is readily available and verifiable to Lender but is beyond Lender's control. The 5-Year LIBOR Swap Rate is not necessarily the lowest interest rates charged by Lender on its loans. For clarity, an Operating and Deposit Conditions Default shall not be curable by Borrower.

(c)     The Base Rate of Interest as provided in this Agreement shall be fixed for the remaining term of the Note, except as otherwise provided herein, and further except as provided in the Loan Agreement for purposes of otherwise calculating the Default Rate or the Maximum Lawful Rate.

4.     Amortization Period; Adjustment of Payment.

(a)     The amortization of the Note shall remain unchanged. As of the Effective Date, the remaining amortization period is equal to two hundred sixty-four (264) months.

(b)     The principal and interest portion of the monthly payment on the Note shall be modified to fifty seven thousand nine hundred forty-five and 34/100's ($57,945.34) per month. The real estate tax escrow portion of the monthly payment on the Note shall be modified to thirteen thousand four hundred sixty-nine and 66/100 Dollars ($13,469.66) per month.

3

5.     Payment of Lender's Out of Pocket Costs. Borrower agrees to pay to Lender the following out of pocket costs incurred by Lender in connection with this Agreement, which such costs shall be due and payable in full by Borrower to Lender upon Borrower's execution and delivery of this Agreement to Lender:

|                       |              |
|-----------------------|--------------|
| Loan extension fee    | $10,000.00   |
| Flood Certification   | $24.00       |
| Lender's legal fees   | $375.00      |
| **TOTAL**             | **$10,399.00** |

6.     Reaffirmation of Loan, Indebtedness, Loan Documents, and Lender's Security Interests. Borrower and Guarantor hereby ratify and reaffirm: (a) the Loan, the Note, the Loan Agreement, the Mortgage, the Guaranty, and the other Loan Documents, and the payment of indebtedness by Borrower and performance of obligations by Borrower and Guarantor thereunder; (b) the unpaid principal balance, accrued interest and other sums and amounts under the Loan and the Loan Documents as of the Effective Date is in the amount of $8,063,459.76; and (c) Lender's security interests in any and all Collateral and other items evidencing, securing and/or guaranteeing the Loan, the Note, and the other Loan Documents.

7.     Loan Documents Unimpaired; No Novation; No Release of Security Interests; Joint and Several Liability. Borrower, Guarantor, and Lender hereby acknowledge and agree that the modification of the Loan, the Note, and the other Loan Documents pursuant to this Agreement: (a) shall not otherwise modify or amend the Loan, the Note, the Loan Agreement, the Mortgage, the Guaranty, and the other Loan Documents except as specifically and expressly provided herein; (b) shall not operate to release, waive, satisfy, discharge or terminate the obligations for payment of the indebtedness and performance of the obligations by Borrower and Guarantor and any other guarantors or other of their obligors to Lender under the Loan, the Note, the Loan Agreement, the Mortgage, the Guaranty, and the other Loan Documents; (c) shall not operate to modify, amend, waive, or terminate any of the rights and remedies of Lender under the Loan, the Note, the Loan Agreement, the Mortgage, the Guaranty, and the other Loan Documents; and (d) shall not operate to release any of Lender's security interests and Collateral evidencing, securing and/or guaranteeing the Loan, the Note, the Loan Agreement, the Mortgage, the Guaranty, and the other Loan Documents. This Agreement is executed as a modification only and not as a novation; and except as herein provided, all terms and conditions, covenants and obligations under the Loan, the Note, the Loan Agreement, the Mortgage, the Guaranty, and the other Loan Documents, and of any other promissory note, deed of trust, mortgage, security agreement or other documents of lien or encumbrance of Borrower or collateral being held by or granted in favor of Lender and all guarantees in favor of Lender shall remain in full force and effect and unmodified. Should any of the terms of the Note conflict with this Agreement, then the terms of this Agreement shall control. If Borrower consists of more than one party, all such parties shall be jointly and severally liable and responsible for all promises, covenants, agreements, and other obligations set forth herein and in the Note and the other Loan Documents.

8.     Release. For good and sufficient consideration, including the execution of this Agreement as well as other documents signed in connection with this Agreement, the

4

10979046.1

adequacy and sufficiency of which is hereby acknowledged, Borrower, and its respective past, present and future predecessors, successors, assigns, affiliates, subsidiaries, and parents, and all of their respective past, present and future officers, directors, shareholders, partners, members, managers, trustees, beneficiaries, employees, agents, attorneys, accountants, agents, legal representatives, designees, successors and assigns, jointly and severally (collectively the "*Releasing Parties*") agree to release, remise, acquit and forever discharge Lender and to indemnify, defend, and hold harmless Lender, and its respective past, present and future predecessors, successors, assigns, affiliates, subsidiaries, and parents, and all of their respective past, present and future participants, officers, directors, shareholders, partners, members, managers, trustees, beneficiaries, employees, agents, attorneys, accountants, agents, legal representatives, designees, heirs, legatees, devisees, estates, executors, successors and assigns, and all other persons and entities whomsoever they may be, jointly and severally (collectively the "*Lender Released Parties*"), of and from any and all accounts, actions, causes of action, claims, contracts, controversies, covenants, damages, debts, demands, fees, costs, expenses, fines, penalties, judgments, orders, liabilities, and obligations whatsoever, in contract, law or in equity, absolute or contingent, direct or indirect, disputed or otherwise, whether now known or unknown, liquidated or unliquidated which the Releasing Parties now have, ever had, may have or could assert against the Lender Released Parties for, upon or by reason of any matter, cause or thing whatsoever arising prior to the Effective Date including, but not limited to, the business, operations or functioning of the Lender Released Parties and any errors, acts, omissions, negligence or willful misconduct but only to the extent that the same directly relate to or arise out of the Loan, the Note and the other Loan Documents as of the Effective Date.

9.   Representations and Warranties.

(a)   Borrower and Guarantor, as applicable, each represent and warrant to Lender that:

(i)   the concepts embodied in this Agreement have been independently negotiated, that it at all times has been represented by counsel of its own choice or has had the opportunity to be represented by counsel of its own choice, that this Agreement is satisfactory to and in the best interest of Borrower and Guarantor, and that Borrower and Guarantor have actively requested that Lender enter into this Agreement. Borrower and Guarantor shall be responsible to pay for its own attorneys' fees, costs and expenses in connection with the preparation, negotiation and execution of this Agreement, and in connection with the consummation of the transactions contemplated in this Agreement.

(ii)   it has the legal power and ability to enter into and perform this Agreement, that all actions required in connection with the authorization, execution, delivery and performance of this Agreement have been duly taken, and that when executed and delivered, this Agreement shall constitute its valid and binding obligation.

(iii)   all financial and tax disclosures and information provided by or on behalf of Borrower and Guarantor and any other guarantors or other of their obligors

5

under the Note and the other Loan Documents to Lender in connection with the negotiations culminating in the execution of this Agreement and the transactions contemplated hereby, are and were true, accurate and complete in all respects.

(iv)   Lender has reasonably relied upon the truth and accuracy of the financial and tax disclosures and information provided by or on behalf of Borrower and Guarantor and any other guarantors or other of their obligors to Lender in agreeing to enter into this Agreement.

(v)   if Borrower or Guarantor has made any false, incorrect, incomplete, or inaccurate covenants, representations, or warranties of Borrower or Guarantor or any other guarantors or other of their obligors under the Note and the other Loan Documents regarding the financial or tax condition upon which Lender has relied, this Agreement shall be null and void at Lender's election.

(b)   Lender represents and warrants that Lender is the sole holder and owner of the Note and the other Loan Documents with full power and authority to enter into and perform this Agreement for the uses and purposes herein set forth, that all actions required in connection with the authorization, execution, delivery and performance of this Agreement have been duly taken, and that when executed and delivered, this Agreement shall constitute its valid and binding obligation.

10.   Binding Effect; Entire Agreement. This Agreement shall inure to the benefit of, and shall be binding upon, the respective successors, heirs and permitted assigns of the parties hereto pursuant to the terms of the Note and the Loan Documents. This Agreement and the documents executed and delivered pursuant hereto, constitute the entire agreement among the parties and may be amended only by a writing signed on behalf of each Party.

11.   Multiple Counterparts. This Agreement may be signed in one or more counterparts, each of which shall be deemed an original. This Agreement shall be deemed fully executed and effective when all of the parties hereto have executed and delivered to each of the other parties hereto at least one of its original executed counterpart of this Agreement even though no single counterpart bears the signatures of each and every Party hereto.

12.   Severability. Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision in this Agreement shall be prohibited by or declared to be invalid under any applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision and the remaining provisions of this Agreement. The representations, warranties, covenants and obligations of the parties herein (including the Release herein) shall survive the termination of this Agreement.

13.   Submission and Acceptance of Agreement. On or before 5:00 p.m. (Joliet, Illinois time) on December 24, 2018, Lender must receive from Borrower and Guarantor (a) this Agreement, duly executed by Borrower and Guarantor evidencing its respective acceptance and/or acknowledgment hereof, and (b) payment in full of Lender's costs as provided herein; otherwise, this Agreement and any offer made by Lender herein or in

6

connection herewith may be rescinded (and thereby no force or effect whatsoever) by Lender
in its sole and absolute discretion.


{Remainder of page intentionally left blank; signature page to follow}

10979046.1

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of
the day and year first above written.

BORROWER:

NORTHWEST CAPITAL HOLDINGS, LLC,
an Illinois limited liability company

By: _____
Edward J. Streit
Title:   Manager

LENDER:

MIDLAND STATES BANK,
an Illinois banking corporation

By: _____
Harry R. McSteen
Title:   Commercial Relationship Manager

## ACKNOWLEDGEMENT AND CONSENT OF GUARANTOR

By: _____
Jacqueline A. Streit, an individual

8

# FIFTH LOAN MODIFICATION AGREEMENT

THIS FIFTH LOAN MODIFICATION AGREEMENT (this "***Agreement***") is made and entered into as of March 24, 2019 (the "***Effective Date***"), by and between NORTHWEST CAPITAL HOLDINGS, LLC, an Illinois limited liability company ("***Borrower***"), and MIDLAND STATES BANK, an Illinois state chartered bank ("***Lender***").

## RECITALS:

A.      Borrower is the owner of a two hundred twenty (220) unit market rate multifamily residential complex known as Westbrook Apartments located at 1833 Seven Pines Road in Springfield, Illinois 62704 (together with all real estate and improvements thereon, the "***Property***").

B.      Lender made a loan to Borrower known as Loan No. ██████0853 in the original principal amount of $8,600,000 (the "***Loan***") to finance, among other things, the acquisition and construction of the Property.

C.      The Loan is evidenced, secured, and/or guaranteed by, among other things, a Promissory Note dated February 24, 2016 made by Borrower and payable to order of Lender in the original principal amount of $8,600,000 (together with all modifications, amendments, change in terms, extensions, renewals, replacements, restatements, and supplements thereto, the "***Note***"), a Loan Agreement dated February 24, 2016 by and between Borrower and Lender in connection therewith (together with all modifications, amendments, change in terms, extensions, renewals, replacements, restatements, and supplements thereto, the "***Loan Agreement***"), a Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated February 24, 2016 made, granted and executed by Borrower to, in favor of, and for the benefit of, Lender (together with all modifications, amendments, change in terms, extensions, renewals, replacements, restatements, and supplements thereto, the "***Mortgage***"), and an Unconditional Continuing Guaranty of Unlimited Obligations and Security Agreement dated February 24, 2016 made and executed by Jacqueline A. Streit ("***Guarantor***") to, in favor of, and for the benefit of, Lender (together with all modifications, amendments, change in terms, extensions, renewals, replacements, restatements, and supplements thereto, the "***Guaranty***", and together with all other documents, instruments and agreements evidencing, securing, and/or guaranteeing the Loan and Note, and further together with all modifications, amendments, extensions, change in terms, renewals, replacements, restatements, refinancings, supplements, substitutions, and assignments thereof, the "***Loan Documents***").

D.      Borrower and Lender entered into that certain First Loan Modification Agreement dated as of February 24, 2018, a Second Loan Modification Agreement dated as of May 24, 2018, a Third Loan Modification Agreement dated as of August 24, 2018, and a Fourth Loan Modification Agreement dated as of December 24, 2018.

E.      Borrower and Lender further desire to modify, amend and supplement certain provisions of the Loan and the Loan Documents, upon the terms and conditions contained herein.

NOW, THEREFORE, in consideration of the foregoing, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto act and agree as follows:

## AGREEMENT:

1.     <u>Affirmation of Recitals</u>. The recitals preceding this Agreement are true and correct statements of fact and are incorporated herein by this reference.

2.     <u>Defined Terms</u>. Capitalized terms used but not otherwise defined herein shall have the meanings given them in Loan Agreement or the other applicable Loan Documents.

3.     <u>Modifications and Amendments to Loan Documents</u>. The Loan and the Loan Documents are hereby modified and amended as follows:

(a)     <u>Maturity; Maturity Date</u>. The maturity of the Note and the Loan shall be extended to July 24, 2020 (the "***Maturity Date***").

(b)     <u>Base Rate of Interest</u>. The Base Rate of interest shall be a fixed rate of interest in the amount of five and sixty-eight one hundredths percent (5.68%, 568 basis points), per annum, effective upon the Effective Date through the Maturity Date (and, upon any successful exercise of the Option to Renew, then during the Renewal Term through and including the Extended Maturity Date). The Base Rate of Interest as provided in this Agreement shall be fixed for the remaining term of the Loan and Note through the Maturity Date (and, upon any successful exercise of the Option to Renew, then during the Renewal Term through and including the Extended Maturity Date), except as otherwise provided herein or in the Loan Agreement for purposes of otherwise calculating the Default Rate or the Maximum Lawful Rate.

(c)     <u>Option to Renew Loan</u>. Borrower shall have the one (1) time option, but not the obligation, to renew the Loan (the "***Option to Renew***") and thereby extend the term of the Loan and Note as well as the Maturity Date for an additional period of twenty (20) months (the "***Renewal Term***") from the Maturity Date (the Maturity Date, as extended by the Renewal Term, the "***Extended Maturity Date***"), upon all other terms and conditions contained herein, in the Note, and in the other Loan Documents, by providing Lender with prior written notice of Borrower's exercise of such Option to Renew (the "***Renewal Notice***") on a date (the "***Renewal Notice Date***") which is at least ninety (90) days prior to the Maturity Date, which such Option to Renew and any exercise or effectiveness thereof shall be subject to and conditioned upon all of the following conditions precedent (collectively, the "***Renewal Conditions***") being strictly satisfied by Borrower (or waived by Lender in Lender's sole and absolute discretion, provided Lender shall have no obligation to waive any Renewal Conditions) as determined by Lender in Lender's sole and absolute discretion:

(i)     no Event of Default has occurred as of (A) the Renewal Notice Date and (B) the Maturity Date;

(ii)     no Event of Default occurs at any time during the time period between the Renewal Notice Date and the Maturity Date;

(iii)     Borrower shall have and maintain at the Property (for clarity, the Westbrook Apartments) an occupancy level of tenants pursuant to arm's length leases of no less than ninety percent (90%) as of (A) the Renewal Notice Date and (B) the Maturity Date;

(iv)     Borrower shall have and maintain at the Property (for clarity, the Westbrook Apartments) an occupancy level of tenants pursuant to arm's length leases

of no less than ninety percent (90%) at all times during the time period between the Renewal Notice Date and the Maturity Date; and

(v)     Borrower shall maintain a Minimum Debt Service Coverage Ratio of no less than 1.15:1.00 as determined by Lender in its sole and absolute discretion based on Borrower's 2019 federal income tax return (or, at Lender's sole election, based on any other financial statements or other financial information provided by Borrower to Lender or as calculated by Lender under Section 10 of the Loan Agreement).

Any successful exercise of the Option to Renew and the Renewal Term shall be subject to the other terms and conditions of the Loan and the Loan Documents.

Should Borrower fail or refuse, for any or no reason, to properly or timely or unsuccessfully exercise such Option to Renew as provided herein or to properly or timely or unsuccessfully satisfy any Renewal Conditions as provided herein, such Option to Renew shall be and be deemed forever waived and forfeited by Borrower, null and void and of no force or effect whatsoever, and any exercise or attempt to exercise such Option to Renew by Borrower shall be and be deemed null and void and of no force or effect whatsoever without further action by Lender. Except for the Option to Renew, subject to the terms and conditions contained herein, (X) Borrower shall have no other option or right to renew or extend the term of the Loan and Note or the Maturity Date (or the Extended Maturity Date), and (Y) Lender may, but shall not be obligated to, otherwise extend or renew the term of the Loan and Note or the Maturity Date (or the Extended Maturity Date) in its sole and absolute discretion, provided, however, nothing contained herein, in the Note, the Loan Agreement, or any other Loan Document, or elsewhere, shall be deemed an agreement of Lender to (or of Lender to permit Borrower to) otherwise extend or renew the term of the Loan and Note or the Maturity Date (or the Extended Maturity Date).

(d)     Deposit Account Pledge and Security Agreement. Borrower shall execute and deliver to Lender, contemporaneously with Borrower's execution and delivery to Lender of this Agreement, a Deposit Account Pledge and Security Agreement (the "***Deposit Account Agreement***") pledging and granting to Lender a lien and security interest in any and all deposit accounts and funds therein of Borrower which are held at Lender, upon the terms and conditions contained therein. The Deposit Account Agreement and the accounts and funds covered thereby shall be and be deemed Collateral for the Loan.

(e)     Use of Operating Account. (i) Borrower shall use, keep, and maintain the Operating Account on an active and ongoing basis for the daily, weekly, monthly and annual operating transactions attributable to the Property including, without limitation, that all income, revenues, proceeds, profits, rents, collections, receivables, and receipts derived from the operation of the Property and all of its facilities shall be promptly and directly deposited into the Operating Account upon receipt thereof and all costs, expenses, and other expenditures incurred from the operation of the Property and all of its facilities shall be promptly and directly paid from the Operating Account, and (ii) all such deposits into the Operating Account shall be made by means of Lender's remote deposit capture devices, subject to any remote deposit capture services or user agreements of Lender in connection therewith.

(f)     Cash Reserve Account. Borrower shall keep and maintain on deposit in the Cash Reserve Account (as defined in the Deposit Account Agreement) cash in the amount of

no less than $50,000.00 during the entire term of the Loan, subject to the terms of the Deposit Account Agreement, the Loan Agreement, and the other Loan Documents.

(g)     Money Market Account. Borrower shall keep and maintain on deposit in the Money Market Account (as defined in the Deposit Account Agreement) cash in the amount of no less than $350,000.00 during the entire term of the Loan, subject to the terms of this Agreement, the Deposit Account Agreement, the Loan Agreement, and the other Loan Documents.

(h)     Monthly Deposits. No later than the tenth (10th) day of each month commencing June 10, 2019 and on a monthly basis by the tenth (10th) day of each month thereafter during the term of the Loan and Note through and including the Maturity Date (and, upon any successful exercise of the Option to Renew, then during the Renewal Term through and including the Extended Maturity Date), Borrower shall deposit cash into the Money Market Account in a lump sum of $8,000.00, per month, directly from the Operating Account (each, a "***Monthly Deposit***"). Each Monthly Deposit shall be automatically made and deposited by Borrower by means of Lender's ACH services, subject to any ACH services or agreement of Lender in connection therewith. Notwithstanding the foregoing, Lender shall have the irrevocable, unconditional and continuing right to, and Borrower hereby grants to Lender the irrevocable, unconditional and continuing right to, make, transfer, and deposit any Monthly Deposit in Lender's sole and absolute discretion directly from the Operating Account, the Cash Reserve Account, and/or the Money Market Account (and/or any other account of Borrower held at Lender) in whole or in part from any one or more of any of the foregoing accounts, as and when provided herein or on any other date of a month for which month Borrower fails for any or no reason to make, transfer, and deposit any Monthly Deposit as and when provided herein.

Borrower's obligation to make a Monthly Deposit (and Lender's right to make a Monthly Deposit) shall continue indefinitely during the term of the Loan and Note through and including the Maturity Date (and, upon any successful exercise of the Option to Renew, then during the Renewal Term through and including the Extended Maturity Date) unless or until Lender may determine, in its sole and absolute discretion, that any Monthly Deposit is not necessary or required based on the performance of the Property (for clarity, the Westbrook Apartments) including, without limitation, based on any financial statements, tax returns, or other information provided by Borrower to Lender in respect of such Property under Section 10 of the Loan Agreement, provided that Lender shall not be obligated to (and shall have no liability to or for not agreeing to) waive, discontinue or forgive any Monthly Deposit, and any waiver, discontinuance or forgiveness by Lender of any Monthly Deposit shall not, in and of itself, release Borrower from making or returning to make (or Lender from having the right to make or returning to make or causing Borrower to make or continue to make) any other, further or continuing Monthly Deposit, which Lender may also start, stop, or restart in its sole and absolute discretion.

(i)     Annual Tax Returns. Sections 10(a)(i) and 10(a)(ii) of the Loan Agreement are revised to reflect that Borrower and any Guarantor shall deliver to Lender its respective annual tax returns, including all schedules, forms, exhibits and statements, no later than July 15 following the preceding calendar year end. All other terms and conditions applicable to such annual tax returns shall be as provided in the Loan Agreement and remain unmodified.

(j)     Minimum Debt Service Coverage Ratio. Borrower shall maintain a Minimum Debt Service Coverage Ratio, as and when provided below, as determined by Lender in its sole

and absolute discretion based on Borrower's annual income tax returns as provided herein and in the Loan Agreement (or, at Lender's sole election, based on any other financial statements or other financial information provided by Borrower to Lender under Section 10 of the Loan Agreement):

    (i)     no less than 1.15:1.00 as of December 31, 2019; and

    (ii)    no less than 1.30:1.00 as of December 31, 2020.

    (k)    **Minimum Occupancy.** Borrower shall have and maintain at the Property (for clarity, the Westbrook Apartments) an occupancy level of tenants pursuant to arm's length leases (each, a "***Minimum Occupancy***"), as and when provided below, as determined by Lender in its sole and absolute discretion, based on any financial statements, tax returns, or other information provided by Borrower to Lender in respect of such Property under Section 10 of the Loan Agreement:

    (i)     no less than 81% as of June 30, 2019;

    (ii)     no less than 84% as of September 30, 2019;

    (iii)    no less than 87% as of December 31, 2019; and

    (iv)    no less than 90% as of March 31, 2020 and as of each and every calendar quarter thereafter.

    (l)    **Exit Fee.** In addition to the Prepayment Premium and any other fees, sums, or amounts payable by Borrower to Lender under the Loan Documents, and in further consideration of this Agreement, upon any sale or transfer of the Property (in whole or in part) by Borrower prior to the Maturity Date (and, upon any successful exercise of the Option to Renew, then during the Renewal Term through and including the Extended Maturity Date), Borrower shall pay to Lender an exit fee in the amount of one percent (1.00%, 100 basis points) of the face amount of the Note (the "***Exit Fee***"), which such Exit Fee shall be paid by Borrower to Lender at the time of such sale or transfer of the Property and which such Exit Fee shall be deemed fully earned on such date, is non-refundable, and shall not be or be deemed liquidated damages, prepaid interest, a penalty, or a credit, reduction, or offset against or payment of any principal, accrued interest, or other fees, sums or amounts due or payable by Borrower to Lender under the Loan Documents.

4.    **Amortization Period; Principal and Interest Payment; Escrow Payment.**

    (a)    **Amortization Period.** The amortization of the Note shall remain unchanged. As of the Effective Date, the remaining amortization period is in the amount of two hundred sixty-two (262) months.

    (b)    **Principal and Interest Payment.** Borrower and Lender acknowledge that Borrower has paid and Lender has collected monthly payments of interest from the Effective Date through May 10, 2019. The monthly payment of principal and interest due and payable by Borrower to Lender for the Loan under the Note and Loan Agreement shall be in the amount of $54,022.00, per month, as the same may be adjusted by Lender as provided in the Note or Loan Agreement, commencing on June 10, 2019.

(c)     Escrow Payment. The monthly payment of real estate tax escrow for the Loan under the Note and Loan Agreement shall remain unchanged as of the Effective Date in the amount of $13,469.66 per month; as the same may be adjusted by Lender as provided in the Note or Loan Agreement or other Loan Documents (including, without limitation, the Mortgage).

5.     Lender's Costs. Borrower agrees to pay to Lender the following fees, costs and expenses paid or incurred by Lender in connection with this Agreement and the transactions contemplated hereby (collectively, the "*Lender's Costs*"). Borrower shall pay in full the Lender's Costs to Lender contemporaneously with Borrower's execution and delivery to Lender of this Agreement, except for the Origination (Loan Renewal) Fee below as further provided hereinafter:

| | |
|---|---|
| Accrued Unpaid Interest from 3/24/19 to 5/10/19 at 5.68% | $19,131.67 |
| Origination (Loan Renewal) Fee (0.75%, 75 basis points) | $60,341.40 |
| Processing Fee | $2,000.00 |
| Lender's Attorney's Fees | $3,997.50 |
| Flood Determination Fee | $24.00 |
| Appraisal | $5,500.00 |
| **TOTAL** | **$90,994.57** |

Borrower agrees to pay to Lender the Origination (Loan Renewal) Fee above in the aggregate amount of $60,341.40 in two equal installment payments, as follows: (a) $30,170.70, contemporaneously with Borrower's execution and delivery to Lender of this Agreement; and (b) $30,170.70, on September 10, 2019.

6.     Ratification/Reaffirmation of Loan, Indebtedness, Loan Documents, and Lender's Security Interests. Borrower and Guarantor hereby ratify and reaffirm: (a) the Loan, the Note, the Loan Agreement, the Mortgage, the Guaranty, and the other Loan Documents, and the payment of indebtedness by Borrower and performance of obligations by Borrower and Guarantor thereunder; (b) the unpaid principal balance, accrued interest and other sums and amounts under the Loan and the Loan Documents as of the Effective Date is in the amount of $8,045,519.45; and (c) Lender's security interests in any and all Collateral and other items evidencing, securing and/or guaranteeing the Loan, the Note, and the other Loan Documents.

7.     Loan Documents Unimpaired; No Novation; No Release of Security Interests; Joint and Several Liability. Borrower, Guarantor, and Lender hereby acknowledge and agree that the modification of the Loan, the Note, and the other Loan Documents pursuant to this Agreement: (a) shall not otherwise modify or amend the Loan, the Note, the Loan Agreement, the Mortgage, the Guaranty, and the other Loan Documents except as specifically and expressly provided herein; (b) shall not operate to release, waive, satisfy, discharge or terminate the obligations for payment of the indebtedness and performance of the obligations by Borrower and Guarantor and any other guarantors or other of their obligors to Lender under the Loan, the Note, the Loan Agreement, the Mortgage, the Guaranty, and the other Loan Documents; (c) shall not operate to modify, amend, waive, or terminate any of the rights and remedies of Lender under the Loan, the Note, the Loan Agreement, the Mortgage, the Guaranty, and the other Loan Documents; and (d) shall not operate to release any of Lender's security interests and Collateral evidencing, securing and/or guaranteeing the Loan, the Note, the Loan Agreement, the Mortgage, the Guaranty, and the other Loan Documents. This Agreement is executed as a modification only and not as a novation; and except as herein provided, all terms and conditions, covenants and obligations under the Loan, the Note, the Loan Agreement, the Mortgage, the Guaranty, and the other Loan Documents, and of any other promissory note, deed of trust, mortgage, security

agreement or other documents of lien or encumbrance of Borrower or collateral being held by or granted in favor of Lender and all guarantees in favor of Lender shall remain in full force and effect and unmodified. Should any of the terms of the Note conflict with this Agreement, then the terms of this Agreement shall control. If Borrower consists of more than one party, all such parties shall be jointly and severally liable and responsible for all promises, covenants, agreements, and other obligations set forth herein and in the Note and the other Loan Documents.

8. <u>Conditions Precedent</u>. This Agreement shall become effective upon the satisfaction of the following conditions precedent, all to Lender's satisfaction:

(a) This Agreement or counterparts thereof shall have been duly executed and delivered to Lender.

(b) All resolutions, consents, approvals, acknowledgements, certificates, and any other documents, agreements and instruments evidencing and/and authorizing the execution and delivery of this Agreement and the terms and conditions hereof, have been duly executed and delivered to Lender, as applicable.

(c) The Lender's Costs are paid in full by Borrower to Lender concurrently herewith.

(d) Borrower complies with and is not in default under any of its covenants, obligations, and liabilities which are made or required to be performed under this Agreement as of Borrower's execution and delivery to Lender of this Agreement.

9. <u>Release</u>. For good and sufficient consideration, including the execution of this Agreement as well as other documents signed in connection with this Agreement, the adequacy and sufficiency of which is hereby acknowledged, Borrower, and its respective past, present and future predecessors, successors, assigns, affiliates, subsidiaries, and parents, and all of their respective past, present and future officers, directors, shareholders, partners, members, managers, trustees, beneficiaries, employees, agents, attorneys, accountants, agents, legal representatives, designees, successors and assigns, jointly and severally (collectively the "***Releasing Parties***") agree to release, remise, acquit and forever discharge Lender and to indemnify, defend, and hold harmless Lender, and its respective past, present and future predecessors, successors, assigns, affiliates, subsidiaries, and parents, and all of their respective past, present and future participants, officers, directors, shareholders, partners, members, managers, trustees, beneficiaries, employees, agents, attorneys, accountants, agents, legal representatives, designees, heirs, legatees, devisees, estates, executors, successors and assigns, and all other persons and entities whomsoever they may be, jointly and severally (collectively the "***Lender Released Parties***"), of and from any and all accounts, actions, causes of action, claims, contracts, controversies, covenants, damages, debts, demands, fees, costs, expenses, fines, penalties, judgments, orders, liabilities, and obligations whatsoever, in contract, law or in equity, absolute or contingent, direct or indirect, disputed or otherwise, whether now known or unknown, liquidated or unliquidated which the Releasing Parties now have, ever had, may have or could assert against the Lender Released Parties for, upon or by reason of any matter, cause or thing whatsoever arising prior to the Effective Date including, but not limited to, the business, operations or functioning of the Lender Released Parties and any errors, acts, omissions, negligence or willful misconduct but only to the extent that the same directly relate to or arise out of the Loan, the Note and the other Loan Documents as of the Effective Date.

10. <u>Representations and Warranties</u>.

(a)     Borrower and Guarantor, as applicable, each represent and warrant to Lender that, as of the Effective Date and as of Borrower's execution and delivery to Lender of the Agreement:

(i)     the representations and warranties of Borrower and Guarantor contained in the Loan Documents were true and correct in all material respects on and as of the date originally made or repeated, and that such representations and warranties are true and correct on the date hereof, except (A) to the extent that any such representation or warranty expressly relates to an earlier date, or (B) for changes resulting from transactions contemplated or amended hereby.

(ii)     Borrower is duly organized, validly existing and in good standing under the laws of the state of its organization or incorporation and has the power and authority to own and operate its assets and to conduct its business as now or proposed to be carried on, and is duly qualified, licensed and in good standing to do business in all jurisdictions where its ownership of property or the nature of its business requires such qualification or licensing.

(iii)     the concepts embodied in this Agreement have been independently negotiated, that it at all times has been represented by counsel of its own choice or has had the opportunity to be represented by counsel of its own choice, that this Agreement is satisfactory to and in the best interest of Borrower and Guarantor, and that Borrower and Guarantor have actively requested that Lender enter into this Agreement. Borrower and Guarantor shall be responsible to pay for its own attorneys' fees, costs and expenses in connection with the preparation, negotiation and execution of this Agreement, and in connection with the consummation of the transactions contemplated in this Agreement.

(iv)     it has the legal power and ability to enter into and perform this Agreement, that all actions required in connection with the authorization, execution, delivery and performance of this Agreement have been duly taken, and that when executed and delivered, this Agreement shall constitute its valid and binding obligation.

(v)     as of the date hereof, there are no actions, suits, proceedings or governmental investigations pending or threatened in writing against Borrower or Guarantor which could be reasonably expected to result in a material or adverse change in Borrower's or Guarantor's ability to satisfy its obligations with respect to the Loan and the Note and the other Loan Documents, and, as of the date hereof, there is no basis known to Borrower or Guarantor for any action, suit, proceeding or investigation which could reasonably be expected to result in such a material or adverse change.

(vi)     as of the date hereof, Borrower has good and marketable title to the collateral and property securing the Loan and the Note and the other Loan Documents, free and clear of all liens and encumbrances, except those approved or waived in writing by Lender.

(vii)     Borrower and Guarantor will not be rendered insolvent by the execution and delivery of this Agreement or terms, conditions or transactions contemplated hereby, and will have sufficient cash flow to enable it to pay its debts as they become due.

(viii)     all financial and tax disclosures and information provided by or on behalf of Borrower and Guarantor and any other guarantors or other of their obligors under the Note and the other Loan Documents to Lender in connection with the negotiations culminating in the execution of this Agreement and the transactions contemplated hereby, are and were true, accurate and complete in all respects.

(ix)    as of the date hereof, any of Borrower, Guarantor or the Property has not suffered any damage, destruction or loss, and no event or condition has occurred or exists, which has resulted or could reasonably be expected to result in a material or adverse change in or impairment of Borrower's or Guarantor's ability to satisfy its obligations with respect to the Loan and the Note or the other Loan Documents.

(x)    Lender has reasonably relied upon the truth and accuracy of the financial and tax disclosures and information provided by or on behalf of Borrower and Guarantor and any other guarantors or other of their obligors to Lender in agreeing to enter into this Agreement.

(xi)    no Event of Default or event or condition which, with notice or lapse of time or both, would constitute an Event of Default, exists as of the date hereof, under the Loan Documents.

(xii)    if Borrower or Guarantor has made any false, incorrect, incomplete, or inaccurate covenants, representations, or warranties of Borrower or Guarantor or any other guarantors or other of their obligors under the Note and the other Loan Documents regarding the financial or tax condition upon which Lender has relied, this Agreement shall be null and void at Lender's election.

(b)    Lender represents and warrants that Lender is the sole holder and owner of the Note and the other Loan Documents with full power and authority to enter into and perform this Agreement for the uses and purposes herein set forth, that all actions required in connection with the authorization, execution, delivery and performance of this Agreement have been duly taken, and that when executed and delivered, this Agreement shall constitute its valid and binding obligation.

11.    <u>Further Assurances</u>. Borrower and Guarantor hereby agrees to take such further actions as may be reasonably requested by Lender as necessary or appropriate to effectuate, carry out and comply with all of the terms of this Agreement and the transactions contemplated hereby.

12.    <u>Survival of Representations and Warranties</u>. All representations and warranties contained herein or made in writing by any party hereto in connection with the transactions contemplated by this Agreement shall survive the execution and delivery of this Agreement and any investigation at any time made by or on behalf of any party hereto, as the case may be.

13.    <u>Waivers</u>. No action taken pursuant to this Agreement, including any investigation by or on behalf of any party, will be deemed to constitute a waiver by the party taking such action, or compliance with any representation, warranty, covenant or agreement contained herein. The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach. The waiver by any party hereto of any condition to its obligations hereunder which is not fulfilled shall preclude such party from seeking redress from the other party hereto for breach of any representations, warranty, covenant or agreement contained in this Agreement.

14.    <u>Binding Effect; Entire Agreement</u>. This Agreement constitutes the entire agreement among the parties pertaining to the subject matter hereof and supersedes all prior agreements, letters of intent, understandings, negotiations and discussions of the parties, whether oral or written. This Agreement shall inure to the benefit of, and shall be binding upon, the respective successors, heirs and permitted assigns of the parties hereto pursuant to the terms of the Note and the Loan Documents.

15.    <u>Amendments</u>. This Agreement may only be amended, modified or supplemented by an agreement in writing signed by all of the parties hereto.

16.     Multiple Counterparts. This Agreement may be signed in one or more counterparts, each of which shall be deemed an original. This Agreement shall be deemed fully executed and effective when all of the parties hereto have executed and delivered to each of the other parties hereto at least one of its original executed counterpart of this Agreement even though no single counterpart bears the signatures of each and every Party hereto.

17.     Severability. Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision in this Agreement shall be prohibited by or declared to be invalid under any applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision and the remaining provisions of this Agreement. The representations, warranties, covenants and obligations of the parties herein (including the Release herein) shall survive the termination of this Agreement.

18.     Governing Law; Jurisdiction; Venue; Remedies. This Agreement shall be interpreted and construed as to both validity and performance and enforced in accordance with and governed by the terms and conditions of the Loan Agreement or other Loan Documents applicable thereto.

19.     Submission and Acceptance of Agreement. On or before 5:00 p.m. (Joliet, Illinois time) on June 10, 2019, Lender must receive from Borrower and Guarantor (a) this Agreement, duly executed by Borrower and Guarantor evidencing its respective acceptance and/or acknowledgment hereof, and (b) payment in full of Lender's Costs as provided herein; otherwise, this Agreement and any offer made by Lender herein or in connection herewith may be rescinded (and thereby no force or effect whatsoever) by Lender in its sole and absolute discretion.

20.     Construction. The Section headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose. Any defined term used in the plural preceded by the definite article shall be taken to encompass all members of the relevant class. Any defined term used in the singular preceded by "***any***" shall be taken to indicate any number of the members of the relevant class. Whenever the word "***or***" is used in this Agreement, it shall not be deemed exclusive

{remainder of page intentionally left blank; signature page to follow}

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the day and year first above written.

BORROWER:

NORTHWEST CAPITAL HOLDINGS, LLC,
an Illinois limited liability company

By: _____

       Edward J. Streit

Title:   Manager


LENDER:

MIDLAND STATES BANK,
an Illinois state chartered bank

By: _____

       Harry R. McSteen

Title:   Commercial Relationship Manager


**ACKNOWLEDGEMENT AND CONSENT OF GUARANTOR**

By: _____

    Jacqueline A. Streit, an individual

## DEPOSIT ACCOUNT PLEDGE AND SECURITY AGREEMENT

THIS DEPOSIT ACCOUNT PLEDGE AND SECURITY AGREEMENT (this "***Agreement***") is made and entered into as of March 24, 2019 (the "***Effective Date***"), by and between NORTHWEST CAPITAL HOLDINGS, LLC, an Illinois limited liability company ("***Borrower***"), as pledger hereunder, and MIDLAND STATES BANK, an Illinois state chartered bank ("***Lender***"), as pledgee hereunder.

<u>RECITALS:</u>

The following recitals are a material part of this Agreement:

A.    Borrower is the owner of a two hundred twenty (220) unit market rate multifamily residential complex known as Westbrook Apartments located at 1833 Seven Pines Road in Springfield, Illinois 62704 (together with all real estate and improvements thereon, the "***Property***").

B.    Lender made a loan to Borrower known as Loan No. ████0853 in the original principal amount of $8,600,000 (the "***Loan***") to finance, among other things, the acquisition and construction of the Property.

C.    The Loan is evidenced, secured, and/or guaranteed by, among other things, a Promissory Note dated February 24, 2016 made by Borrower and payable to order of Lender in the original principal amount of $8,600,000 (together with all modifications, amendments, change in terms, extensions, renewals, replacements, restatements, and supplements thereto, the "***Note***"), a Loan Agreement dated February 24, 2016 by and between Borrower and Lender in connection therewith (together with all modifications, amendments, change in terms, extensions, renewals, replacements, restatements, and supplements thereto, the "***Loan Agreement***"), a Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated February 24, 2016 made, granted and executed by Borrower to, in favor of, and for the benefit of, Lender (together with all modifications, amendments, change in terms, extensions, renewals, replacements, restatements, and supplements thereto, the "***Mortgage***"), and an Unconditional Continuing Guaranty of Unlimited Obligations and Security Agreement dated February 24, 2016 made and executed by Jacqueline A. Streit ("***Guarantor***") to, in favor of, and for the benefit of, Lender (together with all modifications, amendments, change in terms, extensions, renewals, replacements, restatements, and supplements thereto, the "***Guaranty***", and together with all other documents, instruments and agreements evidencing, securing, and/or guaranteeing the Loan and Note, and further together with all modifications, amendments, extensions, change in terms, renewals, replacements, restatements, refinancings, supplements, substitutions, and assignments thereof, the "***Loan Documents***").

D.    Prior to the date hereof, Borrower and Lender entered into that certain First Loan Modification Agreement dated as of February 24, 2018, a Second Loan Modification Agreement dated as of May 24, 2018, a Third Loan Modification Agreement dated as of August 24, 2018, a Fourth Loan Modification Agreement dated as of December 24, 2018.

E.      In connection herewith, Borrower and Lender entered into that certain Fifth Loan Modification Agreement dated as of the date hereof to modify, amend and supplement certain provisions of the Loan and the Loan Documents, upon the terms and conditions contained therein (the "***Fifth Loan Amendment***").

F.      In connection with the Loan and/or the Property, Borrower has opened one or more deposit accounts held at Lender to be used for, among other things, the payment of operating expenses, reserves, escrows, cash disbursements, interest and principal payments and other debt service, working capital, taxes, insurance, fees, costs, expenses, reserves and reserve accounts, the Pledged Accounts, the collection of rents and other items of revenue or receivables, and other uses in connection therewith or related thereto, together with all documents, agreements and instruments accompanying the same (collectively, the "***Pledged Accounts***").

G.      As a condition to the Fifth Loan Amendment, Lender has required that Borrower pledge, assign, convey, transfer and grant to Lender, and Borrower has agreed to pledge, assign, convey, transfer and grant to Lender, a security interest in, and all right, title and interest of Borrower in, to and under, the Collateral (as hereinafter defined) as additional security and collateral for the payment and performance by Borrower under the Loan and all of Borrower's obligations under the Loan Agreement, the Note and the other Loan Documents.

H.      Lender's willingness to enter into the extension of the Loan under the Note and the other Loan Documents is conditioned upon, among other things, the execution and delivery of this Agreement.

I.      Borrower directly benefits from the extension of the Loan under the Note and the other Loan Documents including, without limitation, the Fifth Loan Amendment.

NOW, THEREFORE, in consideration of the promises herein contained, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and each intending to be legally bound hereby, the parties hereto act and agree as follows:

## AGREEMENT:

1.      Agreement. As collateral security for the payment and discharge of the Loan, Borrower hereby grants to, in favor of, and for the benefit of, Lender a security interest in and assigns and pledges to Lender the Pledged Accounts and all other Collateral. Borrower agrees to deliver to Lender all such documents, satisfactory in form and substance to Lender, with respect to the Pledged Accounts as Lender may request. Borrower shall not sell, assign, pledge, hypothecate or otherwise transfer, convey or encumber any of its rights, title and interests in, to and under the Pledged Accounts, except as provided in this Agreement. No withdrawals, transfers, endorsements or payments may be made from the Pledged Accounts without Lender's prior written consent. This Agreement, and the Pledged Accounts and the funds contained therein, and all other Collateral hereunder shall also be and be deemed "Collateral" as provided in the Loan Agreement.

Borrower hereby authorizes Lender to automatically debit the Pledged Accounts in an amount equal to (a) any payment of principal and/or interest due under the Note, (b) any indebtedness, fees, costs, expenses or other amounts or sums paid or incurred by Lender which are to be paid or reimbursed by Borrower under the terms of the Loan Documents, and/or (c) any other amounts or sums due to Lender under the Note, the Loan Agreement or any other Loan Documents, all to the extent that the same are not paid in full by the respective due dates therefor. Borrower shall at all times maintain and keep collected balance in the Pledged Account sufficient to satisfy the foregoing obligations on the respective due dates thereof. Borrower acknowledges and agrees that the authorization granted in this paragraph shall be effective immediately upon execution of this Agreement, and shall not be dependent upon the occurrence of any Event of Default (as defined in Section 3).

This Agreement is given for the purpose of securing any and all obligations and liabilities of Borrower to Lender, whether direct or indirect, joint or several, absolute or contingent, now or hereafter existing, and however created, evidenced or arising, including, but not limited to, the payment of all sums, including, without limitation, the payment of principal and interest, under the Note and the other Loan Documents, or any other agreements, documents and instruments in connection therewith, which are now or at any time due or in favor of Lender thereunder, and the performance and discharge of the obligations, covenants, conditions and agreements contained herein and in the Note and the other Loan Documents, or any other documents in connection therewith, or any modifications, amendments, restatements, extensions, renewals or substitutions of any of the foregoing. This Agreement further secures any and all sums advanced by Lender in order to preserve the collateral pledged herein or to perfect its security interest in such collateral, and in the event of any proceeding to enforce the collection of the obligations, the expenses of retaking, holding, preparing for sale or lease, selling or otherwise disposing of or realizing on the collateral or of any exercise by Lender of its rights in the event of a default under any agreement between Borrower and Lender, together with attorneys' fees and costs.

2.      Pledged Accounts. The Pledged Accounts shall include, without limitation, the following account numbers for checking accounts of Borrower held and maintained at Lender:

| Account: | Account No.: |
|---|---|
| Operating Account | |
| Cash Reserve Account |  |
| Money Market Account | |

In lieu of one or more Pledged Accounts, Lender may handle the same by depositing such funds therefor into a common account held and controlled by Lender as a deemed Pledged Account, with appropriate entries on the books and records of Lender as a deemed deposit of such funds, whereupon a statement summarizing such entries shall be furnished to Borrower upon request of Borrower, at Lender's discretion and subject to Lender's policies and procedures, and in such event, such funds deposited into such common account shall be covered by and subject to the terms and conditions of this Agreement as if such funds were separately deposited into any or more separate Pledged Accounts.

3.      Obligations; Defaults; Liability; Further Assignment. Borrower agrees:

(a) That, to the extent applicable, it shall faithfully abide by, perform and discharge each and every obligation, covenant, condition and agreement of Borrower or to be performed by Borrower under the Note, the Loan Agreement, and the other Loan Documents, and Guarantor shall faithfully abide by, perform and discharge each and every obligation, covenant, condition and agreement of Guarantor to be performed by Guarantor thereunder.

(b) That the occurrence of any of the following shall constitute an "***Event of Default***" hereunder:

(i) any default by Borrower in the observance or performance of any obligation, covenant, promise, condition or agreement under the Pledged Accounts beyond any applicable notice and cure period;

(ii) any default by Borrower in the observance or performance of any obligation, covenant, condition, and agreement contained in this Agreement;

(iii) any representation or warranty of Borrower herein which is not true and correct in any respect as of the date when made or repeated; or

(iv) the occurrence of any Event of Default (as defined in the Loan Agreement).

(c) That any Event of Default hereunder, as provided above, shall be deemed to be an Event of Default under all of the Loan Documents, including, without limitation, the Note and the Loan Agreement. Upon the occurrence of any Event of Default hereunder, Lender shall have the right (but not the obligation), without notice to or demand on Borrower: (i) to declare all amounts outstanding under the Note and all other sums evidenced or secured by the Loan Documents, to be immediately due and payable; (ii) to exercise any and all rights and remedies provided under the Loan Documents, or hereunder as well as such remedies as may be available at law or in equity; and (iii) to correct any such default in such manner and to such extent as Lender may deem necessary to protect the security hereof, including, without limitation, the right (but not the obligation) to appear in and defend any action or proceeding purporting to affect the security hereof or the rights or powers of Lender, and also the right (but not the obligation) to perform and discharge each and every obligation, covenant, condition and agreement of Borrower or Guarantor, and, in exercising any such powers, to pay necessary costs and expenses, employ counsel and incur and pay attorneys' fees and expenses. Lender shall not be obligated to perform or discharge, nor does it hereby undertake to perform or discharge, any obligation, duty or liability of Borrower or Guarantor under the Loan Documents by reason of this Agreement.

(d) That at any time after the occurrence of an Event of Default, Lender may exercise all rights and remedies available to it under the terms of this Agreement, which include the right to an immediate setoff of the funds on deposit in the referenced

Case 20-09234 Claim 3 Part 1 Filed 07/01/20 Entered 07/01/20 21:27:40 Desc Attachment 1 Pledge Agreement Document Page 5 of 12

Case 20-09234 Doc 1 Filed 05/08/20 Entered 05/04/20 21:27:40 Desc Main Document Page 88 of 95

Pledged Accounts to be applied against the Loan in accordance with the Loan Documents, the UCC as in effect in the State of Illinois or any other applicable State, or by statutory or decisional law of the State of Illinois or any other applicable State, at Lender's option unless otherwise required by applicable law.

(e)     That at any time after the occurrence of an Event of Default, Lender may, at its option, without notice, and without regard to the adequacy of security for the indebtedness hereby secured, either in person or by agent, with or without bringing any action or proceeding, or by a receiver to be appointed by a court at any time hereafter, enforce for its own benefit this Agreement or any of the Loan Documents against Borrower or Guarantor in Lender's sole and absolute discretion.

(f)     Upon and during the continuance of an Event of Default, Borrower does hereby irrevocably make, constitute, designate and appoint Lender (and any of its officers, employees or agents designated by Lender) as Borrower's true and lawful attorney-in-fact and agent, so that in the event of any Event of Default by Borrower such attorney-in-fact shall have full power and authority for and in the name of Borrower to execute or endorse any documents, supply any omitted information and correct any errors in any documents or instruments, or do any other things necessary to protect the interest of Lender in the Pledged Accounts, including, without limitation, arranging for the transfer of the Pledged Accounts to the name of Lender, or any purchaser from or nominee of Lender. Borrower does hereby ratify and confirm all that said attorney-in-fact may do or cause to be done in connection with any of the power or authority herein conferred, said power of attorney being coupled with an interest and not revocable by insolvency, bankruptcy, death, dissolution or otherwise. The exercise of any rights under this Agreement shall not be deemed to cure or waive any default under any of the Loan Documents, or waive, modify or affect any notice of default under any of the Loan Documents, or invalidate any act done pursuant to such notice.

(g)     That Lender, upon written notice from Lender to Borrower of the occurrence of an Event of Default, shall be, and hereby is, authorized by Borrower to exercise its rights and remedies hereunder for the benefit of Lender in accordance with the terms and conditions hereof and the other Loan Documents, without setoff or demand and without need or demand for any other waiver, release, agreement, notice or document by, from or to Borrower in evidence thereof or authority therefor.

(h)     That in the exercise of the powers herein granted to Lender, no liability shall be asserted or enforced against Lender, all such liability being hereby expressly waived and released by Borrower. Borrower hereby agrees to indemnify, defend and hold Lender free and harmless from and against any and all liability, expense, cost, loss or damage which Lender may incur by reason of any error, act or omission, or negligence or willful misconduct, of Borrower hereunder or by reason of this Agreement and of and from any and all claims and demands whatsoever which may be asserted against it by reason of any alleged obligations or undertakings on Lender's part to perform or discharge any of the terms, covenants or agreements contained herein or in any of the Loan Documents as a result thereof. Should Lender incur any liability, expense, cost, loss or damage (i) under this Agreement for which it is to be

indemnified by Borrower as aforesaid, (ii) by an Event of Default hereunder, or (iii) by reason of the exercise of Lender's rights hereunder (including but not limited to the exercise of the rights granted to Lender under Section 3(c) hereof), then the amount thereof, including, but not limited to, costs and expenses (including litigation costs and attorneys' fees and disbursements), damages, obligations and liabilities of any nature whatsoever, shall be added to the indebtedness evidenced by the Note and secured hereby and the other Loan Documents (regardless of whether such indebtedness, when aggregated with other sums secured thereby, then increases the outstanding balance of the Note to an amount in excess of the face amount thereof) and shall (iv) be due and payable immediately upon demand by Lender, and (v) bear interest at the Default Rate set forth in the Note or the Loan Agreement.

(i)     That this Agreement shall be assignable by Lender to any assignee of Lender and all representations, warranties, covenants, powers and rights herein contained shall be binding upon, and shall inure to the benefit of, Borrower and Lender and their respective legal representatives, successors and permitted assigns, including, in the case of Lender, all holders, from time to time, of the Note.

4.     <u>Additional Covenants, Representations</u>. Borrower further hereby covenants and represents to Lender that:

(a)     Borrower shall execute and deliver to Lender any documents, agreements, affidavits and instruments requested by Lender to secure Lender in the Pledged Accounts (or any other Collateral) or to effectuate the intents and purposes of this Agreement or any of the Loan Documents;

(b)     The Loan Documents are in full force and effect;

(c)     Borrower has not previously assigned, sold, pledged, transferred, conveyed, mortgaged, hypothecated or otherwise encumbered any of the Pledged Accounts, or its rights, title and interests therein, except as specifically provided in this Agreement to Lender, and shall not further do so;

(d)     Borrower has not performed and will not perform any act which might prevent Borrower from performing its undertakings hereunder or which might prevent Lender from operating under or enforcing any of the terms and conditions hereof or which would limit Lender in such operation or enforcement;

(e)     Borrower is not in default under the Loan Documents, and to the best knowledge of Borrower, no other party to the Loan Documents (other than Lender) is in default under the Loan Documents, and no event has occurred which with the passage of time or the giving of notice, or both, would constitute any such default;

(f)     Borrower has received no notice of any repudiation, rescission or revocation of the Loan Documents or any part thereof by any party thereto;

(g)     All necessary or appropriate consents to this Agreement have been obtained;

(h)     Borrower will observe and perform all of the obligations, covenants, promises, and agreements to be performed by Borrower hereunder and under the Loan Documents;

(i)     None of the following events have occurred: (i) the filing of a petition in bankruptcy, insolvency or reorganization, or for the appointment of a receiver or trustee, affecting Borrower or Guarantor (or any other parties to the Loan Documents other than Lender) or (ii) the making of an assignment by Borrower or Guarantor (or any other parties to the Loan Documents other than Lender) for the benefit of its respective creditors; and

(j)     Borrower hereby expressly waives: (i) any irregularity, invalidity or unenforceability of the Loan hereby secured; (ii) notice of the acceptance hereof by Lender; (iii) notice of the existence of the Loan; or (iv) presentment, demand for payment, protest, and notice of dishonor and of protest on the Loan.

A breach of any of the foregoing representations, warranties or covenants shall constitute an Event of Default under the Note and the Loan Agreement.

5.     Release of Security. This Agreement is made for collateral purposes only and the duties and obligations of Borrower under this Agreement shall terminate and be released, without recourse to or warranty by Lender, only when all amounts and sums due Lender under the Loan Documents are paid in full and all other Obligations are paid and satisfied, and performed and discharged, in full to Lender.

6.     Security Agreement. Borrower agrees:

(a)     (i) That this Agreement shall constitute a "Security Agreement" within the meaning of the Uniform Commercial Code (the "*UCC*") of any State (the "*State*") of filing and/or recording of this Agreement or any evidence thereof with respect to all of Borrower's right, title and interest, whether now existing or hereafter arising or acquired, in, to and under the Pledged Accounts, and all modifications, amendments, renewals, extensions, restatements, substitutions and replacements thereof and additions thereto and the proceeds thereof (collectively, the "*Collateral*"); (ii) that a security interest in and to the Collateral is hereby granted to Lender; and (iii) that all of Borrower's right, title and interest in, to and under the Collateral is hereby assigned to Lender to secure payment of the indebtedness evidenced by, and to secure performance by Borrower of the obligations, covenants, terms, conditions and agreements of, the Loan, the Note and the other Loan Documents.

(b)     If an Event of Default occurs hereunder, Lender, pursuant to the appropriate provisions of the UCC, shall have an option to proceed with respect to both the real property encumbered by the Mortgage as well as the Collateral in accordance with its rights, powers and remedies with respect to such real property, in which event the default provisions of the UCC shall not apply. The parties agree that if Lender shall elect to proceed with respect to the Collateral separately from such real property, Lender shall have all remedies available to a secured party under the UCC and ten (10)

Business Days' notice of the sale of the Collateral shall be notice, except as otherwise required by applicable law. The expenses of preparing for sale, selling and the like incurred by Lender shall include, without limitation, attorneys' fees, costs, expenses and disbursements incurred by Lender. Lender shall have the right to conduct such sales on Borrower's premises, without charge therefor. All public or private sales may be adjourned from time to time in accordance with applicable law. Lender shall have the right to sell, lease or otherwise dispose of such Collateral, or any part thereof, for cash, credit or any combination thereof, and Lender may purchase all or any part of such Collateral at public or, if permitted by law, private sale and, in lieu of actual payment of such purchase price, may set off the amount of such price against the Obligations. At any sale, the Lender may specifically disclaim any warranties including of title or the like. Lender may comply with any applicable state or federal law requirements in connection with a disposition of the Collateral and compliance will not be considered adversely to affect the commercial reasonableness of any sale or disposition of the Collateral.

(c) This Agreement shall be self-operative with respect to the security interest granted in the Collateral, but Borrower, upon request by Lender from time to time, agrees to execute, acknowledge and deliver to Lender a separate security agreement, financing statement or other similar security instruments, in form and content satisfactory to Lender, covering the Collateral, whenever in the sole opinion of Lender there may be any doubt as to whether the title to same has been conveyed by or security interest perfected by this Agreement under the laws of the applicable UCC, and will further execute, acknowledge and deliver or cause to be executed, acknowledged and delivered, any financing statement, affidavit, continuation statement or certificate or other document which Lender may request in order to perfect, preserve, maintain, continue and extend the security interest under and the priority of this Agreement and such security instrument. Borrower further agrees to pay to Lender on demand all costs and expenses incurred by Lender in connection with the preparation, execution, recording, filing and re-filing of any such document. To the extent permitted by the provisions of the UCC, now or hereafter in effect, Borrower hereby authorizes Lender, without the signature of Borrower, to execute and file any of the documents described in this Section if Lender shall determine that such are necessary or advisable in order to perfect Lender's security interest in the Collateral.

7. <u>Provisions under Loan Agreement</u>. The terms and conditions of the Loan Agreement, and all other covenants, obligations, liabilities and indemnities acknowledged, agreed to and/or provided by Borrower thereunder, are hereby made an integral part of this Agreement and are hereby incorporated by reference as if fully set forth herein, and Borrower hereby acknowledges and reaffirms all such covenants, obligations, liabilities and indemnities all of which are intended to supplement and be made a part of this Agreement as the context dictates.

8. <u>Entire Agreement</u>. This Agreement contains the entire agreement between the parties hereto. No additions or modifications of any term or provision shall be effective unless set forth in writing, signed by both parties hereto.

9. <u>Time of Essence</u>. Time is of the essence of this Agreement and of each and every term, condition, obligation and provision hereof.

10. <u>Notices</u>. All notices, demands, requests and other communications which are required or permitted to be given hereunder shall be in writing and shall be deemed sufficiently given when delivered or mailed in the manner set forth in the Loan Agreement.

11. <u>Captions</u>. The captions of this Agreement are for purposes of convenience only and are not intended to be a part of this Agreement and shall not be deemed to modify, explain, enlarge or restrict any of the provisions hereof.

12. <u>Governing Law; Jurisdiction; Venue; Remedies</u>. This Agreement shall be interpreted and construed as to both validity and performance and enforced in accordance with and governed by the terms and conditions of the Loan Agreement or other Loan Documents applicable thereto. To the extent permitted by applicable laws of the State of Illinois, Borrower waives any right or claim of right to cause a marshalling of the assets of Borrower. To the extent permitted by applicable laws of the State of Illinois, Borrower waives any right or claim of right to cause Lender to proceed against any of the security for the Loan before proceeding under this Agreement against Borrower.

13. <u>No Third Party Rights</u>. It is expressly intended, understood and agreed that this Agreement, and the other Loan Documents, are made and entered into for the sole protection and benefit of Lender, and their respective legal representatives, successors and assigns; that no other person shall have any right at any time to action hereon or rights to the proceeds of the Loan; that the Loan proceeds do not constitute a trust fund for the benefit of any third party; and that no third party shall under any circumstances be entitled to any equitable lien on any undisbursed Loan proceeds at any time; *provided, however*, it is specifically agreed by Borrower that Lender shall be a third party beneficiary under the Pledged Accounts.

14. <u>No Joint Venture</u>. The relationship between Lender and Borrower is solely that of a borrower and a lender, and nothing contained herein or in any of the Loan Documents shall in any manner be construed as making the parties hereto partners, joint venturers, or any other relationship other than borrower and lender.

15. <u>Severability</u>. The parties hereto intend and believe that each provision in this Agreement comports with all applicable local, state or federal laws and judicial decisions. However, if any provision or provisions, or if any portion of any provision or provisions, in this Agreement is found by a court of law to be in violation of any applicable local, state or federal ordinance, statute, law, administrative or judicial decision or public policy, and if such court should declare such portion, provision or provisions of this Agreement to be illegal, invalid, unlawful, void or unenforceable as written, then it is the intent of the parties hereto that such portion, provision or provisions shall be given force to the fullest possible extent that they are legal, valid and enforceable, that the remainder of this Agreement shall be construed as if such illegal, invalid, unlawful, void or unenforceable portion, provision or provisions were not contained therein and that the rights, obligations and interests of the parties hereto under the remainder of this Agreement shall continue in full force and effect.

16.    <u>Rights and Remedies Cumulative; Non-Waiver</u>. The rights and remedies herein provided are cumulative and not exclusive of any rights or remedies which Lender has under the Note, the Mortgage, the Loan Agreement or the other Loan Documents, or any other document, instrument or agreement, or would otherwise have at law or in equity. No course of dealing between Borrower and Lender or any failure or delay on the part of Lender in exercising any rights or remedies hereunder shall operate as a waiver of any rights or remedies of Lender and no single or partial exercise of any rights or remedies hereunder shall operate as a waiver or preclude the exercise of any other rights or remedies hereunder.

17.    <u>No Waiver</u>. Waiver of or acquiescence by Lender in any default by Borrower or any Guarantor, or failure of Lender to insist upon strict performance by Borrower or any Guarantor of any warranties, agreements or other obligations contained in this Agreement or under the Loan Documents, shall not constitute a waiver of any subsequent or other default, failure or waiver of strict performance, whether similar or dissimilar.

18.    <u>Costs of Enforcement</u>. In the event that Lender shall retain or engage an attorney or attorneys or other parties to collect or enforce or protect its rights or interests with respect to this Agreement or any instrument or document delivered pursuant to this Agreement or any Collateral, including the representation of Lender in connection with any bankruptcy, reorganization, receivership or any other action affecting creditor's rights, and regardless of whether a suit or action is commenced, Borrower shall pay all of the costs and expenses of such collection, enforcement or protection, including attorneys' fees, and Lender may take judgment for all such amounts.

19.    <u>Fees and Expenses</u>. Borrower shall pay all out-of-pocket costs and expenses, including attorneys' fees and expenses, incurred by Lender in connection with the preparation of this Agreement and any document or instrument delivered pursuant to or in connection with this Agreement and all related documentation, recording or filing fees. Borrower shall also pay all like costs and expenses incurred by Lender in connection with any amendments, waivers, renewals or modifications of or made pursuant to this Agreement or any document or instrument delivered pursuant to or in connection with this Agreement and all other related documentation.

20.    <u>Modifications</u>. No modification of any provision of this Agreement, no approvals required from Lender and no consent by Lender to any departure therefrom by Borrower shall be effective unless such modification, approval or consent shall be in writing and signed by a duly authorized officer of Lender, and the same shall then be effective only for the period and on the conditions and for the specific instances and purposes specified in such writing. No notice to or demand on Borrower in any case shall entitle Borrower to any other or further notice or demand in similar or other circumstances.

21.    <u>Reinstatement of Obligations</u>. Borrower expressly agrees that to the extent a payment or payments to Lender, or any part thereof, are subsequently invalidated, declared to be void or voidable, set aside and are required to be repaid to a trustee, custodian, receiver or any other party under any bankruptcy act, state or federal law, common law or equitable cause, then to the extent of such payment or repayment, the obligation or part thereof intended to be

satisfied and any collateral given therefore including this Agreement shall be revived and continued in full force and effect as if said payment had not been made.

22. <u>Number; Gender; Successors; Assignment; Participation</u>. The provisions applicable thereto shall be as set forth in, and pursuant to the terms and conditions of, the Loan Agreement.

**23.** <u>**WAIVER OF JURY TRIAL**</u>**. TO THE FULLEST EXTENT PERMITTED BY LAW, AND AS SEPARATELY BARGAINED-FOR CONSIDERATION TO LENDER, BORROWER HEREBY WAIVES ANY RIGHT TO A TRIAL BY JURY (WHICH LENDER ALSO WAIVES) IN ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHTS UNDER THIS AGREEMENT OR ANY OF THE LOAN DOCUMENTS OR RELATING THERETO OR ARISING FROM THE LENDING RELATIONSHIP WHICH IS THE SUBJECT OF THIS AGREEMENT AND AGREES THAT ANY SUCH ACTION OR PROCEEDING SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY.**

24. <u>Definitions</u>. Capitalized terms used and not defined herein shall have the meanings given to them in the Loan Agreement. Should any of the covenants, terms or conditions in this Agreement conflict with those in the Loan Agreement, then the covenants, terms and conditions in the Loan Agreement shall prevail.

25. <u>Duplicate Originals; Counterparts</u>. This Agreement may be executed in any number of duplicate originals and each duplicate original shall be deemed to be an original. This Agreement may be executed in several counterparts, each of which counterparts shall be deemed an original instrument and all of which together shall constitute a single Agreement. The failure of any party hereto to execute this Agreement, or any counterpart hereof, shall not relieve the other signatories from their obligations hereunder.

{The remainder of this page is intentionally left blank; signature page follows}

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the day and year first above written.

BORROWER:

NORTHWEST CAPITAL HOLDINGS, LLC,
an Illinois limited liability company

By: _Edward J. Streit_____

      Edward J. Streit
Title:  Manager

LENDER:

MIDLAND STATES BANK,
an Illinois state chartered bank

By: _____

      Harry R. McSteen
Title:  Commercial Relationship Manager